IN THE CIRCUIT COURT OF THE 9TH JUDICIAL CIRCUIT IN AND FOR ORANGE COUNTY, FLORIDA

CIRCUIT CIVIL DIVISION

CASE NO.: _____

434 N. ORANGE INVESTMENT, LLC,

Plaintiff,

v.

LEONARD WANGER and PHILIP KAPLAN,

Defendants.

_____/

## COMPLAINT

Plaintiff, 434 N. ORANGE INVESTMENT, LLC ("**Landlord**" or "**Plaintiff**"), hereby sues Defendants, LEONARD WANGER ("**Wanger**") and PHILIP KAPLAN ("**Kaplan**" and together with Wanger, "**Guarantors**"), and alleges as follows:

### NATURE OF THE ACTION

1.      This is an action by Landlord against Guarantors pursuant to a guaranty agreement for a lease regarding commercial real property located at 410 N. Orange Ave., Orlando, FL 32801 (the "**Property**").

### PARTIES, JURISDICTION, AND VENUE

2.      This is an action for eviction and damages in excess of $50,000, exclusive of interest, costs, and attorneys' fees.

3.      Landlord is a Delaware limited liability company with its principal place of business in Miami-Dade County, Florida.

4.      Wanger is an individual that, upon information and belief, resides in Cook County, Illinois.

5.      Kaplan is an individual that, upon information and belief, resides in San Francisco, California.

6.      Jurisdiction and venue are proper in this Court as (i) the acts and/or omissions complained of took place within Orange County, Florida, (ii) the guaranty agreement between the parties designates venue in Orange County, Florida, and (iii) the real property which is the subject of this action is located in Orange County, Florida.

## GENERAL ALLEGATIONS

### A.      The Lease and Guaranty

7.      Landlord has at all relevant times owned the Property.

8.      On April 28, 2023, Landlord and Velocity Esports Orlando Downtown, LLC ("**Tenant**") entered into that certain Retail Lease Agreement dated April 28, 2023, which was later amended (the "**Lease**"), regarding certain space within the Property. A copy of the Lease, as amended, is attached as Composite Exhibit 1.

9.      In exchange for possession of certain premises within the Property (Ex. 1 at Exhibit F), the Lease required that Tenant pay certain base rent and other amounts to Landlord totaling many millions of dollars over a ten and a half (10.5) year term. *Id.* at ¶¶ 6-8, First Amendment to Lease Agreement.

10.     Wanger and Kaplan agreed to serve as "guarantors" for the Lease, along with an affiliate of tenant, Velocity Esports, Inc. (the "**Corporate Guarantor**"). *Id.* at ¶ 13.

11.     Landlord and Guarantors entered into that certain Guaranty of Lease dated April 28, 2023 (the "**Guaranty**"). A copy of the Guaranty is attached as Exhibit 2.

KLUGER, KAPLAN, SILVERMAN, KATZEN & LEVINE, P.L. • CITIGROUP CENTER, 27TH FLOOR, 201 SO. BISCAYNE BLVD., MIAMI, FL 33131

12. The Guaranty states that Guarantors "hereby unconditionally guarantee the full and prompt payment of all rental amounts and other sums required to be paid by Tenant under the Lease (individually, a 'Guaranteed Payment', and collectively, the 'Guaranteed Payments') ...." limited to $400,000.00, plus attorneys' fees and costs in enforcing the Guaranty. Ex. 2 at p. 1, ¶ 10 (emphasis added).

13. Guarantors' liability under the Guaranty is not impacted by Tenant's potential bankruptcy filing. *Id.* at ¶ 2(b) ("The liability of the undersigned Guarantor under this Guaranty .... shall not be impaired, modified, changed, released, or limited in any manner whatsoever by any impairment, modification, change, release, or limitation of the liability of Tenant or its estate in bankruptcy, or of any remedy for the enforcement thereof, resulting from the operation of any present or future provisions of the United States Bankruptcy Code or any similar law or statute of the United States or any State thereof ...." (emphasis added)).

14. The Guaranty does <u>not</u> require Landlord to pursue Tenant or Corporate Guarantor *prior* to pursuing Guarantors under the Guaranty in the event that Corporate Guarantor is insolvent, bankrupt, and "has indicated to Landlord an inability to pay its debts as they come due", and/or if Landlord "reasonably believes, in good faith, that the Corporate Guarantor does not have the financial means to satisfy any judgment sought to be obtained for the guaranteed obligations", as follows:

> The undersigned further agrees that Landlord shall not be first required to enforce against Tenant or any other person any liability, obligation or duty guaranteed hereby before seeking enforcement thereof against the undersigned. Suit may be brought and maintained against the undersigned by Landlord to enforce any liability, obligation or duty guaranteed hereby without joinder of Tenant or any other person. Notwithstanding the foregoing or anything to the contrary set forth herein, Landlord agrees that the liability of the Corporate Guarantor under the Corporate Guaranty (as such capitalized terms are defined in the Lease) shall be primary and the

liability of the undersigned personal Guarantors under this Guaranty shall be secondary to the liability of the Corporate Guarantor under said Corporate Guaranty. In furtherance of the foregoing, Landlord agrees to first make a good faith effort to collect any outstanding obligations secured by the Corporate Guaranty from the Corporate Guarantor before causing the undersigned personal Guarantors to cover such obligations pursuant to this Guaranty; provided, however, that if the Corporate Guarantor, as of such time of potential enforcement of the Corporate Guaranty or at any time thereafter (i) is bankrupt or insolvent, (ii) has suffered the appointment of or possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator (or other similar official) of any substantial part of such Corporate Guarantor's assets, (iii) has made an assignment for the benefit of its creditor(s), (iv) has indicated to Landlord an inability to pay its debts as they come due, (v) is challenging or threatening to challenge the validity of the Corporate Guaranty or raising defenses to the enforcement thereof or (vi) if Landlord reasonably believes, in good faith, that the Corporate Guarantor does not have the financial means to satisfy any judgment sought to be obtained for the guaranteed obligations, then Landlord shall have the right, without pursuit or further pursuit (as applicable) of the Corporate Guarantor, to instead pursue the undersigned personal Guarantors under this Guaranty for such outstanding obligations.

*Id.* at ¶ 8 (emphasis added).

15.     The Guaranty states that "[t]his Guaranty shall be continuing, absolute and unconditional and shall remain in full force and effect until all Guaranteed Payments are made, all Guaranteed Obligations are performed and all obligations of the undersigned Guarantor under this Guaranty are fulfilled." *Id.* at ¶ 9.

16.     The Guaranty also requires that Guarantors provide certain critical financial and other information to Landlord, as follows:

The undersigned agrees that, within ten (10) days after a request from Landlord (but not more than once per calendar year, unless in connection with an uncured Tenant default, a proposed sale or refinance of the Building in whole or in part), the undersigned shall deliver to Landlord such financial statements as are reasonably required by Landlord to verify the net worth of the undersigned. The undersigned further agrees that, within five (5) days after a request from Landlord, the undersigned shall deliver to Landlord a

4

statement certifying to the undersigned's address and the undersigned's driver license number and/or social security number, federal employer identification number or tax identification number, as applicable.

*Id.* at ¶ 7 (emphasis added).

### B.    The Lease Termination Agreement

17.    On December 2, 2024, Landlord, Tenant, and Guarantors entered into that certain Lease Termination and Surrender Agreement (the "**Termination Agreement**"). A copy of the Termination Agreement is attached as Exhibit 3.

18.    In the Termination Agreement, Landlord and Tenant agreed to *conditionally* terminate the Lease so long as Tenant paid Landlord certain amounts specified therein and Landlord agreed not to elect to rescind the Termination Agreement. Ex. 3 at ¶ 4.

19.    The parties agreed that the Termination Agreement could be rescinded at Landlord's election in the event that Tenant breached the agreement, as follows:

> If either (x) the Termination Conditions are not satisfied by the applicable Termination Condition Deadline, as confirmed by Landlord, (y) this Agreement has not been fully-executed and delivered by all parties hereto by December 4, 2024, or (z) Tenant otherwise fails to abide by its obligations under this Agreement (including without limitation Tenant's obligation to timely and fully pay the all amounts owed pursuant to Section 4 hereof, subject to the grace period set forth in Section 4(c)), time being of the essence in each instance, then Landlord may elect, in its sole discretion, upon written notice to Tenant, to rescind and cancel this Agreement, in which case (i) this Agreement shall be null and void (except for the terms of this paragraph which shall survive such rescission and cancellation) and (ii) Landlord shall be entitled to immediately, and, without further notice, demand repayment of all Rent (e.g., Base Rent and Additional Rent) owed under the Lease, and pursue all remedies set forth in the Lease for an event of default by Tenant thereunder (including, without limitation, the remedy of acceleration).

*Id.* at ¶ 14(a) (emphasis added).

KLUGER, KAPLAN, SILVERMAN, KATZEN & LEVINE, P.L.• CITIGROUP CENTER, 27TH FLOOR, 201 SO. BISCAYNE BLVD., MIAMI, FL 33131

C. **Landlord Rescinded the Termination Agreement Following Tenant's Breach**

20.    By mid-December 2024, Tenant failed to timely pay Landlord the amounts required under the Termination Agreement.

21.    On February 6, 2025, counsel for Tenant and Corporate Guarantor further advised Landlord, in writing, that Tenant and Corporate Guarantor intended to pursue bankruptcy protection. A copy of the February 6, 2025 correspondence is attached as Exhibit 4.

22.    On February 14, 2025, given Tenant's material breach of the Termination Agreement and other developments, Landlord responded to the February 6 correspondence and advised Tenant that the Lease would not be terminated, Landlord did not release Tenant and Guarantors, and that Landlord had elected to rescind the Termination Agreement, as follows:

> Given Former Tenant's breaches of the Termination Agreement, the Retail Lease Agreement dated April 28, 2023, as amended by that certain First Amendment to Lease Agreement, dated February 8, 2024 (the "Lease"), has not been terminated and Landlord's conditional release in favor Former Tenant and Guarantors set forth in the Termination Agreement is not effective. *Id.* at ¶ 7(b) ("For the avoidance of doubt, if Tenant fails to timely (including the grace period set forth in Section 4(c)) satisfy the Termination Conditions set forth in Section 3 above by the applicable Termination Condition Deadline, then this release of Tenant and the undersigned Guarantors from any Lease Related Claims shall be null and void and of no further force and effect"). This correspondence serves as notice that Landlord has elected to rescind and cancel the Termination Agreement. *Id.* at ¶ 14(a)-(b).

*See* Landlord's February 14, 2025 correspondence, attached as Exhibit 5, at pp. 1-2.

23.    Landlord also advised that it intended to pursue claims and damages against Guarantors. Ex. 5 at p. 2 ("Separate and apart from Landlord's rights against Former Tenant under the Lease and the bankruptcy code, Landlord intends to pursue its rights against Wanger and Kaplan, as guarantors, to collect all amounts owed to Landlord under the Lease").

KLUGER, KAPLAN, SILVERMAN, KATZEN & LEVINE, P.L. • CITIGROUP CENTER, 27TH FLOOR, 201 SO. BISCAYNE BLVD., MIAMI, FL 33131

**D.**     **Landlord Demands Payment from Guarantors under the Guaranty**

24.     On March 7, 2025, Landlord sent written notice to Guarantors pursuant to the Guaranty, which notice was accepted by counsel for Tenant and Corporate Guarantor on behalf of Guarantors, stating as follows:

> Further, given that Corporate Guarantor is insolvent, bankrupt, and "has indicated to Landlord an inability to pay its debts as they come due", Landlord "reasonably believes, in good faith, that the Corporate Guarantor does not have the financial means to satisfy any judgment sought to be obtained for the guaranteed obligations". Each of those reasons standing alone entitles Landlord to pursue claims against Guarantors without pursuing Corporate Guarantor further.
>
> Landlord's damages from Tenant's breach of the Lease are extensive, inclusive of all rent owed during the remaining term of the Lease, plus attorneys' fees and costs. Landlord hereby demands full and prompt payment of a total of $400,000.00 from Guarantors, in full satisfaction of their obligation under the Guaranty, within ten (10) days or by March 17, 2025.
>
> In accordance with paragraph 7 of the Guaranty, Landlord also hereby demands that each Guarantor timely deliver to Landlord (i) current financial statements sufficient to verify the net worth of each Guarantor, and (ii) statements certifying to each Guarantor's address and driver license number, and social security number.

*See* Landlord's March 7, 2025 correspondence (emphasis added), attached as Exhibit 6,

25.     Guarantors did not provide any of the requested information or make payment.

26.     All conditions precedent to this action have occurred, been performed, or otherwise satisfied by Landlord, or have been waived or excused by the actions or inactions of Guarantors.

27.     Landlord has retained counsel to represent Landlord in this action and is obligated to pay counsel reasonable attorneys' fees and costs for their services.

KLUGER, KAPLAN, SILVERMAN, KATZEN & LEVINE, P.L. • CITIGROUP CENTER, 27TH FLOOR, 201 SO. BISCAYNE BLVD., MIAMI, FL 33131

## COUNT I
## <u>BREACH OF CONTRACT</u>

28. Landlord realleges and incorporates the allegations set forth in Paragraphs 1-27 as if fully set forth herein.

29. Landlord has a valid and binding contract with Guarantors. Ex. 2.

30. The Guaranty is supported by valid consideration. *Id.*

31. Guarantors are liable for all damages suffered by Landlord relating to the Lease up to a limitation of $400,000.00. *Id.*

32. Guarantors materially breached the Guaranty.

33. As a proximate result of Guarantors' material breaches of the Guaranty, Landlord has and continues to suffer substantial damages.

WHEREFORE, Plaintiff, 434 N. ORANGE INVESTMENT, LLC, demands judgment against Defendants, LEONARD WANGER and PHILIP KAPLAN, for damages, interest, costs, attorneys' fees in accordance with the Guaranty, and for such further relief in favor of Landlord as the Court deems just and proper.

[remainder of page left blank]

KLUGER, KAPLAN, SILVERMAN, KATZEN & LEVINE, P.L. • CITIGROUP CENTER, 27TH FLOOR, 201 SO. BISCAYNE BLVD., MIAMI, FL 33131

Respectfully submitted,

**KLUGER, KAPLAN, SILVERMAN,
KATZEN & LEVINE, P.L.**
*Counsel for Plaintiff, 434 N. Orange
Investment, LLC*
Citigroup Center, 27th Floor
201 South Biscayne Blvd.
Miami, Florida 33131
Telephone:  (305) 379-9000
Facsimile:   (305) 379-3428

By:  /s/ Josh M. Rubens
　　　Josh M. Rubens, Esq.
　　　Fla. Bar No. 77603
　　　jrubens@klugerkaplan.com

KLUGER, KAPLAN, SILVERMAN, KATZEN & LEVINE, P.L. • CITIGROUP CENTER, 27TH FLOOR, 201 SO. BISCAYNE BLVD., MIAMI, FL 33131

# EXHIBIT 1

**RETAIL LEASE AGREEMENT**

by and between

**434 N. ORANGE INVESTMENT, LLC,**
a Delaware limited liability company

(Landlord)

And

**VELOCITY ESPORTS ORLANDO DOWNTOWN, LLC,**
a Florida limited liability company

(Tenant)

Dated: April __28_, 2023 (**"Effective Date"**)

@ Society Orlando

410 N. Orange Ave., Orlando, FL 32801

Execution Copy

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| ARTICLE 1 — LEASED PREMISES AND IMPROVEMENTS TO THE LEASED PREMISES | | 1 |
| Section 1.1 | LEASED PREMISES | 1 |
| Section 1.2 | IMPROVEMENTS TO LEASED PREMISES | 2 |
| ARTICLE 2 — LEASE TERM | | 2 |
| Section 2.1 | COMMENCEMENT OF THE TERM | 2 |
| Section 2.2 | NOTICE OF DELIVERY AND ACCEPTANCE | 3 |
| Section 2.3 | HOLDING OVER | 3 |
| Section 2.4 | SURRENDER | 3 |
| Section 2.5 | REMOVAL OF TENANT PROPERTY BY TENANT | 4 |
| ARTICLE 3 —USE | | 4 |
| Section 3.1 | USE | 4 |
| Section 3.2 | QUIET ENJOYMENT | 4 |
| Section 3.3 | ALCOHOL SPECIFIC PROVISIONS | 4 |
| Section 3.4 | TENANT'S CONTINUOUS OPERATIONS | 6 |
| Section 3.5 | TENANT'S EXCLUSIVE | 6 |
| Section 3.6 | RADIUS RESTRICTION | 7 |
| ARTICLE 4 — RENT | | 7 |
| Section 4.1 | BASE RENT | 7 |
| Section 4.2 | ADDITIONAL RENT | 8 |
| Section 4.3 | ESTIMATE OF CERTAIN ADDITIONAL RENT | 8 |
| Section 4.4 | PAYMENT OF TAXES | 11 |
| Section 4.5 | INSURANCE | 11 |
| Section 4.6 | GROSSING UP OF OPEX | 11 |
| Section 4.7 | SECURITY DEPOSIT; LOC | 12 |
| Section 4.8 | PERSONAL PROPERTY TAXES | 13 |
| Section 4.9 | TRIPLE NET LEASE | 13 |
| Section 4.10 | COST POOLS | 13 |
| Section 4.11 | ANNUAL FINANCING STATEMENTS | 13 |
| ARTICLE 5 — OPERATIONS | | 13 |
| Section 5.1 | COMMON AREAS AND PARKING | 13 |
| Section 5.2 | RULES AND REGULATIONS | 14 |
| Section 5.3 | SIGNS | 14 |
| Section 5.4 | TRASH REMOVAL | 14 |
| Section 5.5 | GOVERNMENTAL REQUIREMENTS | 15 |
| Section 5.6 | NOISE AND ODORS | 15 |

i

Execution Copy

| | | |
|---|---|---|
| ARTICLE 6 — MAINTENANCE, REPAIRS AND ALTERATIONS | | 16 |
| Section 6.1 | MAINTENANCE AND REPAIRS | 16 |
| Section 6.2 | STORM SHUTTERS | 18 |
| Section 6.3 | ALTERATIONS TO BUILDING AND COMMON AREAS | 18 |
| ARTICLE 7 — UTILITIES | | 18 |
| Section 7.1 | UTILITIES | 18 |
| Section 7.2 | SERVICES | 18 |
| ARTICLE 8 — INSURANCE AND INDEMNITY | | 20 |
| Section 8.1 | INSURANCE COVERAGE | 20 |
| Section 8.2 | INDEMNIFICATION AGAINST LIENS | 21 |
| ARTICLE 9 — SUBORDINATION, ATTORNMENT AND SECURITY INTEREST | | 23 |
| Section 9.1 | SUBORDINATION OF LEASE | 23 |
| Section 9.2 | ATTORNMENT | 24 |
| Section 9.3 | SECURITY INTEREST | 24 |
| ARTICLE 10 — ASSIGNMENT AND SUBLETTING | | 25 |
| Section 10.1 | ASSIGNMENT OR SUBLETTING | 25 |
| ARTICLE 11 — DAMAGE OR DESTRUCTION | | 27 |
| Section 11.1 | DAMAGE OR DESTRUCTION | 27 |
| Section 11.2 | OPTION TO TERMINATE LEASE | 28 |
| Section 11.3 | WAIVER | 28 |
| ARTICLE 12 — EMINENT DOMAIN | | 28 |
| Section 12.1 | EMINENT DOMAIN | 29 |
| ARTICLE 13 — DEFAULT | | 29 |
| Section 13.1 | TENANT DEFAULT | 29 |
| Section 13.2 | LANDLORD'S REMEDIES UPON EVENT OF DEFAULT | 30 |
| Section 13.3 | SPECIAL BANKRUPTCY PROVISIONS | 31 |
| Section 13.4 | WAIVER OF DEFAULT | 32 |
| Section 13.5 | LANDLORD SELF-HELP | 32 |
| Section 13.6 | NON-PERFORMANCE BY LANDLORD | 32 |
| Section 13.7 | RIGHT OF ENTRY | 33 |
| ARTICLE 14 — NOTICES | | 33 |
| Section 14.1 | NOTICE | 33 |
| ARTICLE 15 — MISCELLANEOUS | | 33 |
| Section 15.1 | MISCELLANEOUS | 33 |
| Section 15.2 | ESTOPPEL STATEMENT | 34 |
| Section 15.3 | TRIAL BY JURY | 34 |
| Section 15.4 | INVALIDITY OF PROVISION | 34 |

| Section 15.5 | GOVERNING LAW | 34 |
|---|---|---|
| Section 15.6 | TIME OF ESSENCE | 34 |
| Section 15.7 | COUNTERPARTS | 35 |
| Section 15.8 | NO RECORDING | 35 |
| Section 15.9 | LIABILITY OF CO-TENANTS | 35 |
| Section 15.10 | AUTHORITY | 35 |
| Section 15.11 | BROKERAGE | 35 |
| Section 15.12 | RADON | 35 |
| Section 15.13 | ENTIRE AGREEMENT | 35 |
| Section 15.14 | GUARANTY | 36 |
| Section 15.15 | ENVIRONMENTAL HAZARDS | 36 |
| Section 15.16 | EXCULPATION | 38 |
| Section 15.17 | FORCE MAJEURE | 38 |
| Section 15.18 | CONCURRENCY FEES AND IMPACT FEES | 38 |
| Section 15.19 | MOLD, MILDEW AND FUNGUS | 38 |
| Section 15.20 | NO AIR RIGHTS | 39 |
| Section 15.21 | BUSINESS DAY | 39 |
| Section 15.22 | ATTORNEY FEES | 39 |
| Section 15.23 | Waiver of Jury Trial | 39 |
| Section 15.24 | Confidentiality | 40 |
| Section 15.25 | USA PATRIOT ACT | 40 |

**EXHIBIT LIST:**[1]

| EXHIBIT A: | RULES AND REGULATIONS |
|---|---|
| EXHIBIT B: | RESTAURANT PROVISIONS |
| EXHIBIT C: | NOTICE OF DELIVERY AND ACCEPTANCE |
| EXHIBIT D: | OPTION TO RENEW |
| EXHIBIT E: | LANDLORD WORK LETTER |
| EXHIBIT E-1: | TENANT WORK LETTER |
| EXHIBIT F: | LEGAL DESCRIPTION AND SITE PLAN |
| EXHIBIT G: | EXCLUSIVE USES AND PROHIBITED USES |
| EXHIBIT H: | INSURANCE REQUIREMENTS |
| EXHIBIT I-1: | CORPORATE GUARANTY |
| EXHIBIT I-2: | PERSONAL GUARANTY |

---

[1] All documents, schedules and exhibits attached to this Lease shall be deemed incorporated into this Lease by reference and shall be deemed a part hereof to the same extent as if expressly set forth herein.

Execution Copy                                                iii

## RETAIL LEASE AGREEMENT

## BASIC LEASE INFORMATION SUMMARY

Certain of the information relating to the Lease, including many of the principal economic terms, are set forth in the foregoing Basic Lease Information Summary. The Basic Lease Information Summary ("**BLI Summary**") and the Retail Lease Agreement ("**Lease**") are, by this reference, hereby incorporated into one another.

1.    **LANDLORD:** 434 N. ORANGE INVESTMENT, LLC, a Delaware limited liability company (the "**Landlord**"), whose notice address for purposes hereof is as follows:

> 434 N. Orange Investment, LLC
> 398 NE 5th Street, 13th Floor
> Miami, Florida 33132
> Attn: Lowell Plotkin
> Email: lplotkin@propertymg.com

2.    **TENANT:** VELOCITY ESPORTS ORLANDO DOWNTOWN, LLC, a Florida limited liability company (the "**Tenant**"), whose notice address for purposes hereof is as follows:

> Velocity Esports Orlando Downtown, LLC
> 3838 N Kenneth Ave
> Chicago, IL 60641
> Attn: Len Wanger
> Email: Len.Wanger@velocityesports.com

3.    **LEASED PREMISES:** That certain retail premises with approximately **14,788** square feet of rentable area ("**Leased Premises**") as shown on the site plan attached as **Exhibit "F"** hereto, which Leased Premises shall be located in the building commonly known as "Society Orlando" located at 410 N. Orange Ave., Orlando, FL 32801 (which building, together with all ancillary improvements appurtenant thereto, is herein collectively referred to as the "**Building**"). All references to "rentable area" shall mean the square footage of the Leased Premises measured at floor level from the midpoint of all demising walls (or, if not applicable, such other appropriate boundary designated by Landlord) to the exterior surface of all exterior walls and exterior glass (or, if not applicable, such other appropriate boundary designated by Landlord) separating the Leased Premises from the Common Areas (as hereinafter defined). There shall be no deduction for columns, stairs, elevators, chases, ducts, shafts, or other interior construction or equipment.

4.    **DATES:**

(a) "**Effective Date**" shall mean the latest date accompanying a signature by Landlord or Tenant. This Lease shall become fully effective and binding upon the Effective Date. Tenant's obligation to pay Base Rent and all Additional Rent shall commence on the Rent Commencement Date unless otherwise specifically provided in this Lease.

(b) "**Delivery Date**" means the date Landlord is ready to tender possession of the Leased Premises to Tenant in its "AS-IS" condition, with those leasehold improvements designated as "Landlord's Work" on **Exhibit "E"** attached hereto substantially completed. Notwithstanding anything herein to the contrary: (i) if Tenant has not completed the requirements for taking possession of the Leased Premises by the Delivery Date (including but not limited to providing the

Execution Copy

required insurance certificate and/or any security deposit), such delay by Tenant shall equally delay the physical turnover of the Leased Premises, but shall not delay the Delivery Date, the Commencement Date, or the Rent Commencement Date (which shall be deemed to have occurred on the date that Landlord was otherwise ready to turn over the Leased Premises to Tenant); and (ii) if Landlord is delayed in completing the Landlord's Work as a result of Tenant Delay(s), then the Delivery Date shall be deemed to be the date that Landlord reasonably estimates that it would have substantially completed Landlord's Work but for such Tenant Delay(s).  As used herein, **"Tenant Delay(s)"** shall mean the following:

(i)    the failure of Tenant to timely furnish or approve all or any plans, drawings, specifications, finish details or the other information required under this Lease or any exhibits attached hereto;

(ii)    the failure of Tenant to promptly provide its consent when required in connection with the completion of Landlord's Work (if applicable and as hereinafter defined);

(iii)    Tenant's request for special work or materials, finishes, or installations other than a expressly set forth herein that causes a delay in the completion of Landlord's Work; or

(iv)    any other act or omission of Tenant, or anyone performing any work on behalf of Tenant that causes a delay in the completion of Landlord's Work.

(c) **"Commencement Date"** means the Effective Date.

(e) **"Rent Commencement Date"** means the earlier of (i) One hundred eighty (180) days after the Delivery Date or (ii) that date of Tenant's opening to the public for business from the Leased Premises.

(f) **"Outside Delivery Date"** means December 31, 2023 (subject to extension for Tenant Delay(s) and events of Force Majeure).  If the Delivery Date has not occurred on or before the Outside Delivery Date (as subject to extension for Tenant Delay(s) and events of Force Majeure), then, as Tenant's sole remedy, Tenant shall be entitled to a day for day abatement of Rent which shall begin accruing on January 1, 2024 and continue to accrue until the  Delivery Date has occurred; provided, however, that if the Delivery Date has not occurred by April 30, 2024 (which deadline shall be subject to extension for Tenant Delay(s) and events of Force Majeure), then either Landlord or Tenant may, at either party's option as their sole and exclusive remedy, elect by written notice to the other party delivered prior to the occurrence of the actual Delivery Date to terminate this Lease, in which event this Lease shall terminate and the parties shall be discharged from all further obligations accruing hereunder.

5.    **LEASE TERM:**

(a) **Initial Term**: The period beginning on the Commencement Date described above, and expiring on the date which is one hundred twenty six (126) full calendar months after the Rent Commencement Date (including any partial month in which the first Lease Year begins).

(b) **Renewal Term**: Two (2) options to renew for five (5) Lease Years each (as hereinafter defined) (each a **"Renewal Term"**).  [See **Exhibit "D"**.]  The Initial Term, as extended by the Renewal Term(s), if applicable, shall be referred to hereinafter as the **"Lease Term"**.

2

Execution Copy

6.      **BASE RENT:** Commencing on the Rent Commencement Date, Tenant shall commence making payments of Base Rent at a rate of Twenty-Nine and No/100 Dollars ($29.00) per rentable square foot for the first full twelve (12) month period (which may include any partial month in which the Rent Commencement Date occurs), with increases as set forth below (subject to the 50% Base Rent abatement shown below during the first 6 months of the first Lease Year):

| LEASE TERM | ANNUAL BASE RENT PER SQUARE FOOT | ANNUALIZED BASE RENT | MONTHLY BASE RENT** |
|---|---|---|---|
| Lease Year 1* (Months 1-6) | $14.50 | $214,426.00 | $17,868.83 |
| Lease Year 1* (Months 7-12) | $29.00 | $428,852.00 | $35,737.67 |
| Lease Year 2 | $29.87 | $441,717.56 | $36,809.80 |
| Lease Year 3 | $30.77 | $454,969.09 | $37,914.09 |
| Lease Year 4 | $31.69 | $468,618.16 | $39,051.51 |
| Lease Year 5 | $32.64 | $482,676.70 | $40,223.06 |
| Lease Year 6 | $33.62 | $497,157.01 | $41,429.75 |
| Lease Year 7 | $34.63 | $512,071.72 | $42,672.64 |
| Lease Year 8 | $35.67 | $527,433.87 | $43,952.82 |
| Lease Year 9 | $36.74 | $543,256.88 | $45,271.41 |
| Lease Year 10 | $37.84 | $559,554.59 | $46,629.55 |
| Lease Year 11*** | $38.97 | $576,341.23 | $48,028.44 |

*During *Months 1 to 6 of the First Lease Year, as shown above, Tenant shall only be required to pay partially (i.e., 50%) abated Base Rent in the amount of $17,868.83 (plus all sales tax thereon); provided, however, that if the Rent Commencement Period occurs on a day other than the first day of a calendar month, then the partially abated Base Rent shall apply for that month as well as the initial six (6) full months of Lease Year 1.  During this six (6) month period during which Tenant is only required to pay partially (i.e., 50%) abated Base Rent, Tenant shall be required to pay full (i.e., 100%) unabated Additional Rent hereunder.*
**\*\*Base Rent amounts exclude sales tax, which shall be paid by Tenant thereon in accordance herewith.*
*\*\*\*Lease Year 11 shall only include months 121-126 of the Lease Term (i.e., 6 months)*

7.      **TENANT'S PROPORTIONATE SHARE:** The percentage which the rentable square feet of the Leased Premises bears to the rentable square feet contained in the retail portion of the Building ("**Tenant's Proportionate Share**"); Tenant's Proportionate Share is estimated to be **43.29%**. For purposes hereof, the "**retail portion of the building**" shall mean and refer to that certain ground floor retail portion of the Building containing approximately 34,159 rentable square feet; provided, however, that Landlord reserves the right to have its architect re-measure the Leased Premises and/or the Building (and the retail portion thereof) and reasonably adjust Tenant's Proportionate Share based on any such re-measurement. For any Operating Expenses, Taxes or Insurance allocated to the retail portion of the Building, Landlord shall reasonably allocate such expenses between the retail portion of the Building and other non-retail portions of the Building, which allocation determination shall be deemed to be final and conclusive.

8.      **ADDITIONAL RENT:**

3

Execution Copy

(a) **Operating Expenses**: Tenant shall pay its Proportionate Share of the Operating Expenses; See Article 4.

(b) **Insurance**: Tenant shall pay its Proportionate Share of the Insurance (as hereinafter defined); See Article 4.

(c) **Taxes**: Tenant shall pay its Proportionate Share of the Taxes (as hereinafter defined); provided, however, if the Leased Premises are or later become part of a condominium or similar form of ownership then Landlord shall have the right charge Tenant for its proportionate share of Taxes for the specific condominium unit of which the Leased Premises are a part instead of on a Building and/or Project wide basis; See Article 4.

9.    **SECURITY DEPOSIT:** Upon Lease execution, Tenant shall provide a security deposit in the form of cash or a Letter of Credit (as hereinafter defined) in the amount of **$54,000.00**, which amount is approximately one (1) month's Base Rent and Additional Rent hereunder together with sales tax thereon.

10.    **PERMITTED USE OF LEASED PREMISES:** Tenant shall use the Leased Premises solely for the purpose of operating a first-class entertainment venue under the approved Trade Name featuring a full-service bar and sit-down restaurant as well as a wide array of popular video games, arcade and redemption games, esports titles, social games and other similar ancillary entertainment attractions, and for no other purpose. All such operations from the Leased Premises shall be in accordance with all statutes, ordinances and requirements of all local, municipal, state and federal authorities now in force, or which may hereafter be in force, pertaining to the Leased Premises and/or the Building occasioned by or affecting the use thereof by Tenant, including, but not limited to, the Americans With Disabilities Act; as amended from time to time (collectively, **"Applicable Laws"**), and subject to all restrictions set forth in the Lease.

11.    **TRADE NAME:** Velocity Esports (**"Trade Name"**).

12.    **BROKERS:** CBRE, Inc. (**"Landlord's Broker"**) and Jones Lang LaSalle Brokerage, Inc. (**"Tenant's Broker"**).

13.    **GUARANTOR(S):** VELOCITY ESPORTS INC., a Nevada corporation (**"Corporate Guarantor"**) pursuant to that certain Guaranty of Lease attached as Exhibit "I-1" attached hereto (**"Corporate Guaranty"**); and   LEONARD WANGER and PHILIP KAPLAN, jointly and severally (individually and collectively, **"Personal Guarantor(s)"**, and together with the Corporate Guarantor, hereinafter the **"Guarantor(s)"**) pursuant to that certain Guaranty of Lease attached as Exhibit "I-2" attached hereto (**"Personal Guaranty"**, and together with the Corporate Guaranty, hereinafter the **"Guaranty(ees)"**)

14.    **PREPAID RENT**: Upon Lease execution, Tenant shall pay to Landlord **$53,557.21**, which is approximately one month's Base Rent and Additional Rent hereunder (together with sales tax thereon).

15.    **LIQUOR LICENSE**: See Section 3.3 below.

16.    **DEFINITIONS:** The Lease contains the following defined terms. Additional defined terms are contained in this Lease shall have the meanings set forth therein.

(a)    **"Additional Rent"** shall mean those expenses, costs and charges hereinafter designated as such in this Lease, including, but not limited to Tenant's Proportionate Share of Operating Expenses, Tenant's Proportionate Share of Taxes, Tenant's Proportionate Share of Insurance, and any sales taxes, interest, late charges, and all other payments and charges payable by Tenant hereunder or

4

Execution Copy

arising from Tenant's use of the Leased Premises, Building, Project and Common Areas. Landlord's reasonable determination of the allocation of Additional Rent to the retail portion of the Building or the Project (if applicable) shall be deemed to be final and conclusive.

(b)     "**Environmental Laws**" shall mean federal, state and local environmental laws, rules, regulations, permits and orders affecting the Leased Premises and the business operations of Tenant conducted in the Leased Premises, whether now in effect or as may be promulgated hereafter, and as may be amended from time to time, including without limitation any and all applicable environmental laws relating to the recycling, reuse, storage, handling, disposal and presence of any "Hazardous Materials" (defined below) in or about the Leased Premises and the Building.

(c)     "**Hazardous Material(s)**" shall mean any substances defined as or included in the definition of "hazardous substances", "hazardous wastes," "hazardous materials," "toxic substances," "contaminants" or other pollution under any applicable Environmental Laws, including without limitation mold.

(d)     "**Insurance**" shall mean all premiums and other expenses incurred by Landlord for commercial general liability insurance, "all risk" property insurance (plus whatever endorsements or special coverages which Landlord, in Landlord's sole and absolute discretion, may consider appropriate), windstorm, flood, environmental, pollution and mold insurance, umbrella, and all other insurance carried by Landlord for the Building in its sole and absolute discretion, including the amount of any actual deductibles or self-insured retention paid by Landlord for which Landlord is responsible. Landlord's reasonable determination of the allocation of Insurance costs to the retail portion of the Building (if applicable) shall be deemed to be final and conclusive.

(e)     "**Lease Year**" shall mean a period of twelve (12) months beginning on the first day of the first full calendar month that occurs (following the Rent Commencement Date) during the Lease Term, or on an anniversary thereof; provided, however, that the partial calendar month, if any, that occurs at the beginning of the Lease Term shall be added to the first Lease Year for the calculation of rent and other charges due hereunder.

(f)     "**Operating Expenses**" shall mean and refer to all costs and expenses, of any kind or nature, which are paid or incurred by Landlord relative to the operation, repair, replacement, maintenance, and management of the Building, the Project and/or the Common Areas therein, including, without limitation, all costs and expenses relating to: (i) all personnel involved in the operation, repair, replacement, maintenance, and management of the Building and/or Project (other than Landlord's corporate officers) including wages, fringe benefits, and other labor payments (and including a pro rata share of such expenses for employees of Landlord who do not work exclusively at the Project), (ii) water, sewage disposal, grease trap maintenance, repair and replacement drainage, refuse collection and disposal, gas, electricity, and other utility services (excluding utility services provided exclusively for any single tenant or occupant of the Building and/or Project), (iii) general maintenance and repair of the Building and/or Project, including, without limitation, the structural components of the improvements located within the Building and/or Project, elevator maintenance and repair (including any service contract maintained for the Building and/or Project), repainting of improvements, and janitorial services, (iv) maintenance of landscaping and, where and when necessary, replanting, (v) any expenses payable by Landlord pursuant to the provisions of any recorded covenants, conditions, and restrictions, or other documents relating to title affecting the Building and/or Project, (vi) any personal property taxes, assessments, or other impositions levied, assessed, or imposed upon any personal property used in connection with the Building and/or Project, (vii) Landlord insurance related costs and deductibles (not separately collected as part of Tenant's Proportionate Share of Insurance hereunder), (viii) management

Execution Copy

fees not to exceed ten percent (10%) of the total amount of Operating Expenses, (ix) license, permit, and inspection fees, (x) accounting fees and expenses relating to the operation of the Building and/or Project, (xi) the cost of any security service or other security related expense (though Landlord is under no obligation to provide same), and (xii) capital improvements or structural modifications either (1) required by any change in Laws governing the Building and/or Project, (2) reasonably deemed by Landlord as having the effect of reducing Operating Expenses or (3) with a cost less than $500,000; provided, however, that in each event, any costs of such capital improvements or structural modifications shall be amortized over the useful life of such capital improvements or structural modifications. Operating Expenses shall also include all costs and expenses of any kind or nature which are paid or incurred by Landlord relative to the operation, repair, replacement, maintenance, and/or for management of Landlord's office and other retail space within the Building and/or Project (excluding those portions of Landlord's office that are leased to individual tenants and exclusively for the use of such tenants). Operating Expenses shall also include, without limitation (but without duplication of any of the foregoing), any and all assessments and other amounts Landlord is obligated to pay under any declaration of condominium or similar document or instrument. Operating Expenses shall not include "Taxes" or "Insurance", to the extent separately paid by Tenant pursuant to the terms of this Lease.

Operating Expenses shall, however, exclude the following: (i) all costs incurred in connection with, or related to, the acquisition of the land comprising the Building; (ii) all costs incurred in connection with, or related to, the original construction (as distinguished from operation and maintenance) of the Building (including the Common Area); (iii) interest and principal amortization or other payments made by Landlord on loans to Landlord, including mortgage loans and other debt costs or ground lease payments, if any; (iv) depreciation of buildings and other improvements (except permitted amortization of certain capital expenditures); (v) legal fees in connection with leasing, tenant disputes or enforcement of leases unrelated to Tenant and/or this Lease; (vi) real estate brokers' commissions or marketing costs; (vii) costs of any items to the extent Landlord receives reimbursement from insurance proceeds condemnation proceeds or from a warranty or other such third party (such proceeds to be deducted from Operating Expenses in the year in which received); (viii) costs of repairs required as the result of or arising from the gross negligence or willful misconduct of Landlord or any of its agents, servants, employees, contractors, or sub-contractors; (ix) capital expenditures except those made primarily to reduce Operating Expenses or increases therein, or to comply with Applicable Laws or insurance requirements (excluding capital expenditures to cure violations of Applicable Laws or insurance requirements that existed prior to the date of this Lease) provided that any such permitted capital expenditure shall be amortized (with a reasonable interest rate as determined by Landlord) over the useful life of the item as reasonably determined by Landlord; (x) charitable or political contributions; (xi) replacement reserves; (xii) renovating or otherwise improving or decorating, or redecorating leased space to ready it for specific tenants or occupants or to improve vacant tenant space in the Building in connection with leasing the same, other than ordinary maintenance and repairs provided to tenants or premises generally; (xiii) expenses for repairs, replacements or improvements arising from latent defects in the initial construction of the Landlord's Work to the extent both (a) discovered within twelve (12) months following the completion of such work and (b) actually reimbursed to Landlord by virtue of warranties from contractors, suppliers or any other parties; and (xiv) any federal and state income taxes, franchise taxes, gift taxes, capital stock taxes, inheritance taxes, estate taxes, and other taxes to the extent applicable to Landlord's general or net income.

(g)    "**Project**" shall mean that certain mixed use project commonly referred to as "Society Orlando" located at 410 N. Orange Ave., Orlando, FL 32801, including, without limitation, the land, the Building and all other buildings and/or improvements from time to time located thereon or related thereto.

6

Execution Copy

(h)  **"Taxes"** shall mean all impositions, taxes, fees, assessments (special or otherwise), personal property taxes, transit taxes, costs incurred in monitoring and disputing taxes, whether paid to an outside consultant or otherwise, fees or any other taxes, charges or fees appearing on the tax bill, any margin tax, any tax or excise on rents, any tax or charge for governmental services (such as street maintenance or fire protection), and other governmental liens or charges of any and every kind, nature and sort whatsoever, ordinary and extraordinary, foreseen and unforeseen, and substitutes therefor attributable in any manner to the Building and/or Project (as applicable), and/or the land on which the same are located or any part thereof, or any use thereof, or any equipment, fixtures or other facility located therein or thereon or used in conjunction therewith.  Taxes do not include any franchise, estate, inheritance, succession, corporate, general income, capital levy, business or transfer tax of Landlord, nor any costs of challenging Landlord's tax bill or any portion thereof (provided, however, all reasonable costs of a tax contest may be reimbursed to Landlord out of tax savings realized); nor the amount of any special assessments attributable to improvements of a capital nature made to the Leased Premises, the Building and/or the Project, or its environs; nor any fine, penalty, cost, or interest for any tax or assessment, or any part thereof, which Landlord should fail to timely pay.

(i)  **"Tenant's Work"** shall mean all work that is designated as "Tenant's Work" in **Exhibit "E-1"**.

[No Further Text on this Page]

7

Execution Copy

**ARTICLE 1 — LEASED PREMISES AND IMPROVEMENTS TO THE LEASED PREMISES**

Section 1.1      **LEASED PREMISES; COMMON AREAS.**

(a)      Subject to and upon the terms, provisions, covenants and conditions hereinafter set forth, Landlord does hereby lease, demise and let to Tenant and Tenant does hereby lease, demise and let from Landlord those certain Leased Premises described in the BLI Summary.

(b)      Landlord has provided Tenant with an estimated measurement of the rentable area of the Leased Premises, and, except as set forth in this paragraph, the rentable area of the Leased Premises is conclusively defined, stipulated and agreed to be the number of square feet set forth in the BLI Summary. Notwithstanding the foregoing, following the completion of the construction of the Building, the Project and/or the Leased Premises, Landlord may elect to have its architect re-measure the rentable area of the Building, the Project and/or the Leased Premises and, if the rentable area of either the Building, the Project or the Leased Premises differs upon re-measurement from what is set forth in the BLI Summary, then, upon Landlord's request, Tenant shall execute an amendment to this Lease memorializing such corrected measurements, which amendment shall include, without limitation, a correction to the calculation of Tenant's Proportionate Share, and a proportionate adjustment to the Base Rent due and payable by Tenant hereunder.

Additionally, Tenant reserves the right to re-measure the Leased Premises within thirty (30) days of the later of (i) the Delivery Date or (ii) the date that Landlord's architect re-measures the Leased Premises using an architect approved by Landlord (such approval not to be unreasonably withheld); provided, however, that Landlord's remeasurement (or, if applicable, re-measurement) shall be binding unless Tenant's subsequent remeasurement discloses a discrepancy of more than five percent (5%) in the total rentable square footage, in which event Tenant shall have the right to request, not later than thirty (30) days after Tenant's receipt of the re-measurement by Tenant's architect showing such discrepancy, another re-measurement to be performed by an independent third party architect reasonably and mutually acceptable to Landlord and Tenant, whose remeasurement shall be conclusive as to both Landlord and Tenant, and whose cost shall be shared equally by Landlord and Tenant.

If applicable, Tenant shall execute an amendment to this Lease memorializing such corrected measurements, which amendment shall include, without limitation, a correction to the calculation of Tenant's Proportionate Share, and a proportionate adjustment to the Base Rent due and payable by Tenant hereunder.

(c)      **Exhibit "F"** attached hereto includes a legal description of the real property on which the Project is located as well as a site plan which identifies the approximate location of the Leased Premises within the Building.   Except as may be expressly set forth herein, Landlord does not make any representations or warranties that the Leased Premises complies with Applicable Laws, codes or ordinances or that Tenant's Permitted Use is allowable under applicable zoning codes or laws.  This Lease shall be effective upon full execution and delivery of this Lease.

(d)      In addition to the Leased Premises, Tenant has the right to use the pedestrian walkways, and corridors of the Building provided by Landlord for the general use of all retail tenants, and their employees, invitees, visitors, licensees and customers (all of the foregoing sometimes referred to as **"Common Areas"**).  The Common Areas will at all times be subject to Landlord's exclusive control and management in accordance with the terms and provisions of this Lease.  Landlord may increase, reduce

1

Execution Copy

or change the number, dimensions or locations of the Common Areas in any manner that Landlord, in its reasonable discretion, shall deem proper so long as Tenant, its employees, invitees, licensees and customers continue to have reasonable access to the Leased Premises.

(e)       In addition to the foregoing, Landlord shall have the right from time to time to: (a) close, if necessary, any of the Common Areas to prevent dedication of any of the Common Areas or the accrual of any rights of any person or of the public to the Common Areas; (b) close temporarily any of the Common Areas for maintenance purposes or for health and safety purposes (e.g. bomb threat, hurricane, etc.); (c) select a person, firm or corporation, which may be an entity related to Landlord, to maintain and operate any of the Common Areas; (d) designate other lands outside the exterior boundaries of the Building and/or Project to become part of the Common Areas; and (e) upon advance written notice as soon as reasonably practicable under the circumstances, erect temporary scaffolding in connection with any repairs, alterations or renovations (including, without limitation, any emergency repairs or alterations necessitated by Applicable Laws) to the exterior of the Leased Premises and/or the Building or Project without liability to Tenant provided that Landlord, in connection with the erection of any such temporary scaffolding, (i) uses commercially reasonable efforts to minimize any interference with or access to the Leased Premises and (ii) if such scaffolding obstructs the view of Tenant's existing exterior signage at the Leased Premises or Tenant's storefront generally, erects temporary signage identifying the location of Tenant's Leased Premises, to the extent permitted by Applicable Laws. Notwithstanding the provisions of this Subparagraph, in exercising its rights hereunder, Landlord shall provide Tenant with a means of reasonable access to and from the Leased Premises.

Section 1.2       **IMPROVEMENTS TO LEASED PREMISES.**

(a)       Landlord shall deliver the Leased Premises to Tenant on the Delivery Date in its "AS-IS" condition without any representations or warranties except as may be expressly set forth herein, subject to Landlord's obligation to substantially complete the work on **Exhibit "E"** shown as "Landlord's Work". Landlord represents and warrants that Landlord's Work will be completed in compliance with Applicable Laws, and with all mechanical, electrical, and plumbing systems, which are part of Landlord's Work, in good working order.

(b)       Tenant acknowledges and agrees that the Leased Premises are hereby leased to Tenant subject to: (i) any and all conditions that an examination of the Leased Premises would disclose; (ii) any and all Applicable Laws (as hereinafter defined); and (iii) any title matters of record of which Tenant has actual knowledge or which were disclosed by Landlord to Tenant in writing (which, for the avoidance of doubt, may be via email).

(c)       Promptly following the Delivery Date, Tenant shall perform the work on **Exhibit "E"** shown as "Tenant's Work" and all other work necessary to open the Leased Premises to the public under the Trade Name in accordance with the requirements of the Lease.

### ARTICLE 2 — LEASE TERM

Section 2.1       **COMMENCEMENT OF THE TERM.**

(a)       The Lease Term shall commence upon the Commencement Date and shall end on the last day of the calendar month in which the Lease Term expires, unless this Lease is sooner terminated or properly extended (if applicable) as hereinafter provided.

2

Execution Copy

(b)        Upon the Delivery Date, Tenant shall: (a) take possession of the Leased Premises and assume responsibility for all utilities services thereafter furnished to the Leased Premises, (b) diligently perform and complete Tenant's Work and open the Leased Premises to the public by the Rent Commencement Date under the Trade Name set forth in the BLI Summary, and (c) thereafter continuously use and operate the Leased Premises for the Permitted Use throughout the Lease Term during Tenant's Required Hours (as hereinafter defined) under the Trade Name subject only to Permitted Closure(s).  As used here, "**Permitted Closure(s)**" shall mean and refer to: (i) closures related to observance of federal holidays or in connection with any casualties, condemnation(s), or events of Force Majeure necessitating closure of Tenant's business; as well as (ii) temporary closures (x) not to exceed three (3) business days (in the aggregate) for training of personnel in any Lease Year during the Lease Term and (y) not to exceed ten (10) business days (in the aggregate) during the Lease Term for remodeling of the Leased Premises. Any closures of the Leased Premises other than Permitted Closure(s) shall require Landlord's prior written consent.

(c)        Tenant shall provide Landlord with a copy of all permits for Tenant's Work prior to Tenant's undertaking any work at the Leased Premises, and shall post a copy of such permits in the storefront of the Leased Premises until such time as Tenant's Work has been fully inspected and approved by the applicable authority.

Section 2.2        **NOTICE OF DELIVERY AND ACCEPTANCE.** Prior to Tenant or anyone claiming under or through Tenant occupying or using the Leased Premises, Tenant agrees to execute an instrument confirming the Delivery Date, the Commencement Date and the Rent Commencement in the form of **Exhibit "C"**, and any other matters reasonably requested by Landlord. Tenant's obligation to pay Base Rent and Additional Rent shall commence on the Rent Commencement Date confirmed by Landlord unless otherwise specifically provided in this Lease.

Section 2.3        **HOLDING OVER.** The parties recognize and agree that the damage to Landlord resulting from any failure by Tenant timely to surrender possession of the Leased Premises as required herein will exceed the amount of the Base Rent theretofore payable hereunder, and accurate measurement of damages will be impossible.  Tenant therefore agrees that if Tenant or anyone claiming under Tenant remains in possession of the Leased Premises after the expiration of the Lease Term, such party shall be a tenant at sufferance; and during such holding over, Base Rent shall be 150% of the rate which was in effect immediately prior to the Lease Term expiration, which Landlord may collect without admission that Tenant's estate is more than a tenancy at sufferance, and all the other provisions of this Lease shall apply insofar as the same are applicable.  In the event Tenant holds-over in the Leased Premises without Landlord's written permission consenting to such holdover, then, whether or not Tenant is charged 150% the Base Rent and other Rent as set forth herein, Tenant shall remain liable for all costs, expenses, claims, liabilities and damages of whatever kind and nature, including consequential damages which arise from such holdover.

Section 2.4        **SURRENDER.** No act or thing done by Landlord or its agents during this Lease Term shall be deemed an acceptance of a surrender of the Leased Premises, and no agreement to accept a surrender of the Leased Premises shall be valid unless it is made in writing by a duly authorized officer or agent of Landlord. Notwithstanding anything herein to the contrary, upon the expiration of the Lease Term, or upon any earlier termination of this Lease, all alterations, fixtures and/or permanently affixed equipment which may be installed or placed in or about the Leased Premises, and all signs installed in, on or about the Leased Premises, from time to time, shall be at the sole cost of Tenant and (other than

3

Tenant's signage, non-affixed equipment, removable trade fixtures, and other personal property) shall be and become the property of Landlord.  Furthermore, Landlord may, by written notice to Tenant prior to the end of the Lease Term, or given upon any earlier termination of this Lease, require Tenant at Tenant's expense to remove trade fixtures and to repair any damage to the Leased Premises, the Building and/or the Project caused by Tenant during such removal.

Notwithstanding the foregoing, so long as Tenant is not in default hereunder beyond any applicable notice and cure period, Tenant may, in connection with its surrender of the Leased Premises, remove (as part of Tenant's personal property and removable trade fixtures) all arcade equipment and related video game equipment installed in the Leased Premises (even if anchored to a wall) as well as Tenant's specialty pizza oven installed in the kitchen of the Leased Premises; provided, however, that Tenant promptly repairs, at Tenant's cost, any damage to the Leased Premises caused by said removal (which obligation shall survive the expiration of the Lease Term).

Section 2.5      **REMOVAL OF TENANT PROPERTY BY TENANT**.  Upon the expiration of the Lease Term, or upon any earlier termination of this Lease, Tenant shall, subject to the provisions of this Lease, quit and surrender possession of the Leased Premises to Landlord in good condition and repair, reasonable wear and tear and repairs that are specifically made the responsibility of Landlord hereunder excepted.  Upon such expiration or termination, in addition to Tenant's removal and repair obligations with respect to any alterations as set forth herein, Tenant shall, without expense to Landlord, remove or cause to be removed from the Leased Premises all debris and rubbish, and such items of furniture, equipment, business and trade fixtures, server and telephone equipment, movable partitions and other articles of personal property owned by Tenant or installed or placed by Tenant at its expense in the Leased Premises (other than items that are Landlord's property under Section 2.4 above), and Tenant shall repair at its own expense all damage to the Leased Premises, the Building and/or the Project resulting from such Tenant removal.

## ARTICLE 3 — USE

Section 3.1      **USE.** Tenant will use and occupy the Leased Premises for the allowable use or purpose shown in the BLI Summary, and for no other use or purpose ("**Permitted Use**").  Tenant shall not violate any exclusive use restrictions, exclusive uses and prohibited uses described on **Exhibit "G"**, (the "**Prohibited Uses**").  In the event that Tenant uses the Leased Premises for any purpose not expressly permitted herein, said use after notice and failure by Tenant to cease such unpermitted use within applicable cure periods shall be deemed a default by Tenant hereunder, and Landlord may, exercise any of its default remedies.  Tenant shall be required to open and operate in the Leased Premises for its Permitted Use and under its Trade Name, fully stocked, staffed and fixtured on or before the Rent Commencement Date.

Section 3.2      **QUIET ENJOYMENT.** Upon payment by Tenant of the Rent herein provided, and upon the observance and performance of all terms, provisions, covenants and conditions on Tenant's part to be observed and performed, Tenant shall, subject to all of the terms, provisions, covenants and conditions of this Lease, peaceably and quietly hold and enjoy the Leased Premises for the Lease Term hereby demised.

Section 3.3      **ALCOHOL SPECIFIC PROVISIONS; LIQUOR LICENSE.**

4

Execution Copy

(a)      Tenant confirms and agrees that if Tenant intends to serve and sell alcoholic beverages in the Leased Premises then it shall do so in accordance with all Applicable Laws (including, without limitation, any applicable county codes or ordinances) and, in order to permit such use, Tenant shall maintain in full force and effect during the Term all licenses and permits required in connection therewith. Landlord shall not be responsible for monitoring Tenant's compliance with the Florida Beverage Law and/or providing any guidance or information whatsoever with respect to the Florida Beverage Law. Tenant agrees, at its sole cost and expense, to maintain its alcohol beverage license in good standing with the Florida Department of Business and Professional Regulation, Division of Alcohol Beverages & Tobacco (the "DABT"), comply with all reporting and disclosure requirements, and pay any and all taxes relating to the purchase and sale of alcohol beverages at the Leased Premises. Unless Tenant obtains an alcoholic beverage license that allows Tenant to sell alcoholic beverages for consumption off the Leased Premises, Tenant shall use commercially reasonable efforts to not allow its customers to leave the Leased Premises with alcoholic beverages served or purchased from the Leased Premises and shall use commercially reasonable efforts to monitor the same. Tenant, at its sole cost, shall be responsible for hiring any security (in excess of any that may be provided by Landlord, should Landlord elect in its sole direction and without obligation to provide any such security, with respect to the Building) in connection with Tenant's sale of alcoholic beverages at the Leased Premises.

(b)      Tenant shall indemnify, defend with counsel reasonably acceptable to Landlord and save Landlord harmless from and against all Claims (as hereinafter defined), by or on behalf of any third person, party or Governmental Authority whatsoever arising during the Term out of (i) any failure or alleged failure by Tenant to perform any of its obligations under this Section 3.3, or (ii) any accident, injury or damage which occurs in, on or about the Leased Premises, the Building and/or the Project, during the Term, however occurring, resulting from the sale of alcoholic beverages by Tenant, except to the extent any such accident, injury or damage occurring on or about the Common Areas of the Building and/or Project was caused by Landlord's gross negligence. The terms, conditions and covenants of this Section 3.3 shall survive the expiration or earlier termination of the Term.

(c)      Tenant shall promptly apply for and diligently pursue any required approvals for either a 2COP or 4COP alcoholic beverage license ("Liquor License") at the Leased Premises (or within the portion thereof to be operated as a food service establishment) necessary to allow Tenant to serve alcoholic beverages incidental to a primary food service establishment use.

(d)      Landlord agrees to cooperate with Tenant in connection with the Liquor License process, including providing information and documentation reasonably requested by the DABT, at no out-of-pocket expense to Landlord. Tenant shall be responsible for all of the fees in connection with the DABT approval(s) and the Liquor License.

(e)      TENANT HEREBY REPRESENTS AND WARRANTS TO LANDLORD THAT IT KNOWS OF NO REASON WHY A LIQUOR LICENSE WOULD NOT BE ISSUED TO TENANT AND THAT NEITHER TENANT NOR ANY OF ITS PRINCIPALS HAVE BEEN CONVICTED OF A FELONY OR MISDEMEANOR OR HAVE BEEN INDICTED FOR ANY CRIME OR HAVE PREVIOUSLY BEEN DENIED APPROVAL (OR HAS WITHDRAWN AN APPLICATION PENDING ANTICIPATED DISAPPROVAL) FOR A LIQUOR LICENSE OF ANY TYPE.

(e)      Tenant agrees to keep Landlord apprised of its progress in obtaining the Liquor License and shall promptly forward any approval or denial received by Tenant or Tenant's counsel to Landlord and Landlord's counsel.

5

Execution Copy

### Section 3.4    TENANT'S CONTINUOUS OPERATION; REQUIRED HOURS.

(a)    Subject to any Permitted Closures, Tenant shall continuously operate its business, fully stocked, staffed and fixtured at the Leased Premises for Tenant's Permitted Use in a respectable, reputable, tasteful, competent and dignified manner and in accordance with all Applicable Laws, and shall be open for business to the general public seven (7) days a week for at least eight (8) hours per day (collectively, "**Tenant's Required Hours**"). Tenant shall establish regular business hours, in compliance with Applicable Laws, satisfying Tenant's Required Hours hereunder and shall make such hours publicly available to Tenant's patrons. In no event shall Tenant operate later than 12 a.m. (midnight) on Sunday through Thursday or later than 2 a.m. on Friday or Saturday, without Landlord's prior written consent.

(b)    In the event that Tenant fails to continuously operate for the Permitted Use in the Leased Premises during Tenant's Required Hours as set forth herein, and does not cure such failure within thirty (30) days after receipt of notice from Landlord, such failure shall be an event of default hereunder, and, in addition to any other remedies afforded Landlord hereunder or which are available at law or in equity, Landlord may elect to terminate this Lease and recapture the Leased Premises from Tenant, whereupon Tenant shall be obligated to pay to Landlord the then-unamortized costs (as of the termination date specified by Landlord) incurred by Landlord in leasing the Leased Premises to Tenant (the "**Leasing Costs**"), including but not limited to all leasing commissions paid by Landlord in connection with this Lease, the full amount of any tenant improvement allowance(s) provided to Tenant hereunder, all costs incurred by Landlord in completing Landlord's Work (as hereinafter defined), and all legal fees incurred in preparing the Lease (and any subsequent amendments thereto) (collectively, the "**Recapture Payment**"). All such Leasing Costs shall be amortized by Landlord on a straight-line basis over the full Lease Term (inclusive of any renewal option) using a 10% interest rate. The foregoing obligation of Tenant to pay the Recapture Payment to Landlord shall survive the termination of this Lease.

### Section 3.5    TENANT'S EXCLUSIVE USE.

(a)    So long as Tenant is not in default of this Lease beyond any applicable cure period and Tenant (as distinguishable from a sublessee or assignee) is open for business in the Leased Premises to the public for Tenant's Permitted Use, then, during the Lease Term, Landlord agrees that Landlord shall not lease available retail space in the Building to any other tenant whose primary use involves the operation of a restaurant and bar that offers e-sports and arcade game entertainment (the "**Tenant's Exclusive Use**"); provided, however, that the foregoing restriction shall not apply to any Existing Tenants (as defined below) at the Building and/or Project (or any such existing tenant's successors or assigns) and further, any occupant of the Building and/or Project under an Existing Lease (as defined below) (and their successors and assigns). As used herein, "**primary use**" shall mean and refer to if such operations (which violate Tenant's Exclusive Use) are responsible for deriving fifty percent (50%) or more of the Gross Revenues (as hereinafter defined) for the offending tenant.

(b)    Tenant's Exclusive Use shall expire automatically and shall cease to have any force or effect upon the occurrence of any of the following: (i) at the expiration or sooner termination of this Lease, (ii) the occurrence of any event of default by Tenant under this Lease beyond applicable notice and cure periods, (iii) the discontinuance of the Tenant's Exclusive Use by Tenant at the Leased Premises for the Permitted Use set forth herein (excepting Permitted Closures), (iv) a violation by Tenant of the radius restriction set forth in Section 3.6 below or (v) any assignment of this Lease, subletting of the Leased Premises (or any part thereof), or other transfer of this Lease except (x) to an affiliate of Tenant or (y) in

6

connection with a Permitted Transfer (as hereinafter defined) so long as such affiliate or permitted transferee continues using the Leased Premises for the Permitted Use.

(c)    As used in this Lease, "**Existing Tenant**" means a tenant under any Existing Lease or, if Landlord acquires any adjoining property after this Lease is executed, tenants under any pre-existing leases on such property as of the date of Landlord's acquisition, or their successors, assigns and subtenants. As used in this lease, "**Existing Lease**" means a lease for space in the Building and/or Project that has been fully executed as of the Effective Date of this Lease, as may be renewed, modified and/or assigned from time to time. For purposes of this Lease, the term "**Gross Revenues**" shall mean the proceeds from all services, sales and/or other revenue provided, derived, originated, made, placed, ordered, and/or filled at or from any premises leased to a tenant at the Building (as applicable).

Section 3.6    **RADIUS RESTRICTION.**  Throughout the Lease Term (including, any Renewal Terms), Tenant covenants and agrees, on behalf of itself, its parent company, its subsidiaries, its franchisee or franchisor, and on behalf of any company, corporation or other entity who or which controls or is controlled by Tenant, or any person, firm, corporation or other entity which directly or indirectly controls or is controlled by Tenant not to own, operate or become financially interested in any business similar to the business being operated by Tenant for the Permitted Use within a radius of three (3) miles from the Leased Premises.

## ARTICLE 4 — RENT

Section 4.1    **BASE RENT.**

(a)    From the Rent Commencement Date through the end of the Lease Term, Tenant will pay to Landlord as the base rent for the Leased Premises ("**Base Rent**") the amounts set forth in the BLI Summary. If the Rent Commencement Date is a date other than the first day of a calendar month, the Lease Term will be for the number of years and months specified above plus the remainder of the calendar month in which the Rent Commencement Date occurs. Base Rent shall be payable in advance on the first day of the calendar month in equal monthly installments of the amount set forth in the BLI Summary. Except as otherwise provided herein, all Rent shall be payable without any offset, demand, defense or deduction whatsoever, in lawful money of the United States of America, at Landlord's office address as set forth in Section 1 of the BLI Summary or elsewhere as designated from time to time by Landlord's written notice to Tenant. Base Rent due for any partial month of occupancy at the beginning or end of the Lease Term will be prorated, such proration to be based on the actual number of days in the partial month.

(b)    In addition to Base Rent, Tenant shall and hereby agrees to pay to Landlord each month a sum equal to all sales, use, rental, rental use and other taxes assessed by any governmental authority against Rent or otherwise related to the Leased Premises, as applicable.

(c)    If any monthly payment of Base Rent or Additional Rent remains unpaid for more than five (5) days following its due date, then Tenant shall pay to Landlord a late charge in an amount equal to five percent (5%) of the delinquent payment as liquidated damages to cover the extra expenses to Landlord of handling such late payments. If Tenant pays any installment of Rent or any other sum by check to Landlord, then Tenant shall pay to Landlord, on demand, a processing and administrative fee of Two Hundred Fifty and No/100 Dollars ($250.00) per returned check. Landlord, at its option, may subtract any such processing fee from the Security Deposit, if any, held by Landlord hereunder, and, in such event,

7

Tenant shall immediately deposit a like amount with Landlord upon the notification thereof. Provided, however, this provision shall not be construed as requiring Landlord to accept any late payment of Rent or as a waiver of any of Landlord's rights or remedies by virtue of Tenant not making timely payment of Rent hereunder, and Landlord's acceptance of late Rent and such late charge shall not be construed as constituting a waiver by Landlord of any rights or remedies available to it in the event that any subsequent payment of Rent is not timely paid by Tenant on any one or more future occasions.

(d)    Tenant shall pay Landlord interest on any Rent which remains unpaid for ten (10) calendar days after its due date at a rate equal to the lesser of: (i) fifteen percent (15%) per annum, or (ii) the maximum lawful rate (the "**Interest Rate**"), which interest shall accrue from ten (10) calendar days following its due date. This provision shall not be construed as requiring Landlord to accept any late payment of Rent or as a waiver of any of Landlord's rights or remedies by virtue of Tenant not making timely payment of Rent hereunder, and Landlord's acceptance of late Rent and such interest shall not be construed as constituting a waiver by Landlord of any rights or remedies available to it in the event that Rent is not timely paid thereafter by Tenant on any future occasions, including declaring Tenant in default under this Lease and pursuing all remedies available to it arising for such default.

(e)    For all purposes of this Lease, the term "**Rent**" shall include all Base Rent (as adjusted and increased from time to time), charges or impositions thereon, Additional Rent (as hereinafter defined), and all other payments due or which may become due under the Lease from Tenant to Landlord hereunder.

Section 4.2    **ADDITIONAL RENT.** In addition to the Base Rent, Tenant shall, commencing on the Rent Commencement Date and continuing during each Lease Year, pay to Landlord the following:

(a)  Tenant's Proportionate Share of Operating Expenses: Commencing on the Rent Commencement Date, Tenant shall pay to Landlord, on or before the first day of each month, in advance, during each Lease Year, Tenant's Proportionate Share of Operating Expenses, in equal monthly installments pursuant to Article 4.

(b)  Tenant's Proportionate Share of Taxes: Commencing on the Rent Commencement Date, Tenant shall pay to Landlord, on or before the first day of each month, in advance, during each Lease Year, Tenant's Proportionate Share of Taxes,  in equal monthly installments pursuant to Article 4.

(c)  Tenant's Proportionate Share of Insurance: Commencing on the Rent Commencement Date, Tenant shall pay Tenant's Proportionate Share of Insurance to Landlord in advance on the first day of the calendar month in equal monthly installments pursuant to Article 4.

Section 4.3    **ESTIMATE OF OPERATING EXPENSES, TAXES, AND INSURANCE.**

(a) Tenant's Proportionate Share of Operating Expenses, Taxes, and Insurance is estimated to be Twelve and No/100 Dollars ($12.00) per rentable square foot in the first full Lease Year; provided, however, that the foregoing is merely a good faith estimate and is not intended to be a cap or guaranty of the actual amounts that will be owed.

(b) Landlord shall notify Tenant within a reasonable time after the end of each calendar year during the Lease Term hereof, of the amount which Landlord estimates (as evidenced by budgets prepared by or on behalf of Landlord) will be the amount of Tenant's Proportionate Share of Operating Expenses, Taxes, and Insurance for the then current calendar year and Tenant shall pay such sum in

8

Execution Copy

advance to Landlord in equal monthly installments, during the balance of said calendar year, on the first day of each remaining month in said calendar year commencing on the first day of the first month following Tenant's receipt of such notification. Failure of Landlord to provide such estimate shall not relieve Tenant of its obligation to pay Tenant's Proportionate Share of Operating Expenses, Taxes, and Insurance (which in such event shall continue to be paid monthly by Tenant based on the most recent estimate then provided by Landlord for Tenant's Proportionate Share of Operating Expenses, Taxes, and Insurance).

(c) Landlord shall use good faith efforts to provide Tenant within one hundred twenty (120) days following the end of each calendar year during the Lease Term, a statement showing the actual amount which should have been paid by Tenant with respect to Operating Expenses, Taxes, and Insurance for the past calendar year, the amount thereof actually paid during that year by Tenant, and the amount of the resulting balance due thereon, or overpayment thereof, as the case may be (the "**Reconciliation Statement**"); provided, however, that Landlord's failure to provide such Reconciliation Statement within one hundred twenty (120) days following the end of an applicable calendar year shall not be a default hereunder or otherwise relieve Tenant of its obligation to pay any amounts owed pursuant to a subsequently delivered Reconciliation Statement so long as such Reconciliation Statement is ultimately delivered no later than twelve (12) months after the conclusion of the applicable calendar year.

(c) The Reconciliation Statement shall become final and conclusive between the parties unless Landlord receives written detailed objections with respect thereto within sixty (60) days after receipt by Tenant of said statement. Any balance shown to be due pursuant to said Reconciliation Statement shall be paid by Tenant to Landlord within thirty (30) days following Tenant's receipt thereof and any overpayment shall be credited against Tenant's obligation to pay expected Additional Rent in connection with anticipated Operating Expenses, Taxes, and Insurance for the next year, or, if by reason of any termination of this Lease no such future obligation exists, refunded to Tenant. Anything herein to the contrary notwithstanding, Tenant shall not be permitted to delay or withhold payment of any balance shown to be due pursuant to a statement rendered by Landlord to Tenant because of any objection which Tenant may raise with respect thereto but Landlord shall promptly credit or refund any overpayment found to be owing to Tenant as aforesaid upon the resolution of said objection.

(d)      Tenant may deliver a notice to Landlord within sixty (60) days of receipt of the Reconciliation Statement for an applicable year that Tenant would like to audit Landlord's books and records with respect to such statement (a "**Dispute Notice**"). Provided that Tenant has paid all amounts shown as owed per such disputed Reconciliation Statement, and is not otherwise in default under this Lease (beyond any applicable notice and/or cure period), then Tenant may, upon no less than fifteen (15) business days' prior written notice to Landlord, examine Landlord's books and records pertaining to the Operating Expenses covered by the disputed statement; provided, that: (a) the audit shall be conducted by a national or regional accounting firm, with an auditor who is a certified public accountant licensed to practice in the State of Florida, and who shall not be compensated on a percentage of recovery or other contingency fee basis, (b) the audit will be conducted during Landlord's regular business hours at the office where Landlord maintains its records related to Operating Expenses (which may be in Florida or New York), (c) Tenant and all of its consultants shall, prior to the examination, execute Landlord's standard form of confidentiality agreement, (d) the audit shall be restricted to one examination per calendar year and may not look back prior to the current year, and (e) the audit shall be at the sole cost and expense of Tenant. Tenant shall reimburse Landlord for the costs of photocopying or transferring to digital media any books and records requested by Tenant in an amount equal to the actual cost charged to Landlord by third party copy services or $0.10 per page should the copies be made with Landlord's photocopying

9

equipment. Within forty-five (45) days following delivery of the Dispute Notice, Tenant shall have the right to give Landlord written notice stating in reasonable detail any objection to the Reconciliation Statement in dispute raised by the audit (an "**Objection Notice**"). If Tenant fails to give an Objection Notice within such 45-day period, Tenant shall be deemed to have approved the disputed statement in all respects and released all claims based on the disputed statement. If Tenant provides Landlord with a timely Objection Notice, Landlord and Tenant shall work together in good faith to resolve the discrepancy between Landlord's statement and Tenant's review. If Landlord and Tenant determine that Operating Expenses are less than reported, Landlord shall (i) promptly (i.e., within 30 days) pay the difference to Tenant, or (ii) provide Tenant with a credit against future rent in the amount of the difference, and if Landlord and Tenant determine that Operating Expenses were overstated by at least five percent (5%) then Landlord shall, in addition to providing the credit or reimbursement of such overcharge, reimburse Tenant's actual and reasonable out of pocket costs for such audit (in an amount not to exceed $5,000.00). Likewise, if Landlord and Tenant determine that Operating Expenses are greater than reported, Tenant shall promptly pay the difference to Landlord. If Landlord disputes the results of Tenant's examination and Landlord and Tenant are unable to resolve the dispute by negotiation, the dispute shall be settled by arbitration in the County in which the Building is located, administered by the American Arbitration Association under its Commercial Arbitration Rules, with the following exceptions. There shall be a single arbitrator selected by the American Arbitration Association. The arbitrator shall have at least ten years' experience in the supervision of the operation and management of office buildings in the market area in which the Building is located. The scope of the arbitrator's inquiry and determination shall be limited to whether Operating Expenses as billed to Tenant are in accordance with the definitions and computations provided in this Lease. The determination of the arbitrator shall be final, binding, and conclusive on all the parties, and judgment may be rendered on it by any court having jurisdiction, upon application of either Landlord or Tenant. The parties shall share equally in the cost of the arbitrator.

(e)    The failure or inability of Landlord to timely furnish or deliver to Tenant any information, estimates, budgets, statements, data or similar items required to be furnished or delivered hereunder shall not relieve Tenant from its obligation to make any payments or contributions which would be otherwise due pursuant to the terms hereof had such information, estimate, budget, statement, data or similar item been timely delivered by Landlord to Tenant; provided, however, in no event shall Landlord be permitted to request additional payments from Tenant pursuant to a Reconciliation Statement if such Reconciliation Statement is not delivered within twelve (12) months (i.e., one year) after the conclusion of the applicable calendar year.

(f) Additional Rent due by reason of this Article for the final months of this Lease is due and payable even though it may not be calculated until subsequent to the termination date of the Lease; and shall be prorated according to that portion of said calendar year that this Lease was actually in effect. Tenant expressly agrees that Landlord, at Landlord's sole discretion, may apply the Security Deposit specified hereinafter, in full or partial satisfaction of any Additional Rent due for the final months of this Lease, but nothing herein contained shall be construed to relieve Tenant of the obligation to pay any Additional Rent due for the final months of this Lease, nor shall Landlord be required to first apply said Security Deposit to such Additional Rent if there are any other sums or amounts owed Landlord by Tenant by reason of any other terms or provisions of this Lease.

(g) Notwithstanding anything contained in this Lease to the contrary, for purposes of computing Operating Expenses, Controllable Costs (as defined in this paragraph) for any calendar year following the Stabilization Year (as defined in this section) shall not exceed the Cap Amount (as defined in this paragraph) for that calendar year. As used herein, "**Stabilization Year**" shall mean the first full calendar

10

year during the Lease Term in which the average actual occupancy of the Building equals or exceeds eighty-five percent (85%) of the total rentable area of the Building. The **"Cap Amount"** for any given calendar year following the Stabilization Year shall be an amount determined by increasing the Controllable Costs for the immediately prior calendar year by five (5%) percent, as measured on a cumulative and compounding basis. **"Controllable Costs"** shall mean all Operating Expenses for which increases are reasonably within the control of Landlord and not including the Operating Expenses which are not within Landlord's reasonable control, such as, but not limited to, the following: insurance-related costs, premiums, and deductibles, utility and waste collection-related costs, life safety and security costs, any taxes or assessment, security costs, non-reimbursed non-capital hurricane, storm, or other natural disaster-related expenses incurred for emergency, repair, and clean-up costs, mandatory increases in minimum wage, costs related to complying with new or amended Applicable Laws which were not in effect as of the Effective Date of this Lease, or non-recurring capital expenditures which are expressly permitted by this Lease. In no event shall this Cap Amount apply to Taxes, Insurance or any Operating Expenses other than Controllable Costs.

Section 4.4    **PAYMENT OF TAXES.** Commencing on the Rent Commencement Date, Tenant shall make monthly payments based upon the estimated annual total of Tenant's Proportionate Share of Taxes (as calculated in this Article) in monthly installments on or before the first day of each calendar month during the Lease Term, in advance, in an amount estimated by Landlord. For the years in which the Lease Term commences and terminates, the provisions of this Section shall apply, and Tenant's liability for its Proportionate Share of any Taxes for such years shall be subject to a pro rata adjustment based on the number of days of said calendar year during which the Lease Term is in effect. Landlord shall have the right to initially determine monthly estimates and to revise the estimates from time to time. Upon receipt of all tax bills and assessment bills attributable to any calendar year during the Lease Term hereof, Landlord shall furnish Tenant with a written statement of the actual amount of Tenant's Proportionate Share of the Taxes for such year along with such tax bills. In the event no tax bill is available, Landlord will reasonably compute the amount of such tax. If the total amount paid by Tenant under this Section for any calendar or fiscal year during the Lease Term shall be less than the actual amount due from Tenant for such year, as shown on such statement, Tenant shall pay to Landlord the difference between the amount paid by Tenant and the actual amount due, such deficiency to be paid within fifteen (15) days after written demand by Landlord; and if the total amount paid by Tenant hereunder for any such year shall exceed such actual amount due from Tenant for such year, such excess shall be credited against the next installment of Taxes due from Tenant to Landlord hereunder. All amounts due hereunder shall be payable to Landlord in the manner and at the place where the Base Rent is payable.

Section 4.5    **INSURANCE.** Commencing on the Rent Commencement Date, Tenant shall also pay for an amount equal to Tenant's Proportionate Share of all Insurance. Commencing on the Rent Commencement Date, Tenant shall make monthly payments based upon the estimated annual total of all Insurance, in monthly installments on or before the first day of each calendar month during the Lease Term, in advance, in an amount estimated by Landlord. Landlord shall have the right to initially determine monthly estimates and to revise the estimates from time to time but in no event shall monthly estimates be revised more than once annually.

Section 4.6    **GROSSING UP OF OPERATING EXPENSES.** If either the Building or the Project or the retail portion of the Building, as applicable, is not fully occupied during any period of the Lease Term, the occupancy-sensitive Operating Expenses shall be determined as if the Building or the Project or the retail portion of the Building, as applicable, had been fully occupied during such calendar year (and "fully

11

occupied" shall mean occupancy of ninety-five (95%) percent of the rentable area of the Building, the Project or the retail portion of the Building, as applicable).

Section 4.7    **SECURITY DEPOSIT; LETTER OF CREDIT.**

(a)    Tenant shall, simultaneously with the execution of this Lease, deposit with Landlord the amount shown in the BLI Summary ("**Security Deposit**").  The Security Deposit shall be retained by Landlord as security for the payment by Tenant of the Rents and all other payments herein agreed to be paid by Tenant and for the faithful performance by Tenant of the terms and provisions of this Lease. Tenant hereby agrees: (i) that Landlord, at Landlord's option, may at the time of any default by Tenant under any of the terms or provisions of this Lease, apply the Security Deposit or any part thereof towards the payment of the Rents and all other sums payable by Tenant under this Lease, and towards the performance of each and every one of Tenant's obligations under this Lease, but such obligations and Tenant's liability under this Lease shall thereby be discharged only to the extent of the sums so applied by Landlord, and Tenant shall remain liable for any amounts that such sums shall be insufficient to pay as well as the immediate repayment back to Landlord of all portions of the Security Deposit so utilized by Landlord to fully restore the same to its original amount; that Landlord may exhaust any and all rights and remedies against Tenant before resorting to said sum, but nothing herein contained shall require or be deemed to require Landlord to do so; (ii) that, in the event the Security Deposit shall not be utilized for any such purposes, then such deposit shall be returned by Landlord to Tenant within thirty (30) days next after the expiration of the Lease Term or the determination and payment of the amount due under this Section, if any, whichever later occurs.  Landlord shall not be required to pay Tenant any interest on said Security Deposit nor to maintain the Security Deposit in a separate account.  In the event of a sale of the Building, Landlord shall have the right to transfer the Security Deposit to the purchaser and Landlord shall thereupon be released by Tenant from all liability for the return of such Security Deposit, and Tenant agrees to look solely to the new Landlord for the return of said Security Deposit; and it is agreed that the provisions hereof shall apply to every transfer or assignment of the Security Deposit to a new Landlord.

(b)    Notwithstanding anything in the foregoing to the contrary, Tenant shall have the right, in lieu of a cash deposit, to deliver to Landlord an unconditional and irrevocable letter of credit issued by a federally-insured banking institution reasonably acceptable to Landlord (the "**Letter of Credit**") in the face amount of the Security Deposit on a form reasonably acceptable to Landlord, as  the Security Deposit to be held by Landlord until disposed of in accordance with the provisions of this Section 4.7.   If the Letter of Credit (or any replacement thereof) is issued for an effective period of time less than the date which is forty-five (45) days beyond the then remaining Lease Term (or any renewal thereof), Tenant shall from time to time, and not later than sixty (60) days prior to the expiration of the Letter of Credit, replace each such expiring Letter of Credit with a new Letter of Credit in the same amount and upon the same terms. The Letter of Credit (and any replacement thereof) may be drawn upon by Landlord under the terms and conditions as provided in this Section 4.7.  Failure of Tenant to renew the Letter of Credit at least sixty (60) days prior to its expiration shall constitute an Event of Default under this Lease and shall entitle Landlord, in addition to the other remedies contained in this Lease, and without any further notice to Tenant, to draw upon the Letter of Credit.  In the event Landlord makes full or partial draw under the Letter of Credit, the amount so drawn shall be treated as though the Security Deposit was cash under Section 4.7(a) above.

For the avoidance of doubt, if Tenant is in default hereunder, then Landlord shall draw down the Letter of Credit or Security Deposit, as applicable, to satisfy such default so long as such Letter of Credit or Security Deposit is sufficient to fully satisfy such default before Landlord enforces Guarantors'

12

Execution Copy

obligations under the Guarantees to pay to remedy the same.  Notwithstanding the foregoing, if Tenant does not make the required repayment back to Landlord (or, if applicable, the bank providing the Letter of Credit) of the portion of the Letter of Credit or Security Deposit (as applicable) so applied to fully restore the same to its original amount (or, if applicable, to reimburse the bank for any amounts paid on the Letter of Credit), then Landlord shall have the right to demand that Guarantor(s) make such payment pursuant to the Guarantees.

Section 4.8    **PERSONAL PROPERTY TAXES.** Tenant is liable for all taxes levied against personal property and trade fixtures placed by Tenant in the Leased Premises.  In the event such items of Tenant's property are assessed with property of Landlord, Landlord shall allocate such assessment between Landlord and Tenant so that Tenant shall pay only its equitable portion.

Section 4.9    **TRIPLE NET LEASE.** Landlord and Tenant acknowledge that, except as otherwise provided to the contrary in this Lease, it is their mutual intent and agreement that this Lease be a "Triple Net" lease and that as such, the provisions contained in this Lease are intended to pass on to Tenant (or otherwise reimburse Landlord for) certain costs and expenses reasonably associated with the Building and/or the Project as more particularly set forth in this Lease, and Tenant's operation therefrom.  To the extent such costs and expenses payable by Tenant cannot be charged directly to, and paid by, Tenant, such costs and expenses shall be paid by Landlord but reimbursed by Tenant as Additional Rent.

Section 4.10    **COST POOLS**.  Landlord may reasonably determine separately and allocate Operating Expenses, Taxes, Insurance and/or other costs for which Tenant is required to pay Tenant's Proportionate Share, between the retail portion of the Building and/or the Project (as applicable) and other non-retail and/or residential portions of the Building and/or the Project (as applicable), in accordance with sound accounting and management principles.  In addition to the foregoing, Landlord and Tenant acknowledge that Tenant's Permitted Use may have an impact on certain items of Operating Expenses (e.g., and without limitation, expenses for garbage removal) that is disproportionate to Tenant's Proportionate Share.  Accordingly, with respect to any such specific items of Operating Expenses, Landlord shall have the right, on written notice to Tenant, to make reasonable adjustments to Tenant's Proportionate Share in order to account for such disproportionate use.

Section 4.11    **ANNUAL FINANCIAL STATEMENTS**. Within twenty (20) days of Landlord's request in connection with any prospective sale or financing of the Building, Tenant shall cause the following financial information to be delivered to Landlord: (a) a current (which may be the most recent year's) financial statement, including a balance sheet and a statement of income and expenses, for Tenant; and (b) such other financial information pertaining to Tenant or any Guarantor (if applicable in the future) as any lender or purchaser reasonably requests.

### ARTICLE 5 — OPERATIONS

Section 5.1    **COMMON AREAS AND PARKING.** Landlord shall have the exclusive control and management of the Common Areas, and shall have the right to close temporarily all or any portion of the Common Areas and to do and perform such other acts in and to said areas as Landlord shall determine to be advisable in its sole judgment. Tenant acknowledges and agrees that certain trees and other landscaping may be located within the sidewalk area located in front of the exterior of the Leased Premises and Tenant further acknowledges and agrees that Tenant shall have no claim against Landlord that any such trees and landscaping (as replaced during the Lease Term), affect the visibility of the Leased Premises and/or access to the Leased Premises; provided, however, that Landlord shall not plant any such

Execution Copy

trees or landscaping that will materially and adversely affect visibility of or access to the Leased Premises without first obtaining Tenant's prior consent (not to be unreasonably withheld, conditioned or delayed). Tenant will not use the sidewalks adjacent to the Leased Premises, or any other space outside of the Leased Premises, for the sale or display of any merchandise or for other business, occupation or undertaking.  Landlord will operate and maintain the Common Areas in such manner and with such personnel as Landlord shall determine from time to time.  The Leased Premises shall not include any right to any parking space(s).  Tenant and its employees, guests and invitees may park only in those spaces which are designated by Landlord for the retail portion of the Building to the extent spaces are available and subject to the prevailing parking charges established by the Landlord or parking garage operator, as applicable.  The use of any parking garage (if available) shall be governed by rules and regulations as adopted from time to time by Landlord or the garage operator, as applicable.  Tenant shall have no right to use the elevator lobbies, apartment floors, and any other areas designated by Landlord exclusively for residential or office occupants. Tenant acknowledges and agrees that the Building is a mixed use property that may contain retail, residential and office uses and neither Tenant nor any of its employees, agents, contractors or invitees shall have the right to use any other non-retail portions of the Building, including, without limitation, any elevators, lobbies, pools, fitness areas, residential floors, and any other areas designated by Landlord as exclusively for rental, residential or office occupants.

Section 5.2    **RULES AND REGULATIONS.** Tenant agrees to comply with all rules and regulations Landlord may adopt from time to time for the operation, protection and welfare of the Building and/or the Project, its tenants, visitors and occupants.  The present rules and regulations, which Tenant hereby agrees to comply with, entitled "Rules and Regulations" are attached hereto as **Exhibit "A"** and are by this reference incorporated herein.  Any future Rules and Regulations shall become a part of this Lease, and Tenant hereby agrees to comply with the same upon delivery of a copy thereof to Tenant; provided, however, that any new Rules and Regulations adopted by Landlord in the future will not materially and adversely reduce Tenant's rights under this Lease or materially and adversely increase Tenant's obligations under this Lease. Landlord shall use good faith efforts to consistently enforce such Rules and Regulations, but Landlord's failure to enforce any of the Rules and Regulations on any occasion shall not preclude Landlord from subsequently enforcing the same.

Section 5.3    **SIGNS.** Tenant shall have no right to place any signs, posters or plaques on the interior windows or glass doors of the Leased Premises or on the exterior of the Leased Premises or the Building without Landlord's prior written consent, which may be withheld in Landlord's sole and absolute discretion.  Prior to installing any signage, Tenant shall submit such signage to Landlord for Landlord's approval.  All signs shall be installed, maintained, repaired and/or replaced, as necessary from time to time, at Tenant's sole cost and expense and in compliance with Applicable Laws, Landlord's signage criteria ("**Landlord's Signage Criteria**") and the City of Orlando, Florida's signage requirements (which signage requirements may differ in whole or in part from Landlord's Signage Criteria).  Tenant is responsible for obtaining the City of Orlando signage requirements.  After approval by Landlord of Tenant's signage, Tenant shall be required as part of Tenant's Work to install signage for the Leased Premises in the location designated and approved by Landlord (the "**Entry Signage**").  Landlord shall have the unrestricted right to install signs on the interior or exterior of any portion of the Building and/or the Project and to change the Building's and/or Project's name or street address.  Any signs installed by Tenant without Landlord's consent may be removed by Landlord at Tenant's sole cost and expense.

Section 5.4    **TRASH REMOVAL.** Tenant shall store all trash and garbage within the Leased Premises and deposit it in the trash dumpster or other container supplied by Landlord and designated by Landlord for such type of trash and garbage, using only water-tight and odor proof containers to transport

14

the trash and garbage from the Leased Premises to such dumpster or other container. Tenant shall receive and deliver goods and merchandise and remove garbage and trash in the frequency, schedule, manner, and areas (including designated pathways thereto) Landlord prescribes. If Tenant does not properly dispose of its trash and garbage, Landlord may have the area cleaned in which event Tenant shall pay all charges incurred by Landlord therefor, plus an administrative charge of ten percent (10%) of the charges incurred by Landlord, which shall be considered Additional Rent and shall be paid to Landlord upon presentation of a bill therefor. Tenant shall not operate an incinerator or burn trash or garbage within the Building.

Section 5.5    **GOVERNMENTAL REQUIREMENTS.** Tenant shall faithfully observe in the use of the Leased Premises all municipal and county ordinances and codes and state and federal statutes now in force or which may hereafter be in force, affecting the Leased Premises or any part thereof, or the use thereof, including those for the correction, prevention and abatement of nuisances and unsafe conditions and those relating to the handling and disposal of Hazardous Materials and any other environmental concerns. Tenant agrees to comply with any requirement that the Leased Premises be vacated during any smoke alarm test or other governmental inspection of the Building and that such interruption shall not be deemed a constructive eviction or a disturbance of Tenant's use or possession of the Leased Premises, nor shall it render Landlord liable to Tenant for damages or abatement of Rent. Landlord shall endeavor to provide reasonable prior notice (under the circumstances) to Tenant of any such smoke alarm test by any governmental authority that is anticipated to affect the Leased Premises.

Tenant shall be responsible, at Tenant's sole cost and expense for compliance with the Americans with Disabilities Act of 1990, as amended from time to time, and related state and municipal laws and regulations (the "**ADA**") with respect to: (i) both the configuration of the Leased Premises (the interior, as well as all public and/or employee door entrances), Tenant's Work, and Tenant's business operations at the Leased Premises, and (ii) any costs of compliance (whether with respect to the Common Areas, the Leased Premises or any other portion of the Building or Project) that are due to Tenant's specific use of the Leased Premises, or are due to any alterations or improvements made to the Leased Premises by Tenant or its employees, agents or contractors. Notwithstanding anything in this Lease to the contrary, Landlord does not warrant the compliance of the Leased Premises with the ADA or such state or local laws as same relate to Tenant's proposed use or occupancy of the Leased Premises, or as to any alterations, additions or improvements made, or proposed to be made, therein by Tenant, or otherwise. To the extent that there are any changes to the ADA which require changes to the Common Areas, then all costs incurred by Landlord in complying with the ADA may be included as Operating Expenses. The cost of any actions that are Tenant's responsibility hereunder that are incurred by Landlord, including any legal fees and costs shall be reimbursed by Tenant to Landlord within thirty (30) days following Landlord's demand to Tenant.

Section 5.6    **NOISE AND ODORS.**

(a)    Tenant acknowledges that it is operating in a luxury residential building and Landlord needs to ensure a peaceful environment for its residents similar to that of a luxury hotel. Accordingly, Tenant shall not permit any objectionable or unpleasant noises or odors to emanate from the Leased Premises in a manner that could reasonably be expected to disturb any residents of the Building and/or the Project and Tenant shall install and maintain, in a first-class manner, commercially appropriate PCU/exhaust scrubbers to remove or mitigate grease particles and abate smoke from the air stream of its commercial kitchen exhaust systems to help reduce the emission of harmful or undesirable odors; nor shall Tenant place or permit any radio, television, loudspeaker or amplifier on the roof or outside the Leased Premises or where the same can be seen or heard from outside the Leased Premises without

15

Execution Copy

Landlord's prior written consent; nor place any antenna, equipment, awning, fixture or other projection on the exterior of or above the Leased Premises without Landlord's approval (which may be rescinded, after such approval is initially given, upon the receipt of any complaints from residents or other tenants in the Building and/or Project or any governmental authority); nor take any other action which would constitute a nuisance or would unreasonably disturb or endanger other tenants of the Building and/or the Project or unreasonably interfere with their use of their respective premises; nor permit any unlawful practice to be carried on or committed in the Leased Premises; nor do anything which would injure the reputation of the Building and/or the Project. If requested by Landlord, then Tenant shall maintain a service contract with a service provider or providers acceptable to Landlord (whose approval will not be unreasonably withheld, conditioned or delayed) to maintain and repair, no less than quarterly, Tenant's HVAC unit serving the Premises and clean and maintain the PCU/exhaust scrubbers installed by Tenant in accordance with this paragraph.

(b)    Tenant acknowledges and agrees that because of the multi-use and multi-floor nature of the Building and the Project, Tenant shall be commercially diligent in complying with the terms of all of the provisions of this Section. Tenant agrees to exercise commercially reasonable care in its handling of garbage waste and refuse and will remove such materials from the Leased Premises and the Building as frequently as necessary in order to eliminate harmful or undesirable odors. Business machines and mechanical equipment belonging to Tenant which cause noise, vibration or any other nuisance that may be transmitted to the structure or other portions of the Building or to the Leased Premises to such a degree as to be reasonably objectionable to Landlord, or which unreasonably interfere with the use or enjoyment by other tenants of their premises, shall be placed and maintained by Tenant at Tenant's cost and expense, in settings of cork, rubber or spring type vibration eliminators sufficient to eliminate noise or vibration.

(c)    Notwithstanding anything herein to the contrary, Landlord shall have the right to reasonably regulate and control in Landlord's reasonable discretion: (i) any music being played in a manner that is audible in any offensive or obtrusive manner in the Common Areas or any of the residential areas of the Building and/or the Project, (ii) any harmful or undesirable odors emanating to or from any Common Areas of the Building and/or the Project, (iii) the patron capacity of the Building and/or the Leased Premises and (iv) the hours in which Tenant is permitted to operate in the Leased Premises. In furtherance of the foregoing, Tenant agrees to abide by any rules or regulations adopted by Landlord, from time to time, with respect to such matters.

**ARTICLE 6 — MAINTENANCE, REPAIRS AND ALTERATIONS**

Section 6.1    **MAINTENANCE AND REPAIRS.**

(a)    Tenant will, at Tenant's sole cost and expense, keep the Leased Premises in good repair and tenantable condition during the Lease Term and, in furtherance thereof, will replace at its sole cost and expense any and all broken glass in and about said Leased Premises. Without limiting the foregoing, Tenant shall, at its sole cost and expense, maintain, repair and replace all electrical, plumbing, HVAC and other systems and equipment within the Leased Premises and/or which exclusively serve the Leased Premises, including, without limitation, the HVAC systems and equipment installed by Landlord in accordance with the terms hereof. All aforesaid repairs, restorations and replacements shall be in quality and class equal to the previously existing work or installations and shall be performed under the direction and to the satisfaction of Landlord.

16

(b)     If Landlord deems any repair, which Tenant is required to make hereunder to be necessary, then Landlord may demand that Tenant make such repair immediately.  If Tenant refuses or neglects to make such repair and to complete the same with reasonable dispatch, Landlord may, but shall not be obligated to, make such repair and Tenant shall, on demand, immediately pay to Landlord the cost thereof, together with an administrative charge equal to fifteen percent (15%) of the cost of such work. Such sums due Landlord shall be paid by Tenant upon being billed therefore.  Landlord shall not be liable to Tenant for any loss or damage that may accrue to Tenant's business by reason of such work or its results.

(c)     Except for the maintenance and repair of the Leased Premises, which is the sole responsibility of Tenant as provided hereinabove, Landlord shall, as part of Operating Expenses (subject to any exclusions therefrom expressly set forth in the BLI Summary), maintain the Building and repair and replace the structural portions thereof and all electrical, plumbing, HVAC and other systems and equipment used in operation thereof (excluding therefrom any such systems or equipment exclusively serving the Leased Premises), which Landlord deems reasonably necessary or desirable to keep the Building in good order and repair.  Notwithstanding the foregoing, to the extent any damage to the Building is caused by acts or omissions of Tenant, its agents, customers, employees or invitees, Tenant will make such repairs (under Landlord's supervision and to its satisfaction) and bear the sole cost thereof. Tenant agrees to notify Landlord of the necessity for any repairs of which Tenant may have knowledge and for which Landlord may be responsible under the provisions of the first sentence of this Section.  In the event that Landlord is responsible for such repairs, Landlord shall commence such repairs within a reasonable time after receiving notification of same.

(d)     In the event Tenant uses all or any portion of the Leased Premises for food preparation, Tenant shall comply with all regulations and requirements of applicable health and safety authorities, including, if required by such authorities, maintaining an adequate grease trap.  Tenant, at Tenant's sole cost and expense, shall arrange for regular and frequent cleaning of any such grease trap so as to fully and completely prevent any overflow of the grease trap.  Tenant, at Tenant's sole cost and expense, shall also arrange for regular and frequent cleaning of any ventilation filters and other equipment related thereto. Landlord, at Landlord's option, shall have the right to periodically inspect such grease trap and/or request copies of any applicable maintenance/service contracts to ensure Tenant's compliance with the covenants set forth in this paragraph.  Notwithstanding the foregoing, should Tenant share a grease trap serving the Leased Premises with one or more other tenants at the Building, then Landlord shall arrange to maintain and repair such grease trap and shall include the costs of such maintenance and repairs (and, as necessary, replacements) in Operating Expenses (which costs may be allocated equitably just between or among the tenants sharing such grease trap); provided, however, Tenant shall be solely liable (at Tenant's sole cost and expense) to make any repairs to such grease trap which are necessitated by the negligence or willful misconduct of Tenant or any of its employees, contractors or agents.

(e)     Tenant shall take good care of the Leased Premises, keep the Leased Premises secure (and Tenant acknowledges that it is not relying on any representation or warranty of Landlord in this regard), and keep the Leased Premises free from waste at all times.  Tenant shall not overload the floors in the Leased Premises, nor deface or injure the Leased Premises.  Tenant at all times shall keep the Leased Premises neat, clean and free from dirt and rubbish; shall take care that dirt, refuse, and garbage from or connected with the Leased Premises does not collect on the sidewalks, service ways and loading areas adjacent to or serving the Leased Premises or any other portion of the Building.

Execution Copy

Section 6.2    **STORM SHUTTERS.** In the event that Landlord is required to provide, or provides storm shutters for the Leased Premises, then Tenant shall be responsible for storage, safe keeping and installation of such shutters. Tenant shall install such shutters in all events where circumstances could bring damage to the Leased Premises or the Building, and/or when otherwise directed by Landlord. If Landlord shall provide a storage facility for shutters, Tenant shall be responsible for the prompt and orderly retrieval, installation and re-storing of the shutters for the Leased Premises. The placing of any holes in the storefront or building facade to install the shutters shall be repaired by the Landlord at the Landlord's expense.

Section 6.3    **ALTERATIONS TO BUILDING AND COMMON AREAS.** Tenant acknowledges and makes this Lease with the distinct understanding and agreement that Landlord shall have the right and privilege to make any additions to the Building of which the Leased Premises are a part, and to make such alterations, structural changes, refurbishments, renovations and repairs to said Building and the Common Areas as it may deem desirable and advisable without any liability to Tenant therefore; provided, however, Landlord shall use good faith efforts to not make any alterations or additions to the Building (which are discretionary and not required by Applicable Laws or governmental authorities) that can reasonably be expected to have a material and adverse effect on the visibility of the storefront of the Leased Premises or Tenant's access to and from the Leased Premises without first obtaining Tenant's prior written consent (not to be unreasonably withheld, conditioned or delayed).

## ARTICLE 7 — UTILITIES

Section 7.1    **UTILITIES.**

(a)    The Leased Premises shall be separately metered for gas and electric utility service, which shall be at Tenant's sole cost and expense, and Tenant shall be obligated to timely and fully pay directly to the applicable utility company providing such service all such utility charges due and payable.

(b)    Landlord shall install, at Landlord's sole cost and expense, a submeter for water and sewer utility services at the Leased Premises. Tenant hereby agrees to pay Landlord for its share of such water and sewer utilities used upon receipt of the invoice for billing for any sub-metered services. If Tenant fails to pay the charges after written notice and within applicable cure periods, Landlord may, at Landlord's option, pay for said sub-metered utilities and the amount so paid by Landlord shall be charged to Tenant as Additional Rent, which shall be due and payable to Landlord with the next monthly installment of Base Rent. In addition, unless prohibited by law, sub-metered bills may be estimated on a temporary basis when necessary, due to equipment malfunction or similar problem, or in the event if certain utilities are furnished to the Leased Premises in common with any other tenant's premises until such malfunction, problem and/or event may be resolved by Landlord. Tenant agrees not to disconnect, adjust, and/or otherwise tamper with Tenant's sub-meter device and/or sub-meter system.

(c)    Any other utility services provided to the Leased Premises, such as, but not limited to, cable and internet, shall be provided at Tenant's sole cost and expense and subject to all terms and provisions of this Lease. Notwithstanding anything herein to the contrary, Landlord may designate certain utility providers (such as, but not limited to, cable and internet providers) as the exclusive providers of such services for the Building and/or the Project. Should Landlord elect to do so, then Tenant shall be required to use such utility providers for the provision of such services.

Section 7.2    **SERVICES.**

18

Execution Copy

(a)      Landlord shall provide electric current for lighting, incidentals and normal retail use; and water at those points of supply provided for general use of the Building's tenants at all times and will provide a commercial grease trap for Tenant's use in connection with the Leased Premises.  Such services shall be provided as long as no event of default has occurred under this Lease, following  the expiration of all applicable notice or cure period, subject to interruption caused by repairs, renewals, improvements, changes of service, and alterations, and further subject to interruptions of the nature described hereinafter, and upon such happening, no claim for damages or abatement of Rent for failure to furnish any such services shall be made by Tenant or allowed by Landlord nor shall any such happening be construed as a constructive eviction of Tenant or relieve Tenant from the responsibility of performing any of Tenant's obligations under this Lease.  All other responsibility for maintenance of the Leased Premises, unless specifically assigned to Landlord under this Lease, shall be the responsibility of Tenant.

(b)      Landlord shall not be liable for any interruption whatsoever in utility services whether due to fire, accident, strike, acts of God or other causes beyond the control of Landlord or for any other reason whatsoever, or which are necessary in connection with alterations, repairs or improvements by Landlord. No interruptions hereunder shall constitute an actual or constructive eviction in whole or in part, nor shall any interruptions entitle Tenant to any abatement or diminution of rent hereunder. Tenant shall use only those fixtures and equipment that operate on the Building's standard electric circuits, but which in no event shall overload the Building's standard electric circuits from which Tenant obtains electric current.  Any required installation of special circuits, cable, wire or equipment to service Tenant's unusual electrical needs shall be at Tenant's expense and only if prior approval therefor is given in writing by Landlord.

Notwithstanding anything in this Section 7.2 to the contrary, if (i) there is a utility service interruption due to the negligence or willful misconduct of Landlord or any of its employees, contractors or agents (a "**Landlord Utility Interruption**"), and (ii) such Landlord Utility Interruption materially and adversely interferes with Tenant's use and occupancy of the Leased Premises for the Permitted Use such that Tenant determines it cannot reasonably conduct business upon the Leased Premises during such period of interruption, and (iii) Tenant does not use or occupy the Leased Premises for the conduct of business during such period of interruption, and (iv) Tenant has notified Landlord in writing of the Landlord Utility Interruption, then if said Landlord Utility Interruption lasts longer than five (5) consecutive days, Tenant shall be entitled to an abatement of Base Rent payable under this Lease commencing upon the expiration of such five (5) day period and lasting until the earlier of the date that the Landlord Utility Interruption ceases or the date that Tenant first conducts business again from the Leased Premises.

(c)      Tenant shall use only those fixtures and equipment that operate on the Building's standard electric circuits, but which in no event shall overload the Building's standard electric circuits from which Tenant obtains electric current.  Any required installation of special circuits, cable, wire or equipment to service Tenant's unusual electrical needs shall be at Tenant's expense and only if prior approval therefor is given in writing by Landlord. Tenant shall be required, at Tenant's sole cost and expense, to have the lighting within the Leased Premises turned on continuously; provided, however, that Tenant shall be permitted to dim or otherwise turn off its lighting in the interior of the Leased Premises during hours that Tenant is not open (and is not otherwise required to be open) for business so long as Tenant maintains reasonably adequate lighting of the exterior of the Leased Premises twenty-four (24) hours, seven (7) days a week, except to the extent that such exterior lighting is otherwise provided by and under the control of Landlord and/or its Building property manager.

19

Execution Copy

(d)      Landlord reserves the right, after 12:00 a.m., to turn off all unnecessary lighting in the unoccupied areas of the Building and the Leased Premises to minimize the energy consumption of the Building in both the Common Areas and the Leased Premises.

## ARTICLE 8 — INSURANCE AND INDEMNITY

Section 8.1      **INSURANCE COVERAGE.**

(a)      Tenant shall, at Tenant's sole cost and expense, purchase and maintain the insurance pursuant to **Exhibit "H"** as of the Effective Date of this Agreement and Tenant's failure to do so shall be a default under the Lease. Tenant shall not do or permit any act or thing to be done in, or about the Leased Premises that may subject Landlord to any liability or responsibility for injury, damage to person or property or to any liability by reason of the existence or application of, compliance with or violation of any requirement, but shall exercise such control over the Leased Premises as to protect the Landlord fully against any such liability and responsibility. Landlord shall not be responsible or liable to Tenant, or those claiming by, through or under Tenant, for any loss or damage which may be occasioned by or through the acts or omissions of persons occupying space adjoining the Leased Premises or any part of the premises adjacent to or connecting with the Leased Premises or any other part of the Building or otherwise. All property of Tenant kept in the Leased Premises shall be so kept at Tenant's risk only and Tenant shall save Landlord harmless from claims arising out of damage to the same, including subrogation claims by Tenant's insurance carrier.

(b)      Tenant, except for when occasioned by Landlord's negligence or willful misconduct (subject in all respects to the waiver of subrogation set forth in Section 8.1(f) below), shall indemnify, protect, defend, and hold Landlord and its Affiliates harmless from and against any and all Claims (defined below) arising out of or in connection with loss of life, personal injury, property damage (including loss of use therefrom) or otherwise arising from: (i) the use, occupation, improvement or maintenance of the Leased Premises or the Building or any work or activity in or about the Leased Premises or Building by Tenant or its assignees or subtenants or their respective agents, employees, contractors, or licensees; (ii) any activity, condition or occurrence in or about the Leased Premises; (iii) the filing of any mechanic's or materialmen's lien against the Leased Premises or the Building in connection with any work done or caused to be done by Tenant; (iv) any breach or failure to perform any obligation imposed on Tenant under this Lease; or, (v) any act or omission of Tenant or its assignees or subtenants or their respective agents, contractors, employees, or licensees. Upon notice from Landlord, Tenant shall, at Tenant's sole expense and by counsel satisfactory to Landlord, defend any action or proceeding brought against Landlord by reason of any such Claim. The term "Claims" means any claim, demand, investigation, proceeding, action, suit, judgment, award, fine, lien, loss, damage, expense, charge or cost of any kind or character and liability (including reasonable attorney fees and court costs). The obligations of this Section shall survive the expiration or earlier termination of this Lease. If any Claims are made or brought against the Landlord, against which Claims, Tenant is obligated to indemnify Landlord pursuant to the terms of this Lease, then upon demand by Landlord, Tenant, at its sole cost and expense, shall resist or defend such Claims in Landlord's name, if necessary by such attorneys as Landlord may select, including, without limitation, attorneys for Landlord's insurer. Notwithstanding the foregoing, if such attorneys shall be defending both Tenant or any persons within Tenant's control and Landlord, Landlord may retain its own attorneys to defend or assist in defending any claim, action or proceeding, and Tenant shall pay the reasonable fees and disbursements of such attorneys. The provisions of this Section shall survive the expiration or earlier termination of this Lease.

20

Execution Copy

(c)    Landlord, except to the extent occasioned by the negligence or willful misconduct of Tenant or any of Tenant's employees, contractors, agents, subtenants or invitees, shall indemnify, protect, defend, and hold Tenant and its Affiliates harmless from and against any and all Claims arising out of or in connection with loss of life, personal injury, property damage occurring in the Common Areas of the Building and resulting from the gross negligence or willful misconduct of Landlord or any of its contractors, employees or agents.

(d)    In the event that Tenant fails to procure, maintain and/or pay for and provided evidence of same to Landlord, at the times and for the duration specified in this Lease, or fails to carry insurance required by law or governmental regulation, then in addition to the rights and remedies otherwise available to Landlord, Landlord may (but without obligation to do so) at any time or from time to time, and with five (5) days' prior written notice to Tenant, procure such insurance and pay the premiums therefor, in which event Tenant shall repay to Landlord all sums so paid by Landlord together with interest thereon as provided elsewhere herein and any costs or expenses incurred by Landlord in connection therewith, which shall be considered Additional Rent and shall be paid to Landlord within ten (10) days following Landlord's written demand to Tenant for such payment.

(e)    Landlord shall procure or cause to be procured and maintained throughout the Lease Term a policy or policies of insurance subject to reimbursement pursuant to this Lease, causing the Building to be insured under "all risk" property coverage and commercial general liability insurance (plus, as to either coverage, whatever endorsements or special coverages Landlord, in its sole and absolute discretion, may consider appropriate), to the extent necessary to comply with Landlord's obligations pursuant to other provisions of this Lease, and such other insurance (if any) that Landlord deems appropriate for the Building. Landlord shall be permitted to provide its insurance through blanket policies.

(f)    Notwithstanding anything to the contrary contained in this Lease, Landlord and Tenant mutually waive and release their respective rights of recovery against each other, and against the current and former officers, directors, partners, members, shareholders, employees, agents, tenants, licensees, contractors and subtenants of the other, directly or by way of subrogation or otherwise, for any claim, and for any loss of, or damage to, either party's property, any party's business or operations and/or any personal injury to the extent that such claim, loss, damage or injury results from a cause of loss which is covered by any property or commercial general liability insurance actually maintained by a party or which would have been covered by any property or commercial general liability insurance required pursuant to the terms of this Lease to be in effect at the time of such loss, damage or injury. Subject to any limitations on such amounts set forth in this Section, such waiver or release shall include any deductible, retention and self-insured loss or damage. Such waiver or release shall be effective without regard to whether such required policy was in effect and without regard to the availability of coverage or limits of liability under any such policy. Each party shall obtain any special endorsements required by its insurer to allow such waiver of rights of subrogation but the failure to obtain same shall not impair the effectiveness of this waiver and/or release between Landlord and Tenant. Any cost for a special endorsement shall be paid for by the party obligated to pay for the required insurance policy hereunder. This clause shall not apply to any claim for willful misconduct or intentional acts which are not covered by the required insurance. Subject to any limitation set forth in this Section, nothing in this Section shall preclude Landlord from including in the Insurance any deductible or retention portion of any loss or the cost of any public adjuster.

Section 8.2    **INDEMNIFICATION AGAINST LIENS.**

21

Execution Copy

(a)    All construction work done by Tenant within the Leased Premises shall be performed in a good and workmanlike manner, lien-free and in compliance with all laws and governmental requirements, and in such manner as to cause a minimum of interference with other construction in progress and with the transaction of business in the Building. Tenant shall give Landlord at least ten (10) days' advance notice before beginning work on any permitted alterations, additions or improvements (including, but not limited to, carpets, drapes and anything bolted, nailed or otherwise secured in a manner customarily deemed to be permanent) made in or upon the Leased Premises in order to (among others) permit Landlord to take any action it may deem necessary in advance of the commencement of any such work or alterations.

(b)    Prior to commencement of any such alterations or other work or construction on behalf of Tenant at the Leased Premises for which a notice of commencement is required pursuant to Chapter 713, Florida Statutes, Tenant shall record or cause to be recorded such a notice in the public records of Orange County, identifying Tenant as the party for whom the aforesaid alterations, work or construction is being performed and requiring the service upon Landlord of copies of all notices, liens or claims of lien arising or claimed by reason of any such alterations, work or construction.

(c)    Tenant hereby agrees to indemnify Landlord from and against, and shall keep the Leased Premises and the Building free from, any liens for any work performed, material furnished, or obligations incurred, by, or at the direction of Tenant. Neither Tenant nor any person or entity shall have any right to encumber or subject the interest of Landlord in the Leased Premises or the Building to any construction or other liens of any nature whatsoever, and upon the filing of any such lien, the failure of Tenant to have the same discharged by bond or otherwise within thirty (30) days after filing shall constitute a default and entitle Landlord at its option to take any action provided for elsewhere in this Lease. If Tenant fails to provide security for or satisfaction of any mechanics' lien within thirty (30) days of the placement of the lien, then Landlord, in addition to any other rights or remedies it may have, may (but shall not be obligated to) discharge said lien by (i) paying the claimant an amount sufficient to settle and discharge the claim, (ii) posting a release bond, or (iii) taking such action as Landlord shall deem appropriate. Tenant shall pay to Landlord within ten (10) days of Landlord's demand all actual out of pocket costs incurred by Landlord in settling and discharging such lien (including reasonable attorney fees, costs, interest at the then current statutory rate and bond premiums). Further, Tenant acknowledges that Landlord's damages arising from Tenant's failure to remove or bond off any construction liens which may be filed against the Leased Premises and/or any portion of the Building as a result of Tenant's Work are extremely difficult and impractical to fix. Therefore, in the event a construction lien is filed against the Leased Premises and/or any portion of the Building as a result of Tenant's Work and Tenant either has not removed such lien or has not bonded off such lien within thirty (30) days after written notice from Landlord, Tenant shall, in addition to any other remedies available to Landlord, pay a per diem amount of One Hundred and No/100 Dollars ($100.00) until such lien is removed or bonded off as compensation to Landlord for the damages arising from Tenant's failure to remove or bond off such lien.

(d)    Pursuant to Florida Statutes 713.10, it is the intent of the parties hereto that Landlord's interest in the Leased Premises shall not be subject to any liens filed because of or arising from Tenant's failure to make payments in connection with any buildings or improvements installed or constructed on the Leased Premises. Nothing contained in this Lease shall be construed to confer upon any party, including without limitation, material suppliers and contractors, the right to file a construction lien or other lien or any claim related thereto, nor to perform any labor or to furnish any materials for the account of Landlord in respect to the construction of any improvements, alterations or repairs to the Leased Premises or the Building by Tenant, its employees, agents or contractors.

22

Execution Copy

(e)     Tenant shall include in its contracts for construction on the Leased Premises the following requirements: (i) Landlord be included as an indemnified party in all indemnifications from contractor; (ii) Landlord be included as an additional insured on contractors commercial general liability policy and be provided with an endorsement evidencing same; and (iii) Landlord be included in all waivers of subrogation for claims related general liability and/or builder's risk coverage.

(f)     Tenant shall include in its contracts for construction on the Leased Premises the following language:

> Owner advises Contractor that Owner leases a portion of the land upon which the Building shall be constructed from 434 N. ORANGE INVESTMENT LLC, a Delaware limited liability company (the "Landlord"). In accordance with the applicable provisions of the Florida Construction Lien Law and specifically Florida Statutes, Section 713.10, no interest of the Landlord in any personalty or in the Leased Premises or in the underlying land or in the improvements located on the Leased Premises or Landlord's fee or other interest therein shall be subject to liens for improvements made by Owner or caused to be made by Owner as contemplated in this Contract. Contractor shall cause the foregoing disclosure and prohibition on claims of liens filed against Landlord's interest in the Building to be included in all bid documents and/or Subcontracts entered into for performance of all work.

(g)     Except as may be expressly set forth in this Lease, Tenant further acknowledges and agrees that Landlord shall not be liable to Tenant for any damages, losses or injuries to the persons or property of Tenant, its invitees, licensees or patrons, which may be caused by the acts, neglect, omissions or faults of any person or which may result from fire, wind, explosion, falling plaster, steam, gas, electricity, water or rain or leaks from any part of the Building or from the pipes, appliances or plumbing works, or from the road, street or subsurface, or from any other place, or by any cause whatsoever. All personal property placed or moved into the Leased Premises or the Building shall be at the risk of Tenant or the owner thereof, and Landlord shall not be liable to Tenant for any damage to said personal property.

### ARTICLE 9 — SUBORDINATION, ATTORNMENT AND SECURITY INTEREST

Section 9.1     **SUBORDINATION OF LEASE.**

(a)     This Lease shall be subject and subordinate to any mortgage or ground lease (including all renewals, modifications and extensions thereof) now or hereafter encumbering or affecting the Building or the land thereunder or Landlord's interest therein. This provision shall be self-operative without the execution of any further instruments. Notwithstanding the foregoing, however, Tenant hereby agrees to execute any instrument(s) which Landlord, its mortgagee or prospective mortgagee may deem desirable to evidence the subordination of this Lease to any and all such mortgages or ground leases. If, in connection with providing financing for the Building, any prospective mortgagee shall request reasonable modifications of this Lease as a condition to such financing, Tenant agrees that Tenant will not unreasonably withhold, delay or defer the execution of any agreement of modification of this Lease, provided such modifications do not increase the financial obligations of Tenant hereunder or materially adversely affect the leasehold interest hereby created or Tenant's reasonable use and enjoyment of the Leased Premises.

Execution Copy

(b)     Landlord shall obtain and deliver to Tenant a subordination and non-disturbance agreement in recordable form from the holder of any mortgage and/or similar security interest encumbering all or any part of the Leased Premises on such mortgagee's then current form, which Tenant shall promptly execute and deliver at Tenant's sole cost and expense, with only those edits thereto which are mutually approved by such mortgagee and Tenant.

Section 9.2     **ATTORNMENT.** If the interests of Landlord under this Lease shall be transferred voluntarily or by reason of the termination of any ground or underlying leases or by reason of foreclosure or other proceedings for enforcement of any mortgage on the Leased Premises, Tenant shall, at the election of such transferee, be bound to such transferee (herein sometimes called the "**Successor Landlord**") for the balance of the Lease Term hereof remaining, and any extensions or renewals thereof which may be effected in accordance with the terms and provisions hereof, with the same force and effect as if the Successor Landlord were Landlord under this Lease, and Tenant does hereby agree to attorn to the Successor Landlord, including the mortgagee under any such mortgage or the lessor under any such ground lease if it be the Successor Landlord, as its Landlord under this Lease upon the then existing terms of this Lease.  The foregoing attornment shall be effective and self-operative without the execution of any further instruments, upon the Successor Landlord succeeding to the interest of Landlord under this Lease. Notwithstanding the foregoing, however, Tenant hereby agrees to execute any instrument(s) which Successor Landlord or its prospective mortgagee may deem desirable to evidence said attornment by Tenant.  In the event of such transfer of Landlord's interests, Landlord shall be released and relieved from all liability and responsibility thereafter accruing to Tenant under this Lease or otherwise and Landlord's successor by acceptance of Rent from Tenant hereunder shall become liable and responsible to Tenant in respect to all obligations of "Landlord" arising during the period of such Successor Landlord's ownership of Landlord's interest hereunder, and not for any obligations of Landlord or any prior Successor Landlord or any claim by or cause of action of Tenant arising or accruing prior to such Successor Landlord's becoming the owner of Landlord's interest under this Lease.

Section 9.3     **SECURITY INTEREST; SUBORDINATION OF SAME.**

(a)     Tenant hereby pledges and assigns to Landlord as security for the payment of any and all Rent or other sums or amounts provided for herein, all of the furniture, fixtures, goods and chattels of Tenant which shall or may be brought or put on or into said Leased Premises, and Tenant agrees that said lien may be enforced by distress, foreclosure or otherwise, at the election of Landlord.  Tenant agrees that Landlord is authorized to file with the appropriate filing office a standard Uniform Commercial Code Financing Statements in form sufficient to perfect the lien in favor of Landlord created by this Section. For the avoidance of doubt, Landlord's lien rights shall not apply with respect to Tenant business records. Notwithstanding the foregoing, Landlord shall not unreasonably withhold its consent to any request by Tenant that Landlord subordinate Landlord's lien rights set forth in this paragraph to the lien of any bonafide third party, unaffiliated lender providing financing to Tenant in connection with its business at the Leased Premises and Landlord shall execute a subordination agreement (at no cost or expense to Landlord) in form and substance reasonably acceptable to Landlord.

(b)     Tenant covenants and agrees that it shall maintain throughout the Term a Liquor License free and clear of all liens, encumbrances, violations or claims except that of Landlord set forth herein. Tenant hereby grants to Landlord a first priority security interest in the Liquor License, to guarantee Tenant's faithful performance under this Lease. Tenant authorizes Landlord to file a Uniform Commercial Code financing statement and any other documents required by governmental authorities, including, but not limited to, the Florida Division of Alcoholic Beverages and Tobacco Form ABT-6022, with respect to

24

Execution Copy

the creation and perfection of the Landlord's first priority security interest in the Liquor License. All costs of any filings shall be paid by Tenant as Additional Rent hereunder. Tenant shall execute and deliver such further instruments and perform such further acts as shall be requested by Landlord in connection with the foregoing within five (5) business days of Landlord's request. Tenant shall maintain and renew said liens, as necessary, no less than sixty (60) days prior to expiration as required by law (i.e., within five (5) years from the date of recording and no later than every five (5) years thereafter) during the Term of this Lease and all extensions or renewals hereof; provided, however, that if Tenant has failed to renew said liens in accordance with the immediately preceding provision, then such failure shall be a default hereunder, which if not cured within the earlier of (i) thirty (30) days after written notice from Landlord or (ii) fifteen (15) days prior to the latest date for renewal of such lien, then such default shall be an "Event of Default" hereunder and Landlord shall be entitled to all remedies which Landlord is otherwise entitled to for an Event of Default by Tenant hereunder. Without limitation of the foregoing, Tenant shall execute the required forms to transfer the Liquor License to Landlord or its assigns, said documents to be held in escrow by Landlord. Upon any Event of Default (as hereinafter defined) by Tenant under this Lease, which is not cured within the applicable notice, grace and/or cure period as provided herein, Landlord may file said transfer documents with the Division of Alcoholic Beverages, transferring the Liquor License to Landlord or its assigns and/or Landlord may foreclose the aforesaid its security interest or take any other appropriate legal action in any court of competent jurisdiction.

(c)     Notwithstanding anything herein to the contrary, the provisions set forth in this Section 9.3 and the liens and security interests granted in this Section 9.3 shall expire and be deemed extinguished as of the first (1st) day of the eleventh (11th) Lease Year (i.e., after the conclusion of the 10th Lease Year) so long as Tenant has not be in default, beyond any applicable notice and/or grace period, at any time during the initial ten (10) Lease Years during the Lease Term.

## ARTICLE 10 — ASSIGNMENT AND SUBLETTING

### Section 10.1     ASSIGNMENT OR SUBLETTING.

(a)     Tenant shall not assign, transfer, mortgage, pledge, or otherwise encumber or dispose of this Lease or sublet the Leased Premises or any part thereof or permit the Leased Premises to be occupied by other persons without first obtaining the prior written consent of Landlord. Landlord's exercise of its consent shall be in its reasonable discretion. Notwithstanding the foregoing, the parties agree that it shall be reasonable for Landlord, among other reasons, to withhold consent to the assignment or transfer of this Lease if: (i) Landlord is not satisfied with the financial condition, identity, reputation or business character of the proposed assignee or sublessee; (ii) if Landlord or its agents have shown any space in the Building or the Project to or attempted to negotiate lease terms with such proposed assignee or sublessee regarding other available space in the Building within the preceding six (6) months; (iii) if such proposed assignee or the sublessee desires to change the Permitted Use; or (iv) if the intended use would violate the list of prohibited or exclusive uses set forth on **Exhibit "G"** attached hereto. In furtherance thereof, in the case of a subletting, Landlord's consent may be predicated, among other things, upon Landlord becoming entitled to collect and retain all Rent and any other economic consideration payable under the sublease, and in the case of an assignment, Landlord's consent may be predicated, among other things, upon Landlord's right to increase Base Rent and the Security Deposit, and to require additional guaranties of payment and performance of the obligations of "Tenant" under this Lease, and further upon Landlord's becoming entitled to collect and retain any economic consideration for said assignment paid or payable by the prospective assignee to Tenant. Tenant shall pay all attorneys' fees and costs incurred by Landlord pursuant to this Section in connection with Landlord's review of any proposed assignment or sublease. If

25

this Lease be assigned, or if the Leased Premises or any part thereof be sublet or occupied by anybody other than Tenant, Landlord may, after default by Tenant, collect or accept Rent from the assignee, subtenant, or occupant and apply the net amount collected or accepted to the Rent herein reserved, but no such collection or acceptance shall be deemed a waiver of this covenant or the acceptance of the assignee, subtenant, or occupant as Tenant, nor shall it be construed as, or implied to be, a release of Tenant or any Guarantor of the Lease from the further observance and performance by Tenant of the terms, provisions, covenants and conditions herein contained. Notwithstanding anything in the foregoing to the contrary, the parties agree that it shall be reasonable for Landlord, among other reasons, to withhold consent to a proposed assignment or sublease if: (i) Landlord is not satisfied with the financial condition, identity, reputation or business character of the proposed assignee or sublessee; (ii) if Landlord or its agents have shown any space in the Building or the Project to or attempted to negotiate lease terms with such proposed assignee or sublessee regarding other available space in the Building within the preceding six (6) months; (iii) if such proposed assignee or sublessee desires to change the Permitted Use; (iv) if the intended use would violate the list of prohibited or exclusive uses applicable to the Building and/or the Project; (v) if such proposed assignee or sublessee could reasonably be expected to materially increase Operating Expenses or Insurance costs for the Building and/or the Project; or (vi) if Landlord's mortgagee or ground lessor (if applicable) does not approve such proposed assignee or sublessee or the terms of the proposed assignment or sublease.

(b)        The consent by Landlord to any assignment or subletting hereunder shall not be construed as releasing Tenant from any liability hereunder or as constituting the consent by Landlord to any subsequent assignment or subletting, which subsequent assignment or subletting shall require the prior written approval of Landlord as provided herein in each instance. In the event an assignment is permitted by Landlord, contemporaneously with the granting of Landlord's consent, Tenant shall cause the assignee to expressly assume in writing and agree to perform all of the covenants, duties and obligations of Tenant hereunder and such assignee shall be jointly and severally liable therefor along with Tenant (but any assignee who does not expressly assume such obligations in writing shall nevertheless be deemed to have assumed such obligations by acceptance of any such assignment). Any assignment, subletting, hypothecation, pledging or other disposition of Tenant's interest hereunder, in violation of the terms hereof shall be deemed null and void, and shall constitute an act of default hereunder.

(c)        Except for a Permitted Transfer (as hereinafter defined), if Tenant is not an individual, any direct or indirect change in the ownership (legal or equitable) of a controlling and/or a majority interest of Tenant, whether such change in ownership occurs at one time or as a result of sequential incremental changes, and whether said change is by sale, assignment, hypothecation, bequest, inheritance, operation of law, merger or consolidation, or otherwise, shall be deemed an assignment of this Lease subject to the consent of Landlord, the failure of which shall be deemed a default hereunder.

(d)        Notwithstanding anything to the contrary contained herein, so long as Tenant is not in default hereunder (beyond any applicable notice and/or grace period), Tenant may assign this Lease or sublet all or any portion of the Leased Premises, without Landlord's consent as follows (a **"Permitted Transfer"**): to any entity controlling, controlled by, or under common control with Tenant, or to a successor of Tenant by asset acquisition, capital stock purchase or similar equity purchase, merger, consolidation, or to the purchaser of all or substantially all of Tenant's assets or stock (or Tenant may effect a change of control of the Tenant entity in connection with such any transaction); provided, however, that (i) the surviving Tenant continues to have a net worth at least equal to Tenant's net worth at the time of such transaction, and (ii) if such transfer results in a change of control of Tenant, then the new controlling owner shall have no less than three (3) years of relevant experience operating businesses

26

Execution Copy

for the Permitted Use and shall be simultaneously acquiring (or have already acquired) the majority of Tenant's locations operating under the Trade Name in the United States, and (iii) if an assignment or sublease, such assignee or sublessee expressly assumes, in writing, all of Tenant's obligations under this Lease, in form and content reasonably acceptable to Landlord (except, as between a sublessee and Tenant, for the specific business deal between Tenant and such sublessee), and (iv) no series of one or more of such transactions shall be used by Tenant to "spin-off" this Lease to independent third parties, and (v) Tenant shall give Landlord ten (10) days' prior written notice of any such transaction not requiring Landlord's consent (or if Tenant is unable to disclose an impending transaction, then Tenant shall notify Landlord in writing within five (5) days after the transaction). In addition, any change in the controlling interest in the stock of Tenant as a result of an initial public offering of Tenant's stock, and any transfer of the capital stock of Tenant by persons or parties through the "over-the-counter market" or through any recognized stock exchange, shall not be deemed to be an assignment or transfer requiring Landlord's consent. In connection with any Permitted Transfer, (x) Tenant shall remain jointly and severally liable for all Lease obligations and (y) the Guarantors shall not be released from any liability under the Guarantees unless such transferee is an unaffiliated third party who provides a replacement guarantor whom (i) has an equal or greater tangible net worth than the aggregate net worth of the original named Guarantors, (ii) is otherwise reasonably acceptable to Landlord and (iii) executes a replacement guaranty on the same form(s) as the Guarantees.

(f) **SUCCESSORS AND ASSIGNS.** All terms, provisions, covenants and conditions to be observed and performed by Tenant shall be applicable to and binding upon Tenant's respective heirs, administrators, executors, successors and assigns, subject, however, to the restrictions as to assignment or subletting by Tenant as provided herein.

## ARTICLE 11 — DAMAGE OR DESTRUCTION

Section 11.1    **DAMAGE OR DESTRUCTION.** Tenant shall give immediate written notice to the Landlord of any damage caused to the Leased Premises by fire or other casualty. In the event the Leased Premises shall be partially or totally destroyed by fire or other casualty insurable under the property insurance policy carried by Landlord so as to become partially or totally untenantable, then the damage to the Leased Premises shall be promptly repaired as set forth below (unless Landlord shall elect to terminate this Lease as hereinafter provided), and the Base Rent, Additional Rent and other charges payable by Tenant to Landlord (to the extent that such charges are based upon the square foot area of the Leased Premises) shall be abated in proportion to the Floor Area of the Leased Premises rendered untenantable, until the earlier of such time that Tenant either reopens in the Leased Premises or is obligated to reopen in the Leased Premises as more particularly described herein. Landlord shall perform the repairs to Landlord's Work in the Leased Premises and Tenant shall perform the repairs to Tenant's Work in the Leased Premises. Landlord shall not be required to provide any tenant or construction allowance (even if previously provided to Tenant under the Lease). Payment of full Base Rent and all Additional Rent shall commence and Tenant shall be obligated to reopen for business under its Trade Name, fully stocked, fixtured and staffed on the sixtieth (60th) day following the date that Landlord has substantially completed Landlord's Work for the Leased Premises. In making repairs, restoration or reconstruction of Tenant's Work, Tenant, at its expense, shall comply with all laws, ordinances, and governmental rules or regulations, and shall perform all work or cause such work to be performed with due diligence and in a first-class manner. All permits required in connection with Tenant's repairs, restoration and reconstruction shall be obtained by Tenant at Tenant's sole cost and expense. Landlord's Work shall consist of items which Landlord shall have constructed as part of Landlord's Work for the Leased Premises under **Exhibit "E"**. The party required hereunder to repair the damage to the Leased

27

Premises shall reconstruct such Leased Premises in accordance with the working drawings originally approved by Landlord. In no event shall Landlord be required to repair or replace Tenant's merchandise, trade fixtures, furnishings or equipment.

Section 11.2    **OPTION TO TERMINATE LEASE.**

(a)    If (i) more than twenty percent (20%) of the rentable area of the Building shall be damaged or destroyed by fire or other casualty or so much of the Leased Premises shall be damaged by fire or other casualty that such damage cannot reasonably be expected to be repaired by the Restoration Deadline (as hereinafter defined), or (ii) during the last two (2) years of the Lease Term more than twenty percent (20%) of the rentable area of the Leased Premises shall be damaged or destroyed by fire or other casualty, or (iii) all or any part of the Leased Premises are damaged or destroyed at any time by the occurrence of any risk not insured under the insurance carried by Landlord or Tenant (and not required to be carried by Tenant hereunder), or (iv) any mortgagee of the Building shall require that the insurance proceeds payable as a result of such casualty be applied to the payment of mortgage debt, then in any of such cases Landlord, at its sole option, may terminate this Lease by giving written notice to Tenant of Landlord's election so to terminate, such notice to be given within one hundred eighty (180) days after the occurrence of such damage or destruction and all rent shall abate from the date of such damage or destruction.

(b)    If (i) during the last (2) years of Lease Term more than twenty percent (20%) of the rentable area of the Leased Premises shall be damaged or destroyed by fire or other casualty or (ii) the damage is so extensive that Landlord cannot reasonably expect to repair any damage caused to the Leased Premises (which Landlord is required to repair) within three hundred sixty five (365) days of such damage (the **"Restoration Deadline"**), or (iii) Landlord fails to complete repairs to the Lease Premises on or before the Restoration Deadline, then Tenant, at its sole option, may terminate this Lease by giving written notice to Landlord of Tenant's election.

(c)    Notwithstanding the foregoing, the Restoration Deadline shall be subject to extension (not to exceed 90 days) for events of force majeure and should Tenant elect to terminate on account of a failure of Landlord to repair and restore the Leased Premises by the Restoration Deadline, then any such election shall be subject to cure if Landlord completes such restoration within thirty (30) days of receipt of said notice. If this Lease is not terminated, Tenant, at Tenant's sole cost, shall repair and replace the Leased Premises in accordance with this Article, together with Tenant's merchandise, trade fixtures, furnishings and equipment in a manner and to at least a condition equal to that prior to the damage or destruction thereof.

Section 11.3    **WAIVER.** To the fullest extent permitted by Applicable Laws, Tenant hereby waives any statutory rights of termination, right to quit and surrender the Leased Premises or (except as provided above) right to abate Rent which may arise by reason of any partial or total destruction of the Leased Premises which Landlord is obligated to restore or may restore under any of the provisions of the Lease. Tenant shall not be entitled to any offset, abatement (except as provided above) or reduction in Rent, nor shall Tenant be entitled to any compensation or damages from Landlord for loss of the use of the whole or any part of the Leased Premises or the Building from such damage or destruction. Tenant's personal property or any inconvenience or annoyance caused by such damage, repair, or reconstruction.

**ARTICLE 12 — EMINENT DOMAIN**

28

Execution Copy

Section 12.1    **EMINENT DOMAIN.**

(a)    If more than twenty percent (20%) of the square footage of the Leased Premises should be taken for any public or quasi-public use under any governmental law, ordinance or regulation or by right of eminent domain or by private purchase in lieu thereof, this Lease will terminate, effective on the date physical possession is taken by the condemning authority.  If less than twenty percent (20%) of the square footage of the Leased Premises should be taken, this Lease will not terminate (except as set forth in subparagraph (b) below); however, the Base Rent payable hereunder during the unexpired portion of this Lease will be reduced in proportion to the area taken, effective on the date physical possession is taken by the condemning authority.  Following such partial taking, Landlord shall make all necessary repairs or alterations to the remaining Leased Premises to the extent such repairs or alterations are Landlord's responsibility pursuant to this Lease, as may be required to make the remaining portions of the Leased Premises an architectural whole.

(b)    If any part of the Building should be taken and Landlord determines that it is no longer economically feasible to operate the Building or any applicable portion thereof, Landlord may terminate this Lease. If more than twenty percent (20%) of the square footage of the Leased Premises should be taken and such taking materially impairs Tenant's ability to use the Leased Premises for the Permitted Use as reasonably determined by Tenant, then Tenant shall have the right to terminate this Lease.  Any election to terminate this Lease in accordance with this provision shall be evidenced by written notice of termination delivered to the other party within thirty (30) days after the date physical possession is taken by the condemning authority.

(c)    All compensation awarded for any taking (or the proceeds of private sale in lieu thereof) of the Leased Premises or for any portion of the Building shall belong to Landlord, and Tenant hereby assigns its interest in any such award to Landlord; provided, however, Landlord has no interest in any award made to Tenant for Tenant's moving and relocation expenses or for the loss of Tenant's fixtures and other tangible personal property if a separate award for such items is made to Tenant, as long as such separate award does not reduce the amount of the award that would otherwise be awarded to Landlord.

## ARTICLE 13 — DEFAULT

Section 13.1    **TENANT DEFAULT.** The following events will be deemed to be events of default by Tenant under this Lease:

(a)    Tenant fails to pay when due any Rent or any other obligation under this Lease involving the payment of money within five (5) days after written notice to Tenant; provided, however, that Landlord shall not be required to provide Tenant with more than one (1) form of written notice in any twelve (12) month period (after which any Rent or other obligation that is more than five (5) days delinquent shall constitute an automatic event of default).

(b)    Tenant fails to comply with any provision of this Lease, other than as described in subsection (a) above, and either does not cure such failure within thirty (30) days after written notice thereof to Tenant (provided, however, that if the nature of Tenant's default under this Section is such that more than thirty (30) days are reasonably required for its cure, then Tenant shall not be deemed to be in default if Tenant commences such cure with such thirty (30) day period and thereafter uses its best efforts to pursue such cure to completion, and so long as Tenant in any event completes the cure to Landlord's

Execution Copy

satisfaction not later than ninety (90) days following the initial delivery to Tenant of written notice of the occurrence of such failure).

(c)     The entry of any decree or order for relief by a court having jurisdiction in the Leased Premises with respect to Tenant or any Guarantor of Tenant's obligations in an involuntary case under the federal bankruptcy laws, as now or hereafter constituted, or any other applicable federal or state bankruptcy, insolvency or other similar law, or the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator (or similar official) of Tenant or any Guarantor or for any substantial part of the assets of Tenant or any Guarantor, or the entry of any decree or order with respect to winding-up or liquidation of the affairs of Tenant or any Guarantor, if any such decree or order continues un-stayed and in effect for a period of sixty (60) consecutive days.

(d)     The commencement by Tenant or any Guarantor of a voluntary case under the federal bankruptcy laws, as now or hereafter constituted, or any other applicable federal or state bankruptcy, insolvency or other similar law, or the consent by Tenant or any Guarantor to the appointment of or possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator (or other similar official) of Tenant or any Guarantor or for any substantial part of the assets of Tenant or such Guarantor, or any assignment made by Tenant or any Guarantor for the benefit of creditors.

(e)     Tenant deserts or vacates the Leased Premises or any substantial portion of the Leased Premises prior to the last month of the Lease Term other than pursuant to a Permitted Closure.

(f)     Tenant does or permits to be done anything which creates a lien upon the Leased Premises or upon all or any part of the Building which is not released or bonded off within thirty (30) days.

(g)     Tenant fails to deliver an estoppel in accordance with Section 15.2 hereof.

(h)     Tenant fails to maintain the insurance required pursuant to **Exhibit "H"** and such failure continues for more than three (3) business days after written notice and opportunity to cure.

Section 13.2     **LANDLORD'S REMEDIES UPON EVENT OF DEFAULT.**

(a)     Upon the occurrence of any such events of default and the failure of Tenant to cure same within the applicable cure period, Landlord shall have the right to: (i) forthwith and without further notice or demand, terminate the Lease; (ii) have the right to all rights and remedies available at law and in equity; and, (iii) have the right to accelerate all Rent under the Lease for the Lease Term. Without any further notice or demand whatsoever except as may be otherwise required by Applicable Laws, Tenant shall be obligated to reimburse Landlord for the damages suffered by Landlord as a result of the event of default, plus interest at the Interest Rate.

(b)     If Tenant shall continue in default in the performance of any of the covenants or agreements herein contained after the expiration of the time limit hereinabove set forth for the curing of said default(s), then Landlord may, but shall not be obligated to, cure said default(s) on behalf of Tenant. Any amount paid or expense or liability incurred by Landlord in the performance of any such matter for the account of Tenant shall be deemed to be Additional Rent and the same, together with interest thereon at the Interest Rate from the date upon which any such expense shall have been incurred, may be added, at the option of Landlord, to any Rent then due or thereafter falling due hereunder. Nothing contained herein shall be construed to prevent Landlord from immediately collecting from Tenant, by suit or otherwise, any such sums with interest at the Interest Rate.

30

Execution Copy

(c)     If on account of any breach or default by Tenant in its obligations hereunder, Landlord employs an attorney to present, enforce or defend any of Landlord's rights or remedies hereunder, or which arises from Tenant's use and possession of the Leased Premises, Tenant agrees to pay any attorney's fees and costs incurred by Landlord in connection with such breach or default including without limitation all attorneys' fees and court costs at all trial, appellate and bankruptcy levels.

(d)     No agreement to accept a surrender of the Leased Premises and no act or omission by Landlord or Landlord's agents or employees during the Lease Term shall constitute an acceptance or surrender of the Leased Premises unless made in writing and signed by Landlord.  No reentry or taking possession of the Leased Premises by Landlord shall constitute an election by Landlord to terminate this Lease unless a written notice of such intention is given to Tenant.  Pursuit by Landlord of any of the above remedies shall not preclude Landlord's pursuit of any other remedies prescribed in other sections of this Lease and any other remedies provided by law or in equity, it being agreed that the remedies of Landlord hereunder are cumulative.

Section 13.3     **SPECIAL BANKRUPTCY PROVISIONS.**

(a)     In the event Landlord terminates the Lease pursuant to its remedies described herein or under Applicable Laws prior to the filing of a voluntary bankruptcy petition by or on behalf of Tenant, the Lease shall not be property of the bankruptcy estate and Landlord shall not be required to seek relief from the automatic stay.  In the event Landlord seeks relief from the automatic stay, Tenant, as a debtor in possession or on behalf of any trustee for Tenant shall not object to the relief for the automatic stay.

(b)     If Landlord cannot terminate this Lease or Tenant's right of possession because of the application of bankruptcy or similar laws, then Tenant, as a debtor in possession or on behalf of any trustee for Tenant, shall: (i) within the statutory time, assume or reject this Lease and (ii) not seek or request any extension or adjournment of any application to assume or reject this Lease by Landlord.  In such event, Tenant or any trustee for Tenant may only assume this Lease if: (A) it cures or provides adequate assurance that it will promptly cure any default hereunder, (B) it compensates or provides adequate assurance that Tenant will promptly compensate Landlord for any actual pecuniary loss to Landlord resulting from Tenant's defaults, including without limitation accrued interest at the Interest Rate as set forth in this Article and attorneys' fees as a result of such default, and (C) it provides adequate assurance of performance during the Lease Term of all of the terms, covenants and provisions of this Lease to be performed by Tenant.  In no event after the assumption and/or assignment of this Lease shall any then-existing default remain uncured for a period in excess of the earlier of ten (10) days or the time period set forth herein.  Adequate assurance of performance shall include, without limitation, adequate assurance: (1) of the source of Rent, and in the case of an assignment, that the financial condition and operating performance of the proposed assignee and its Guarantors, if any, shall be similar to the financial condition and operating performance of Tenant and its Guarantors, if any, as of the time Tenant became the lessee under the Lease; (2) that any percentage rent (if then applicable) due under this Lease will not decline substantially; (3) that assumption or assignment of the Lease is subject to all the provisions thereof, including (but not limited to) provisions such as a radius, location, use, or exclusivity provision, and will not breach any such provision contained in any other lease, financing agreement, the Prohibited Uses and the master agreements relating to the Building; and (4) that assumption or assignment of the Lease will not disrupt any tenant mix or balance in the Building.

31

(c)   In the event the Lease is assigned by Tenant or any trustee for Tenant, Landlord may require a deposit or other security for the performance of the Tenant's obligations under the Lease substantially the same as would have been required by Landlord upon the initial leasing to a similar tenant.

Section 13.4   **WAIVER OF DEFAULT.**   Failure of Landlord to declare any default immediately upon occurrence thereof, or delay in taking any action in connection therewith, shall not waive such default, but Landlord shall have the right to declare any such default at any time and take such action may be lawful or authorized hereunder, in law and/or in equity.  No waiver by Landlord of a default by Tenant shall be implied, and no express waiver by Landlord shall affect any default other than the default specified in such waiver and that only for the time and extension therein stated.  No waiver of any term, provision, condition or covenant of this Lease by Landlord shall be deemed to imply or constitute a further waiver by Landlord of any other term, provision, condition or covenant of this Lease.

Payment by Tenant or receipt by Landlord of a lesser amount than the Rent or other charges herein stipulated may be, at Landlord's sole option, deemed to be on account of the earliest due stipulated Rent or other charges, or deemed to be on account of Rent owing for the current period only, notwithstanding any instructions by or on behalf of Tenant to the contrary, which instructions shall be null and void, and no endorsement or statement on any check or any letter accompanying any check payment as Rent or other charges shall be deemed an accord and satisfaction, and Landlord shall accept such check or payment without prejudice to Landlord's right to recover the balance of such Rent or other charges or pursue any other remedy in this Lease or in law or in equity against Tenant.

Section 13.5   **LANDLORD SELF-HELP.** If Tenant defaults in the making of any payment or in the doing of any act under this Lease required to be made or done by Tenant, then Landlord may, but shall not be required to, following any applicable notice and cure period, make such payment or do such act, and charge the amount of the expense thereof, if made or done by Landlord, with interest thereon at the Default Rate.  Such payment and interest shall constitute Additional Rent hereunder due and payable within five (5) days after Landlord's demand therefore, but the maker of such payment or the taking of such action by Landlord shall not operate to cure such default or to stop Landlord from the pursuit of any remedy to which Landlord would otherwise be entitled at law, in equity or under this Lease.

Section 13.6   **NON-PERFORMANCE BY LANDLORD.** In the event of any default by Landlord, Tenant's exclusive remedy shall be either: (i) an action for actual damages; or (ii) an action for specific performance in connection with Landlord's repair responsibilities affecting the Leased Premises if as result of Landlord's action (or inaction), Tenant, its employees and customers cannot gain access to or use the Leased Premises during regular business hours.  Prior to commencing any legal action, Tenant shall give Landlord written notice specifying any alleged default in reasonable detail, and Landlord shall thereupon have a reasonable period of time, but not less than thirty (30) days, in which to commence to cure such default.  If Landlord fails to commence to cure such default or, having so commenced, thereafter fails to exercise reasonable diligence to complete such curing, Tenant may exercise one of the remedies set forth in this Section.

Notwithstanding the foregoing, if Landlord defaults under this Lease and such default is not cured within the period provided above and Tenant has given Landlord the requisite notice of default, then Tenant may upon ten (10) additional days prior written notice (which shall not be required in the event of an emergency) to Landlord (i) act in good faith to remedy the breach or default on Landlord's behalf and require Landlord to reimburse Tenant for such reasonable and actual out of pocket costs and expenses ("**Tenant's Self-Help Costs**") within thirty (30) days following written demand accompanied by reasonable

Execution Copy

documentation of said expenses; provided, however, Tenant shall not be entitled to remedy such breach or default, absent an emergency, if doing so requires Tenant to make structural alterations to the Building and/or the Project or alter or repair any electrical or plumbing systems, or HVAC units serving the Building and/or the Project. If Landlord fails to reimburse Tenant's Self-Help Costs within thirty (30) days following written demand accompanied by reasonable documentation of said expenses, then Tenant shall send a second request in writing to Landlord and if Landlord fails to respond to the same within five (5) business days, confirming that it is reimbursing such Tenant's Self-Help Costs or reasonably objecting to the same, then Tenant shall have the right to off-set such Tenant's Self-Help Costs against up to one half (i.e., 50% of) the next due payments of monthly Base Rent hereunder until Tenant has recouped Tenant's Self-Help Costs.

All obligations of Landlord hereunder will be construed as independent covenants, not conditions; and all such obligations will be binding upon Landlord only during the period of its possession of the Building and not thereafter. Tenant shall not interpose any non-compulsory counterclaim or claims for set-off, recoupment or deduction of Rent in a summary proceeding for nonpayment of Rent or other action or summary proceeding based on termination, holdover or other default in which Landlord seeks repossession of the Leased Premises from Tenant. Landlord shall not be liable under this Lease for consequential damages, special damages or lost profits.

Section 13.7   **RIGHT OF ENTRY.** Landlord, or any of its agents, shall have the right to enter the Leased Premises during all reasonable hours to examine the same or to make such repairs, additions or alterations as may be deemed necessary for the safety, comfort, or preservation thereof, or of the Building, or to show the same to prospective lenders or purchasers. Landlord may also exhibit said Leased Premises to prospective tenants at any time within one hundred eighty (180) days before the expiration of the Lease Term. Said right of entry shall likewise exist for the purpose of removing placards, signs, fixtures, alterations, or additions which do not conform to this Lease. Tenant shall provide Landlord with information relating to any security system installed by Tenant within the Leased Premises such that Landlord may at all times freely exercise its rights under this Section. When exercising Landlord's right of entry set forth in this Section 13.7, absent an emergency or Tenant default hereunder, Landlord shall use commercially reasonable efforts not to materially and adversely interfere with Tenant's ongoing business operations within the Leased Premises.

## ARTICLE 14 — NOTICES

Section 14.1   **NOTICES.** Wherever any notice is required or permitted under this Lease, such notice shall be in writing. Any notice or document required or permitted to be delivered under this Lease will be deemed to be delivered when actually received by the designated addressee or, if earlier and regardless of whether actually received or not: (a) one (1) business day after being deposited with a nationally recognized overnight courier (but not facsimile) or (b) but for a default notice hereunder (which must be sent by overnight courier) the day delivered by email (electronic mail) without the need for a physical copy of such notice (as long as not sent after 5 pm EST, in which event such email notice shall be deemed delivered on the next business day) so long as no notice of error in delivery was received by the sender.

## ARTICLE 15 — MISCELLANEOUS

Section 15.1   **MISCELLANEOUS.** The terms "Landlord" and "Tenant" as defined in this Lease shall include their respective heirs, successors, executors, administrators, personal representatives and/or assigns wherever the context so requires or admits (but nothing in this Section shall constitute consent

33

Execution Copy

by Landlord to any assignment or subletting by Tenant).  Whenever the context of this Lease admits or requires, words in the singular shall include the plural, words in the plural shall include the singular and pronouns of any gender shall include all other genders.  Paragraph headings contained in this Lease are solely for convenience and shall not affect its construction.  All references in this Lease to paragraphs or exhibits refer to the respective parts of this Lease unless such reference expressly identifies another document.  All references in this Lease to the term "person" shall be deemed to include individuals, children, firms, associations, joint ventures, partnerships, estates, trusts, business trusts, syndicates, fiduciaries, corporations, and all other groups or combinations.  This Lease shall be construed without regard to any presumption or rule requiring construction against the party who drafted the Lease.

Section 15.2   **ESTOPPEL STATEMENT**. Tenant agrees that from time to time, upon not less than ten (10) business days prior request by Landlord, Tenant will deliver to Landlord a statement in writing certifying: (i) that this Lease is unmodified and in full force and effect (or, if there have been modifications, that the Lease as modified is in full force and effect and stating the modifications); (ii) the dates to which the Rent and other charges have been paid; (iii) that Landlord is not in default under any provisions of this Lease, or, if in default, the nature thereof in detail; (iv) whether or not Tenant is in occupancy of the Leased Premises; and, (v) such other information pertaining to this Lease and Tenant as Landlord, its mortgagee or its prospective mortgagee may reasonably request.  At Landlord's option, Tenant's failure to deliver such statement within such ten (10) business day time period shall be a material breach of this Lease or shall be conclusive upon Tenant: (i) that this Lease is unmodified and in full force and effect, except as may be represented by Landlord; (ii) that not more than one month's Rent has been paid in advance; (iii) that neither Tenant nor Landlord is in default under any provisions of this Lease; and (iv) that Tenant is in occupancy of the Leased Premises.  Any such statement may be conclusively relied upon by a prospective purchaser or encumbrancer to the Leased Premises.

Section 15.3   **WAIVER OF TRIAL BY JURY.** IT IS MUTUALLY AGREED BY AND BETWEEN LANDLORD AND TENANT THAT THE RESPECTIVE PARTIES HERETO SHALL AND THEY HEREBY DO WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER ON ANY MATTERS ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT, AND TENANT'S USE OR OCCUPANCY OF THE LEASED PREMISES.  TENANT FURTHER AGREES THAT IT SHALL NOT INTERPOSE ANY NON-COMPULSORY COUNTERCLAIM OR COUNTERCLAIMS IN A SUMMARY PROCEEDING OR IN ANY ACTION BASED UPON NONPAYMENT OF RENT OR ANY OTHER PAYMENT REQUIRED OF TENANT HEREUNDER.

Section 15.4   **INVALIDITY OF PROVISION.** If any term, provision, covenant or condition of this Lease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Lease or the application of such term, provision, covenant or condition to persons or circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby and each term, provision, covenant or condition of this Lease shall be valid and be enforceable to the fullest extent permitted by law.

Section 15.5   **GOVERNING LAW.** This Lease shall be governed by, and construed and enforced in accordance with, the laws of the State of Florida.

Section 15.6   **TIME OF ESSENCE.** It is understood and agreed between the parties hereto that time is of the essence of all the terms, provisions, covenants and conditions of this Lease.

34

Execution Copy

Section 15.7    **COUNTERPARTS.** This Lease may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute but one instrument. This Lease may be executed electronically (via PDF, DocuSign or other similar electronic platform) without requirement for original signature, unless applicable State law in which the Leased Premises is located does not allow for electronic signatures and/or the specific method of electronic signatures

Section 15.8    **NO RECORDING.** Neither this Lease, any short form of this Lease nor any instrument which makes any reference to this Lease may be recorded by Tenant in the Public Records of Orange County, Florida.  Any such recording shall constitute a default hereunder.

Section 15.9    **LIABILITY OF CO-TENANTS.** If two or more persons execute this Lease as Tenant, the liability of each such person hereunder shall be joint and several.  In like manner, if Tenant is made up of a person (as applicable for purposes of the definition of person provided herein), the members of which are by virtue of statutory or general law subject to personal liability, the liability of each such member shall be joint and several.

Section 15.10    **AUTHORITY.** If Tenant signs as a corporation, execution hereof shall constitute a representation and warranty by Tenant that Tenant is a duly organized and existing corporation, that Tenant has been and is qualified to do business in the State of Florida and in good standing with the State of Florida, that the corporation has full right and authority to enter into this Lease, and that all persons signing on behalf of the corporation were authorized to do so by appropriate corporate action.  If Tenant signs as a partnership, trust, or other legal entity, execution hereof shall constitute a representation and warranty by Tenant that Tenant has complied with all Applicable Laws relative to Tenant's right to do business in the State of Florida, that such entity has the full right and authority to enter into this Lease and that all persons signing on behalf of Tenant were authorized to do so by any and all necessary or appropriate partnership, trust, or other actions.

Section 15.11    **BROKERAGE.** Landlord and Tenant each represent and warrant one to the other that except as set forth in the BLI Summary, neither of them has employed any broker in connection with the negotiations of the terms of this Lease or the execution thereof.  Landlord and Tenant hereby agree to indemnify and to hold each other harmless against any loss, expense, or liability with respect to any claims for commissions or brokerage fees arising from or out of any breach of the foregoing representation and warranty.  Landlord agrees to pay the commissions due to the Landlord's Broker pursuant to a separate written agreement between Landlord and Landlord's Broker, after which Landlord's Broker shall pay Tenant's Broker its share of such commission pursuant to a separate arrangement.

Section 15.12    **RADON.** Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time.  Levels of radon that exceed federal and state guidelines have been found in buildings in Florida.  Additional information regarding radon and radon testing may be obtained from your County health department (Section 404.056(5), Florida Statutes).

Section 15.13    **ENTIRE AGREEMENT.** This Lease contains the entire agreement between the parties hereto and supersedes all previous negotiations leading thereto, and it may be modified only by an agreement in writing executed and delivered by Landlord and Tenant.  Tenant acknowledges and agrees that Tenant has not relied upon any statement, representation, prior written or prior or contemporaneous oral promises, agreements or warranties except such as are expressed herein.  Any

35

Execution Copy

formally executed addendum to or modification of this Lease shall be expressly deemed incorporated by reference herein unless a contrary intention is clearly stated therein. In the event one or more riders are attached hereto, the provisions thereof shall govern over any inconsistent provision in the body of this Lease.

Section 15.14    **GUARANTEES.**

(a)        Notwithstanding anything to the contrary set forth in this Lease, it is agreed that this Lease, and Landlord's obligations hereunder, are contingent upon the execution by the applicable Guarantors of (i) that certain Corporate Guaranty and (ii) that certain Personal Guaranty attached, respectively, as Exhibit "I-1" and Exhibit "I-2" hereto and made a part hereof for all purposes, and Tenant's delivery of such fully executed Guarantees to Landlord simultaneously with Tenant's delivery of the executed Lease to Landlord.

(b)        Notwithstanding anything to the contrary set forth in this Lease or the above described Guarantees, Landlord hereby agrees that the Corporate Guarantor's liability under the Corporate Guaranty shall be primary and the Personal Guarantor(s)' liability under the Personal Guaranty shall be secondary to the liability of the Corporate Guarantor under said Corporate Guaranty. In furtherance of the foregoing, Landlord hereby agrees to first make a good faith effort to collect any outstanding obligations secured by the Corporate Guaranty from the Corporate Guarantor before causing the Personal Guarantor(s) to cover such obligations under the Personal Guaranty; provided, however, that if the Corporate Guarantor, as of such time of potential enforcement of the Corporate Guaranty or at any time thereafter (i) is bankrupt or insolvent, (ii) has suffered the appointment of or possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator (or other similar official) of any substantial part of such Corporate Guarantor's assets, (iii) has made an assignment for the benefit of its creditor(s), (iv) has indicated to Landlord an inability to pay its debts as they come due, (v) is challenging or threatening to challenge the validity of the Corporate Guaranty or raising defenses to the enforcement thereof or (vi) if Landlord reasonably believes, in good faith, that the Corporate Guarantor does not have the financial means to satisfy any judgment sought to be obtained for the guaranteed obligations, then Landlord shall have the right, without pursuit or further pursuit (as applicable) of the Corporate Guarantor, to instead pursue the Personal Guarantor(s) under the Personal Guaranty for such outstanding obligations.

Section 15.15    **ENVIRONMENTAL HAZARDS.**

(a)        Tenant shall strictly comply, at its sole cost and expense, with any and all applicable Environmental Laws. Tenant shall not cause or permit the storage, use, generation, or disposition of any Hazardous Materials in, on, or about the Leased Premises and the Building by Tenant, its agents, employees, contractors and invitees. Tenant shall promptly advise Landlord in writing immediately upon becoming aware of the existence of any spills, releases or discharge of Hazardous Materials that that occur in or about the Leased Premises, and any and all enforcement, cleanup, removal or other governmental or regulatory actions instituted, completed or threatened by any governmental authority with respect to the Leased Premises from time to time under any applicable Environmental Laws. Tenant shall indemnify, defend (with counsel reasonably acceptable to Landlord at all tribunal levels), protect, and hold harmless Landlord, its employees, agents, contractors, stockholders, officers, directors, successors and assigns from and against all claims, actions, suits, proceedings, judgments, losses, costs, personal injuries, damages, liabilities, deficiencies, fines, penalties, damages, attorneys' fees, consultants' fees, investigations, detoxification, remediation, removal, and expenses of every type and nature, caused by either (i) the use, storage, transportation, release, disposal, discharge or emission of Hazardous Materials on or about the

36

Execution Copy

Leased Premises or the Building by Tenant or Tenant's agents, employees, contractors, licensees, suppliers, employees, customers and invitees, or (ii) Tenant's failure to comply with the provisions of this Section, or (iii) Tenant's or Tenant's agents, employees, contractors, licensees, suppliers, employees, customers and invitees' failure to comply with any Environmental Laws. The indemnification obligations set forth in the immediately preceding sentence shall survive the expiration or termination of this Lease. Tenant agrees to allow reasonable access to facilities for monitoring of the above by Landlord, Miami-Dade County, DERM, the Florida DER or any other local, state or federal governmental authority to assure compliance with the above as well as any other conditions relating to the use of the subject property.

(b)     Violations of any of the above shall be deemed to be a default on the part of Tenant of the terms of the Lease at the option of Landlord. In the event of a breach of the provisions of this Section, Landlord shall, in addition to all of its rights and remedies under this Lease and pursuant to law, require Tenant to remove any or all of such Hazardous Materials from the Leased Premises or the Building in the manner prescribed for such removal by all requirements of law. The provisions of this Section shall survive the expiration or sooner termination of this Lease.

(c)     Tenant's obligation to indemnify, defend and hold Landlord harmless shall not apply to matters to the extent arising or resulting from (i) the mere discovery by Tenant of any Hazardous Materials within, on or adjacent to the Leased Premises, Building or Project that were not released or deposited by Tenant or any of Tenant's employees, contractors, agents, sublessees or invitees; or (ii) the mere discovery by Tenant of any Hazardous Materials within, on or adjacent to the Leased Premises, Building or Project caused by the negligence or intentional misconduct of Landlord. Further, Tenant shall not be responsible for abating any Hazardous Materials existing at the Leased Premises, Building or Project prior to the Delivery Date ("**Pre-Existing Environmental Matters**") or for indemnifying Landlord against any such Pre-Existing Environmental Matters, provided such Pre-Existing Environmental Matters were not caused by or otherwise placed upon the Leased Premises, Building or Project by Tenant or any of its employees, contractors, agents, sublessees or invitees.

(d)     In the event that Tenant discovers after the Delivery Date any Pre-Existing Environmental Matters in the Leased Premises, which were not caused by or otherwise placed upon the Leased Premises, Building or Project by Tenant or any of its employees, contractors, agents, sublessees or invitees and which require removal or remediation of Hazardous Materials under Environmental Laws, then Landlord shall be responsible for the removal or remediation of such Hazardous Materials to the extent required by Environmental Laws. If such removal or remediation materially and adversely interferes with Tenant's ability to operate for the Permitted Use from the Leased Premises and Tenant actually ceases operations for the Permitted Use from the Leased Premises, then all Rent shall abate during such period of interruption and continuing until the earlier of (i) the date that Landlord has completed all required removal or remediation of Hazardous Materials to the extent required by Environmental Laws or (ii) the date that Tenant is first able to resume operations for the Permitted Use from the Leased Premises.

(e)     Notwithstanding the foregoing, if any required removal or remediation of such Hazardous Materials under Environmental Laws by Landlord pursuant to paragraph (d) immediately above (x) materially and adversely interferes with Tenant's ability to operate for the Permitted Use from the Leased Premises, (y) was not necessitated or otherwise caused by any acts or omissions of Tenant or any of its employees, contractors, agents, sublessees or invitees, and (z) cannot reasonably be expected to be substantially completed, or otherwise is not substantially completed, within three hundred sixty five (365) days of the commencement of such required removal or remediation, then Tenant, at its sole option, may terminate this Lease by giving no less than thirty (30) days' written notice and opportunity to cure to

37

Execution Copy

Landlord. As used in this paragraph, such removal or remediation of Hazardous Materials shall be deemed to be "substantially completed" once the removal or remediation is sufficient to allow Tenant to resume operations for the Permitted Use from the Leased Premises without any material and adverse interference from such removal or remediation of Hazardous Materials.

Section 15.16  **EXCULPATION.**   Notwithstanding any provision in this Lease to the contrary, Tenant agrees to look solely to Landlord's then interest in the Building for recovery of any judgment from Landlord, it being understood and agreed by Tenant that Landlord (or its representatives, agents, partners, shareholders, directors, employees, fiduciaries and officers) shall never be personally liable for any such judgment or for the payment of any monetary obligation due Tenant under this Lease or otherwise.  If this Lease is executed on behalf of Landlord by any other party acting as agent for Landlord, then said other party shall be deemed to be acting as agent only and shall not in any event be held liable to Tenant for the fulfillment or nonfulfillment of any of the terms, covenants or conditions of this Lease or for any action or proceeding that may be taken by Landlord against Tenant or by Tenant against Landlord, including but not limited to, any such action arising out of the performance or nonperformance by Landlord's agent of any act pursuant to Landlord's direction.  Any waiver of Landlord's liability hereunder, including, but not limited to any waiver of subrogation rights, shall apply with equal force and effect to such agent, except when such liability arises out of the grossly negligent acts or omissions or willful misconduct of such agents.

Section 15.17  **FORCE MAJEURE.** The term **"Force Majeure"** as used in this Lease shall mean "Acts of God", labor disputes (whether lawful or not), material or labor shortages, restrictions by any governmental or utility authority, pandemics or epidemics, civil riots, floods or other cause reasonably beyond a party's control. Notwithstanding the foregoing (a) the occurrence of such events shall not excuse Tenant's obligations to pay Rent or excuse such obligations as this Lease may otherwise impose on the party to obey, remedy or avoid such event, and (b) should the work performed by Tenant or Tenant's contractor result in a strike, lockout and/or labor dispute, such strike, lockout and/or labor dispute shall not excuse Tenant's performance. Tenant shall not be deemed to be in default of any of its obligations hereunder, except for Tenant's obligations to pay Rent and any other payments due hereunder, if Tenant shall be prevented from or delayed in performing such obligation by reason of Force Majeure, and Tenant's time for such performance shall be extended by the number of days during which any condition of Force Majeure continues, such extension not to exceed a total of ninety (90) days during the Lease Term. For the avoidance of doubt, the parties acknowledge and agree that the mere continuation of the COVID-19 pandemic generally shall not serve to extend the Rent Commencement Date or otherwise excuse the timely payment of Rent or performance of obligations by Tenant hereunder.

Section 15.18  **PERMITS; LICENSES; CONCURRENCY FEES AND IMPACT FEES.** Tenant shall secure any and all necessary licenses and permits necessary or useful in connection with Tenant's Work. Tenant shall pay any and all concurrency fees and/or impact fees due to the City of Orlando, Orange County or the State of Florida with respect to the Leased Premises. In addition to the foregoing, Tenant shall be solely responsible to secure and maintain in full force and effect during the Lease Term all licenses and permits required in connection with Tenant's business operations in the Leased Premises for Tenant's Permitted Use, and the failure to secure and/or maintain such licenses and permits shall be a default hereunder.

Section 15.19  **MOLD, MILDEW AND FUNGUS.** Tenant acknowledges that it is necessary for Tenant to provide appropriate climate control at the Leased Premises, keep the Leased Premises clean, and take other measures to retard and prevent mold and mildew from accumulating in the Leased

38

Execution Copy

Premises.  Tenant agrees to clean and dust the Leased Premises on a regular basis and to remove visible moisture accumulation on windows, walls and other surfaces as soon as reasonably possible.  Tenant agrees not to block or cover any of the heating, ventilation or air-conditioning ducts in the Leased Premises.   Tenant shall run the air conditioning system in the Leased Premises to maintain the temperature in the Leased Premises at 78° F or less, to minimize humidity in the Leased Premises. Tenant agrees to immediately report to the Landlord: (i) any evidence of a water leak or excessive moisture in the Leased Premises, as well as in any storage room, garage or other common area; (ii) any evidence of mold or mildew-like growth that cannot be removed by simply applying a common household cleaner and wiping the area; and (iii) any inoperable doors or windows.  Tenant agrees to immediately repair, at Tenant's expense, any failure or malfunction in the heating, ventilation and air conditioning systems in the Leased Premises, except for when such repairs are necessitated by Landlord's gross negligence and/or willful misconduct (in which case Landlord shall make such repairs so long as Tenant has promptly given Landlord notice of the need for such repairs).  Tenant hereby (A) assumes the risks associated with mold, mildew and/or fungus, (B) waives any claim or cause of action against Landlord arising out of the existence of mold, mildew and/or fungus in the Leased Premises and/or the Building, and (C) releases Landlord from any and all liabilities resulting from same.  Tenant further agrees that Tenant shall be responsible for any damage to the Leased Premises and Tenant's property as well as injury to the Tenant, its agents, employees, invitees, guests, licensees and customers resulting from Tenant's failure to comply with the terms of this Section.

Section 15.20    **NO AIR RIGHTS**.  No rights to any view or to light or air over any property, whether belonging to Landlord or any other person, are granted to Tenant by this Lease.  If at any time any windows of the Leased Premises are temporarily darkened or the light or view therefrom is obstructed by reason of any repairs, improvements, maintenance or cleaning in or about the Building, the same shall be without liability to Landlord and without any reduction or diminution of Tenant's obligations under this Lease; provided that such darkening or obstructing shall not continue for more than three (3) consecutive days due to a direct action by Landlord (except for any repairs required by law or in connection with any customary maintenance for the Building which may reasonably require more than three [3] days to complete).

Section 15.21    **BUSINESS DAY**.  If the date for performance of any act, obligation or delivery of any notice under this Lease shall fall on a day other than a business day, then the date for such performance or delivery of such notice shall be postponed until the next business day.  For purposes of this Lease, any references to "business days" shall be deemed to be references to normal working business days (i.e. Monday through Friday of each calendar week, exclusive of federal or state holidays or such other dates upon which nationally-chartered banks of the United States of America are not open for business).

Section 15.22    **ATTORNEY FEES; VENUE**.  Notwithstanding anything to the contrary contained in this Lease, in the event of any litigation between Landlord and Tenant arising out of this Lease or Tenant's use and occupancy of the Leased Premises, the prevailing party shall be entitled to recover its costs and expenses incurred in such litigation, including reasonable attorneys' fees, at all levels, including appeals. Any legal action or proceeding arising out of or in any way connected with this Lease shall be instituted in a court (federal or state) located in Orange County, Florida, which shall be the exclusive jurisdiction and venue for litigation concerning this Lease.

Section 15.23    **WAIVER OF JURY TRIAL**. LANDLORD AND TENANT KNOWINGLY, INTENTIONALLY, AND VOLUNTARILY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM INVOLVING

39

ANY MATTER WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS LEASE, THE LANDLORD/TENANT RELATIONSHIP, THE LEASED PREMISES, THE BUILDING OR THE PROJECT.  TENANT FURTHER WAIVES THE RIGHT TO INTERPOSE ANY PERMISSIVE COUNTERCLAIM OF ANY NATURE IN ANY ACTION TO OBTAIN POSSESSION OF THE LEASED PREMISES.

Section 15.24    **CONFIDENTIALITY**.  Tenant agrees that the terms of this Lease are confidential and constitute proprietary information of Landlord, and that disclosure of the terms hereof could adversely affect the ability of Landlord to negotiate with other tenants.  Tenant hereby agrees that Tenant and its partners, officers, directors, employees, and attorneys shall not disclose the terms of this Lease to any other person without Landlord's prior written consent, except to any accountants of Tenant in connection with the preparation of Tenant's financial statements or tax returns, to an assignee of this Lease or subtenant of the Leased Premises, to any lender of Tenant, to any professionals hired by Tenant but on a need to know basis only, or to an entity or person to whom disclosure is required by applicable law or in connection with any action brought to enforce this Lease.  Tenant shall inform all such persons to whom it discloses this Lease of the confidential nature of this Lease as described herein.

Section 15.25    **USA PATRIOT ACT**.

(a)    Tenant (which for this purpose includes the direct and indirect owners of Tenant) represents, warrants and covenants as follows: (i) Tenant has not been designated as a "specifically designated national and blocked person" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control ("**OFAC**") at its official website, http://www.treasury.gov/ofac/downloads/t11sdn.pdf or at any replacement website or other replacement official publication of such list, and (ii) Tenant is currently in compliance with the regulations of OFAC and any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action relating thereto, and with respect to all dealings between Landlord and Tenant, will so remain in compliance during the Lease Term.

(b)    Tenant represents that neither Tenant nor any person or entity who owns a direct or indirect interest in Tenant is under investigation by any governmental authority for, or has been charged with, or convicted of, money laundering, drug trafficking, terrorist related activities, or any crimes which in the United States would be predicate crimes to money laundering.  Tenant represents and warrants that it is in material compliance with any and all applicable Anti-Money Laundering Laws and provisions of the Patriot Act (each as defined below).  For purposes of this Agreement, the term "**Anti-Money Laundering Laws**" means laws, regulations and sanctions, state and federal, criminal and civil, that (i) limit the use of and/or seek the forfeiture of proceeds from illegal transactions; (ii) limit commercial transactions with designated countries or individuals believed to be terrorists, narcotics dealers or otherwise engaged in activities contrary to the interests of the United States; (iii) require identification and documentation of the parties with whom a United States Financial Institution (as defined in 31 B.SC. 5312) conducts business; or (iv) are designed to disrupt the flow of funds to terrorist organizations.  Such laws, regulations and sanctions shall be deemed to include the USA Patriot Act of 2001, Pub. L. No. 107-56 (the "Patriot Act"), the Bank Secrecy Act, 31 U.S.C. Section 5311 et seq., the Trading with the Enemy Act, 50 U.S.C. App. Section 1 et seq., the International Emergency Economic Powers Act, 50 U.S.C. Section 1701 et seq., and the sanction regulations promulgated pursuant thereto by the OFAC, as well as laws relating to prevention and detection of money laundering in 18 U.S.C. Sections 1956 and 1957.

40

Execution Copy

(c)      Tenant hereby represents and certifies to Landlord that Tenant and any person or entity who owns a direct or indirect interest in Tenant are not: (i) a person whose name appears on the list of Specially Designated Nationals and Blocked Persons published by OFAC of the U.S. Department of Treasury; (ii) otherwise blocked pursuant to other U.S. trade sanctions including, but not limited to, the Trading with the Enemy Act, the International Emergency Economic Powers Act, the Iran Sanctions Act as amended, the Sudan Accountability and Divestment Act and any sanctions administered and enforced by the U.S. Department of State, the U.S. Department of the Treasury, including OFAC or any enabling legislation or executive order relating thereto (collectively, "**U.S. Trade Restrictions**"); or (iii) an agent or instrumentality of, or otherwise controlled by or acting on behalf of, directly or indirectly, (i) or (ii) above.

(d)      Tenant represents, warrants and covenants that in performing its obligations under this Lease, Tenant shall not violate U.S. Trade Restrictions and shall not perform its obligations in any way that would cause Landlord to be in violation of U.S. Trade Restrictions.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK; SIGNATURES ON FOLLOWING PAGE]*

41

Execution Copy

DocuSign Envelope ID: C9FDBF25-1029-4BDB-8985-1DDC2E10956B

IN WITNESS WHEREOF, the parties hereto have signed, sealed and delivered this Lease on the day and year first above written.

LANDLORD:

**434 N. ORANGE INVESTMENT LLC,**
a Delaware limited liability company

By:_____
Print Name: Lowell Plotkin
Title Authorized Representative

TENANT:

**VELOCITY ESPORTS ORLANDO DOWNTOWN, LLC,**
a Florida limited liability company

By: len Wanger
Print Name: Leonard Wanger
Title Manager

42

Execution Copy

## EXHIBIT "A"

### RULES AND REGULATIONS

1.      Tenant shall not carry on, conduct, permit, allow in or from the Leased Premises any business other than that specifically provided for herein as Tenant's Permitted Use, without prior written consent of the Landlord.

2.      The water and wash closets and urinals shall not be used for any other purpose than the purpose for which they were respectively constructed, and the expense of any breakage, stoppage or damage resulting from violations of this rule shall be borne by Tenant or tenants, who, or whose clerks, agents, servants or licenses shall have cause it.

3.      Tenant shall not mark, paint, drill into or in any way deface the walls, ceilings, partitions, floors, wood, stone or iron work, or make or permit any improper noises in the Building.

4.      Other than in the event of a temporary emergency related to a malfunctioning of the regular locks on the doors (of which Tenant shall give prompt notice to Landlord), no additional locks or securing devices shall be placed upon any doors of the Leased Premises and Tenant shall not permit any duplicate keys to be made, but if more than two keys for any door or lock shall be desired, the additional number must be obtained from Landlord and be paid for by Tenant.  Tenant must, upon the termination of this Lease, leave the windows and doors in the Leased Premises in like condition as of the date the Lease, and must then surrender all keys to Landlord.

5.      Intentionally deleted.

6.      Tenant shall not do or permit anything to be done within the Leased Premises, or bring anything therein shall in any way increase the rate of fire insurance on the Building, or on the property kept therein, or obstruct or interfere with the rights of other tenants, or in any way injure or annoy them or those having business with them, or conflict with the regulations of the fire department, or the fire laws, or with any insurance policy upon the Building or part thereof, or with any rules or ordinances established by the Board of Health or other governmental authority.  Tenant shall not use any other method of heating than that supplied by the Landlord.

7.      Tenants will ensure each day that the windows and doors are closed and securely locked before leaving the Leased Premises.

8.      Landlord shall have power to prescribe the weight and position of safes, which shall, if considered necessary by Landlord, stand on two-inch thick plank strips to distribute the weight.  All damage done to the Building by taking in or putting out a safe or any other article of Tenant's office equipment, or due to its being on the Leased Premises, shall be repaired at the sole cost and expense of Tenant.  No freight, merchandise, furniture or bulky matter of any description will be received into the Building or carried in the elevators, except during hours approved by Landlord.

9.      If Tenant desire to introduce electrical signaling equipment, telegraphic, telephonic or other wires and instruments, Landlord will direct the electricians as to where and how the same are to be placed, and without such directions no placing, boring or cutting for wires will be permitted.  Landlord shall in all cases retain the right to require the placing and using of such electrical protecting devices to prevent the transmission of excessive currents of electricity into or through the Building, and to require

43

the changing of wires and of their placing and arrangement as Landlord may deem necessary, and further to require compliance on the part of all using or seeking access to such wires and such rules as Landlord may establish relating thereto, and in the event of non-compliance with the requirements and rules Landlord shall have the right to immediately cut and prevent the use of such wires.

10.     No room or rooms shall be occupied or used as sleeping or lodging apartments at any time, nor shall Tenant sublet any part of said premises, or permit any other person to have or use desk space therein without the prior written consent of Landlord, and in the event the Landlord agrees thereto, Tenant shall, at the option of Landlord, in addition to the Rent herein reserved, pay to Landlord monthly a sum of not less than one-third (1/3) of Base Rent.

11.     Tenant shall not cause unnecessary labor by reason of carelessness and indifference to the preservation of good order and cleanliness in the Leased Premises and in the Building.

12.     Nothing shall be thrown by Tenant, or Tenant's clerks, servants or licensees, out of the windows or doors of the Leased Premises, or down the passages of the Building. Nothing shall be placed on the outside of the Building, or the windows, window-sills or projections.

13.     Landlord shall have the right to prohibit any advertising by Tenant, which in Landlord's opinion may impair the reputation of the Building; and upon written notice from Landlord, Tenant shall refrain from or discontinue such advertising.

14.     Tenant shall promptly, and at its sole cost and expense, execute and comply with all laws, rules, orders, ordinances and regulations of the city, county, state or federal government, and of any department or bureau of any of them, and of any other governmental authority having jurisdiction over the Leased Premises, affecting Tenant's occupancy of the Leased Premises or Tenant's business conducted thereon.

15.     Landlord shall, in no case, be liable in damages for the admission or exclusion of any person from the Building. In case of invasion, mob riot, public excitement or other commotion, Landlord reserves all rights to prevent access to the Building during the continuance of the same by closing the doors or otherwise for the safety of all tenants and protection of property in the Building.

16.     If any parking is offered by Landlord to Tenant pursuant to the Lease, then: (i) Tenant shall comply with reasonable parking rules and regulations as may be posted and distributed from time to time; (ii) Tenant shall furnish Landlord with a complete list of license numbers of all automobiles operated by Tenant, its contractors, employees, subtenants, and licensees and their employees, within five (5) days after Landlord's verbal and/or written request therefore; and (iii) Tenant agrees that if any automobile or other vehicle owned by Tenant or any of its contractors, employees, subtenants, licensees and their employees, at any time is parked anywhere other than in the areas designated by Landlord for employee parking, Landlord has the right to remove or cause to be removed the vehicle to such location as determined by Landlord (and any costs of the removal and retrieval of same shall be paid by such violator) or to place a "boot" on such vehicle rendering the vehicle immobile until payment of such fines by such violator as may be established by Landlord from time to time for removal of same (currently, One Hundred and No/100 Dollars ($100.00) for each removal).

17.     Canvassing, soliciting and peddling in the Common Areas are prohibited. Tenant shall not distribute brochures or other material in the Common Areas nor take any action, which in the sole and exclusive judgment of Landlord would constitute a nuisance, or would disturb, endanger, or interfere with

44

Execution Copy

the rights of other persons to use the Common Areas, or would tend to injure the reputation of the Building.

18.     Tenant shall not conduct within the Leased Premises any "fire", bankruptcy, "going-out-of-business," "lost-our-lease" or similar sale; nor is Tenant permitted to operate within the Leased Premises a "wholesale" or "factory outlet" store, a cooperative store, a "second hand" store, a "surplus" store, a store commonly referred to as a "discount house". Tenant shall not advertise that it sells products or services at a "discount," "cut-price" or "cut-rate prices." The purpose for this restriction is the maintenance of a first-class retail Building image, not price regulation; therefore, Landlord agrees that items may be sold, and on occasion be advertised as being sold, at discounted prices as long as Tenant complies with all Applicable Laws and maintains an image consistent with a first-class retail Building.

20.     No animals shall be brought into or kept in or about or boarded overnight in the Building.

21.     Landlord has the right to evacuate the Building in the event of an emergency or catastrophe.

22.     All deliveries shall be made via the loading dock, service elevators, and rear entry to the Leased Premises during normal business hours. Landlord's written approval shall be obtained for any delivery after normal business hours. No obstructions, goods or delivery vehicles shall be left unattended outside of the Leased Premises. Passenger elevators are to be used only for the movement of persons.

23.     Smoking is not permitted in any of the Building's public or open areas (i.e. lobbies, elevators, corridors, restrooms, etc.) at any time.

24.     Tenant will not locate, and/or temporarily store trash, inventory, linen hampers, kegs, cartridges, plastic "milk crates" anywhere in the Common Areas.

25.     Tenant will not place any merchandise, rolling racks, tables, sign holders, trash or potted plants/shrubbery in the entryway or vestibule to the Leased Premises.

26.     Intentionally deleted.

27.     Landlord may require Tenant, at Tenant's sole cost and expense to contract for termite and pest extermination services for the Leased Premises which shall be rendered no less frequently than monthly and to deliver to Landlord a certificate evidencing such services.

Execution Copy

## EXHIBIT "B"

## RESTAURANT SPECIFIC PROVISIONS

In the event that Tenant cooks, prepares, serves, provides, or otherwise deals with food in the Leased Premises, Tenant is hereby further subject to the following provisions.

1. **WASTE**.

a.      Tenant agrees not to permit or commit any waste or nuisance within the Leased Premises, the Building or the Project. Without limiting the generality of the foregoing statement, Tenant agrees (1) not to allow any offensive noises, odors, vibrations, or lights to emanate from the Leased Premises, (2) to maintain a regular, professional program of pest control within the Leased Premises (including without limitation termite prevention for any applicable portion of the Leased Premises or Tenant's personally), and (3) to keep the area adjacent to the Leased Premises (including any dumpster areas as well as the service area directly behind the Leased Premises) relatively free of litter.

b.      Tenant acknowledges and agrees that the nature of Tenant's Permitted Use could pose particular potential danger to the environment, the sewage disposal and drainage system serving the Building, and the surrounding community, the Building itself, the health and safety of patrons, shoppers, other tenants and other persons using the Building or the Project. Tenant further acknowledges that the Permitted Use creates special needs for garbage and refuge removal. As a material inducement for Landlord to enter into this Lease, Tenant agrees that the elimination of all of these dangers shall be solely Tenant's responsibility.

c.      If the existing soil pipe is overloaded by Tenant's discharge, then Tenant shall be required to immediately commence and diligently proceed to install another drain line at Landlord's request. Said drain line shall be installed at Tenant's sole cost and expense (including the cost to tie in to the sewer line by Landlord's plumber), and in conformity with plans and specifications, approved in writing in advance by Landlord.

d.      Without limiting any other provision contained in this Lease, Tenant shall also, at its sole cost and expense, employ such other devices and installations (including without limitation under-sink or in-ground grease traps, ventilation systems and proper fire extinguishing equipment including the installation of an Ansul system or a comparable system pre-approved by Landlord prior to installation thereof) which, in Landlord's sole judgment, are necessary to (i) protect the Building and/or the Project, its occupants and customers and its systems; and, (ii) comply with the requirements of all governing bodies and agencies having jurisdiction (including the local health and fire departments) and Landlord's insurance companies.

e.      If Tenant installs a grease trap or traps (or ties into existing grease trap or traps, whether in-ground or above) or any "through-the-roof" ventilating equipment, and does not conscientiously clean same using Landlord's designated contractor, so that (i) grease accumulates, causing a potential health or fire hazard, or (ii) is discharged into the sanitary drains, the roof or the air, Landlord after notice may contract with an outside service to clean the grease trap, make necessary repairs to roof, or other areas of grease accumulation, and the cost of said outside service shall be Additional Rent under this Lease.

B-1

Execution Copy

f.       Tenant shall also be responsible for the costs of any necessary repairs caused anywhere by grease accumulation, including, but not limited to, the dumpster pad, asphalt, roof, and/or any other areas of the Leased Premises or Building so affected.

Any breach of the foregoing by Tenant shall be a material default hereunder, in respect of which Landlord may exercise any or all rights and remedies provided in this Lease including, without limitation, the right to terminate this Lease.

2. **GREASE CONTAINMENT REGULATIONS**. As a food service tenant, Tenant's business produces grease which can accumulate on the roof and/or the Building's exterior. Failure to contain Tenant's grease waste properly can result in costly property damages as well as fines for violation of local, state, and federal codes and ordinances. In an effort to assist Tenant with preventing property damage and in complying with all codes and ordinances, Tenant shall be required to provide Landlord with the following:

a.       **IN-GROUND/UNDER-SINK GREASE TRAPS**. A food service tenant's failure to contain the grease prior to it reaching the main sewer line could result in violations of environmental codes, blockage of on-site and city sewer lines, and damage to lift station pumps and controls. To avoid fines, penalties and repair costs, and in accordance with the Lease, Tenant is required to meet all local, state and federal regulations with regard to the installation and maintenance of under-sink or in-ground grease traps for Tenant's food service facility. A copy of Tenant's maintenance agreement to clean the under-the-sink and in-ground grease trap MUST be submitted to Landlord at the notice address, within thirty (30) days prior to Tenant's opening.

b.       **WASTE COOKING OIL CONTAINERS**. Per code, waste cooking oil containers must be housed on a concrete pad, usually beside Tenant's dumpster. These containers present a serious health and odor nuisance if not serviced regularly. These systems, if used, MUST be pumped out on a regular basis and cleaned thoroughly. Cleaning includes disinfecting the container and pressure washing around the container, including grease that may have spread onto the concrete pad. A copy of Tenant's maintenance agreement to service Tenant's waste cooking oil container(s) MUST be submitted to Landlord at the notice address, within thirty (30) days prior to Tenant's opening.

**Tenant's failure to comply with any of the above-referenced requirements may result in default subject to the provisions of Article 13 of the Lease.**

B-2

Execution Copy

## EXHIBIT "C"

### NOTICE OF DELIVERY AND ACCEPTANCE

Project Name:                    Society Orlando

Leased Premises                  Address: 410 N. Orange Ave., Orlando, FL 32801

Square Footage:                  _____ square feet.

This declaration is hereby attached to and made part of the Retail Lease Agreement dated April ____, 2023, entered into by and between 434 N. ORANGE INVESTMENT, LLC, as Landlord and Velocity Esports Orlando Downtown, LLC, as Tenant.

1.      The Delivery Date and the Commencement Date as defined in the Lease is _____, ____.

2.      The Rent Commencement Date as defined in the Lease is _____, ____.

3.      The expiration date of the Initial Term is _____, ____.

4.      As of the date hereof, Landlord has fulfilled all of its obligations under the Lease.  As of the date hereof, there are no offsets or credits against Base Rent or Additional Rent, nor has any Base Rent or Additional Rent been prepaid except as provided pursuant to the Terms of the Lease.

5.      The Lease is in full force and effect and has not been modified, altered, or amended, except pursuant to any instruments described above, if any.

<u>**TENANT:**</u>

VELOCITY ESPORTS ORLANDO DOWNTOWN, LLC

By:_____

Name:_____

Title:_____

Date:_____

C-1

Execution Copy
58775981;11

**EXHIBIT "D"**

**OPTION(S) TO RENEW**

A.      Landlord hereby grants Tenant two (2) options to renew (each a "**Renewal Option**") the initial Lease Term for two (2) additional term of five (5) years each (each a "**Renewal Term**"), commencing as of the date immediately following the expiration of the then current Lease Term, and with such option(s) to be subject to the covenants and conditions hereinafter set forth.

B.      Tenant shall give Landlord written notice (each a "**Renewal Notice**") of Tenant's election to exercise said Renewal Option not later than two hundred seventy (270) days prior to the expiration of the then current Lease Term. Tenant's failure to give a Renewal Notice by said date, whether due to Tenant's oversight or failure to cure any existing defaults or otherwise, shall render all remaining Renewal Option(s) null and void.

C.      Tenant shall not be permitted to exercise a Renewal Option if Tenant is in default under the Lease, subject to applicable notice and grace periods (if any).  If Tenant fails to cure any default under the Lease prior to the commencement of the applicable Renewal Term, subject to applicable notice and grace periods, such Renewal Term (and any remaining Renewal Option(s)) shall be immediately cancelled, unless Landlord elects to waive such default, and Tenant shall forthwith deliver possession of the Leased Premises to Landlord as of the expiration or earlier termination of the then current Lease Term.

D.      Tenant shall be deemed to have accepted the Leased Premises in "AS-IS" condition as of the commencement of each applicable Renewal Term, subject to any other repair and maintenance obligations of Landlord under the Lease, it being understood and agreed that Landlord shall have no additional obligation to renovate or remodel the Leased Premises or any portion of the Building or Project as a result of Tenant's renewal of the Lease.

E.      The covenants and conditions of the Lease in force during the original Lease Term, as the same may be modified from time to time, shall continue to be in effect during the Renewal Term, except as follows:

(1)      The "Commencement Date" for the purpose of the Lease shall be the first day of the Renewal Term.

(2)      The Base Rent for first Lease Year of each applicable Renewal Term shall be one hundred and three percent (103%) of the Base Rent due and payable in the immediately preceding Lease Year (of the then expiring Lease Term), and Base Rent shall continue to escalate (i.e., increase) by three percent (3%) per annum each Lease Year thereafter.

(4)      Following expiration of the Renewal Term(s) as provided herein, Tenant shall have no further rights to renew or extend the Lease.

(5)      Landlord shall have the right to increase the Comprehensive General Liability Insurance carried by Tenant to an amount that is reasonable and customary at the start of each Renewal Term.

F.      Tenant's Renewal Option(s) shall not be transferable by Tenant to any assignee or subtenant other than in connection with a Permitted Transfer.

D-1

Execution Copy

## EXHIBIT "E"

## LANDLORD WORK LETTER

1.        **Acceptance of Premises**. Except as set forth in this Exhibit, Tenant shall accept the Leased Premises in their "AS IS" condition on the Delivery Date.

2.        **Landlord's Work**. Notwithstanding the foregoing, as of the Delivery Date, the Leased Premises shall be delivered to Tenant in "grey shell" condition and Landlord, at its expense, shall have substantially completed those certain base building improvements to the Leased Premises as described on Schedule 1 attached hereto and made a part hereof (collectively, **"Landlord's Work"**) in connection with Landlord's construction of the Building and/or the Project. Tenant acknowledges and agrees that it has, of the date hereof, reviewed and approved those certain plans and specifications for Landlord's Work prepared by Baker Barrios dated on or about December 19, 2022 ("**Landlord's Work Plans**") and that Landlord and Landlord's general contractor shall have the right (without Tenant's consent) to make certain minor variations or deviations from the Landlord's Work Plans that cannot reasonably be expected to have a material adverse effect on Tenant or Tenant's Work (individually and collectively, "**Minor Variances**"). For any variations or deviations that could reasonably be expected to have a material adverse effect on Tenant or Tenant's Work (individually and collectively, "**Non-Minor Variances**"), Landlord shall obtain Tenant's consent (not to be unreasonably withheld, conditioned or delayed). Tenant shall respond to any request for approval of Non-Minor Variances within seven (7) days of the date of request. Should Tenant fail to respond within such seven (7) day period, then Landlord may send a second request (which may be via email) and if Tenant fails to respond to such second request within three (3) additional days, then Tenant shall be deemed to have approved the same.

3.        **Substantial Completion; Notice; Punch List**.

(a)        As used herein and elsewhere in the Lease, the terms "substantial completion", "substantially completed", and any derivations thereof shall mean that the Landlord's Work in the Leased Premises is substantially completed (as reasonably determined by Landlord) and substantial completion shall be deemed to have occurred even though minor details of construction, decoration, landscaping and mechanical adjustments remain to be completed by Landlord (collectively, "**Punch List Items**").

(b)        Upon substantial completion of the Landlord's Work, Landlord shall notify Tenant in writing (which may be via email) that Landlord's Work is substantially completed (the "**Substantial Completion Notice**").

(c)        Tenant shall have five (5) business days after receipt of the Substantial Completion Notice to inspect the Leased Premises and provide Landlord with a list of Punch List Items to be completed (which list Landlord reserves the right to review and reasonably object to in good faith).

(d)        Once Landlord and Tenant have agreed upon the final list of Punch List Items, Landlord shall use good faith efforts to complete the same within thirty (30) days (subject to Force Majeure and Tenant Delays) or as soon thereafter as reasonably practicable.

4.        **Limited Warranty on Landlord's Work**. Should Tenant alert Landlord within one (1) year of the Delivery Date that it has discovered any latent or hidden defects in Landlord's Work, then Landlord shall use good faith efforts (which shall not require an obligation to litigate or commence any legal action) to avail itself of any available warranties provided by Landlord's contractor(s), as applicable, for such

F-1

Execution Copy

Landlord's Work and require such parties to remedy such latent or hidden defects in their work; provided, however, Landlord makes no guarantees or assurances regarding its ability to compel such parties to repair any such latent or hidden defects and if they fail to do so, then Landlord shall have no obligation to make any such repairs at Landlord's cost or expense.

Execution Copy

**SCHEDULE 1 TO LANDLORD'S WORK LETTER**

**DESCRIPTION OF LANDLORD'S WORK**

Landlord will perform the following work in a good and workmanlike manner, using first quality materials:

**Building**

1.  Landlord to deliver the Leased Premises in "shell" condition.
2.  Delivery of watertight shell housing the Leased Premises.
3.  Floor: Compacted fill, no slab provided.
4.  Ceiling Finish: Exposed
5.  All demising walls full height, fire rated construction.

**Electric**

1.  3 PHASE 800A 480V Service (3-4" C.) or 3 PHASE 200A 480V Service (2-3"C.) fed from wireway at main switchgear room
2.  Electric conduits and feeders terminated in CT panel and/or disconnect switch or pull box to POC.

**Natural Gas**

1.  2000 MBH 2" gas service capacity and minimum 14" WC pressure at the POC within the Leased Premises.

2.  Gas meter manifold and all piping from manifold to POC within the Leased Premises.

3.  Valve required for the delivery of gas service to the Leased Premises.

4.  Service switchover or new service set-up information as required.

**Water**

1.  2" service to the designated POC.
2.  Submetering or remote readout devices.

**Fire Protection**

1.  Fire sprinkler service, backflow device, isolation valves and adequate capacity for shell space only.
2.  Conduits and pull strings necessary for Tenant's connection to base building Fire Alarm Panel.

**Sanitary Sewer**

1.  4" Sanitary Line and 3" vent stubbed and capped to designated POC.

**Grease Line**

F-3

Execution Copy

1.  4" Grease line and 3" vent stubbed and capped to designated POC.

**Grease Interceptor -**

1.  A recessed or underground grease interceptor. Ventilation per building design.

**Internet & Cable/Telecom**

1.  2" conduit w/pull string or cabling sufficient to accommodate fiber from base building internet service.
2.  With pull string from active base building service panel to POC.

**Exhaust/Make Up Air**

1.  Louvers will be provided to building exterior for Tenant connection.

**HVAC**

1.  Furnish and install condenser water to Premises.

**Storefront**

1.  Storefront, doors, vestibules (if any), delivery/emergency egress doors, all glass and glazing.

**Exterior Finishes**

1.  Per building design.

**Accessibility**

1.  Modifications to Ingress/egress to the Leased Premises or path of travel to the Leased Premises up to the point of entry, if necessary, to meet ADA/state/local accessibility.

**Hazardous Materials**

1.  Delivery of environmental report showing there is no evidence of Hazardous Materials in the Leased Premises or the Building that require removal or remediation per Applicable Laws.

Execution Copy

## EXHIBIT "E-1"

## TENANT WORK LETTER

1.        **Tenant's Work**.  Following the Delivery Date, Tenant shall promptly perform all further work necessary to ready the Leased Premises for opening to the public for the Permitted Use by the Rent Commencement Date, including without limitation, the installation of fixtures, equipment and appliances which shall not be part of Landlord's Work hereunder (collectively, "**Tenant's Work**"). Tenant further acknowledges that Landlord has a substantial economic interest in maintaining a uniformity of materials and systems throughout the Building, insuring that the appearance and the quality of any improvements to the Leased Premises conform to the general nature, quality, style and design of other portions of the Building, and insuring that any such improvements are carried out in a good and workmanlike manner by qualified, licensed contractors and are fully paid for.  For this reason, alterations, improvements and work of any kind performed by Tenant to the Leased Premises at any time shall be subject to the following conditions and limitations:

(i)        Prior to commencing any Tenant's Work and within fifteen (15) business days after the Effective Date of this Lease, Tenant shall submit for Landlord's approval (a) detailed plans and specifications for all Tenant's Work and repairs to be made by Tenant (the "**Tenant Plans**") and (b) if Tenant is required to obtain any permit(s) from the City of Orlando in connection with such work, final plans and specifications after Tenant obtains said permit(s).  Landlord and/or its agents shall approve or reject the same in writing in Landlord's reasonable discretion within ten (10) days following receipt of the Tenant Plans from Tenant.  If Landlord requires additional time to approve the Tenant Plans, Landlord shall not be deemed to be in default hereunder or otherwise liable in damages to Tenant, and Tenant's deadline to submit said Tenant Plans to the City of Orlando, shall be extended accordingly.  Tenant shall make any changes recommended by Landlord or its agents, and resubmit such revised Tenant Plans and specifications for Landlord's approval within five (5) business days of request. Notwithstanding the foregoing, if Landlord does not respond to a request by Tenant to approve the Tenant Plans within fifteen (15) days after receipt of the same, then Tenant may send a second request for approval which shall say in bold print in all caps: "**THIS IS A SECOND REQUEST FOR APPROVAL OF THE TENANT PLANS. LANDLORD'S FAILURE TO RESPOND TO THE SAME WITHIN FIVE (5) BUSINESS DAYS WILL RESULT IN DEEMED APPROVAL**".  If Landlord fails to respond to such second request within five (5) business days then Landlord shall be deemed to have approved the Tenant Plans submitted.

(ii)        Landlord shall have the right to approve the contractor(s) to be used by Tenant prior to the commencement of Tenant's Work (such approval not to be unreasonably withheld).

(iii)        All of Tenant's Work shall comply with the provisions of all Applicable Laws, and, prior to commencing any work, Tenant shall deliver to Landlord copies of all applicable governmental permits and authorizations which may be required in connection with such work.

(iv)        Tenant shall (and shall require that all contractors) comply with all applicable provisions of the Florida mechanics' liens laws, and the provisions hereof.

(v)        All of Tenant's Work shall be subject to Landlord's periodic inspection and/or supervision.

(vi)        All of Tenant's contractors must procure workmen's compensation insurance covering all persons employed in connection with the work who might assert claims for death or bodily

F-5

injury; no work shall be commenced until Landlord shall have received copies of certificates of insurance confirming the existence of such insurance coverage and other insurance coverage required under the Lease.

(vii)      Tenant shall apply for any building permit and any other required permits for the completion of Tenant's Work promptly following the approval of Tenant's Plans and Tenant agrees to use good faith and diligent efforts to obtain such permits (if applicable) from the City of Orlando, which shall include, an obligation to use a permit expediter with no less than five (5) years' experience in the City of Orlando to assist with the pursuit of such construction permits.

(viii)     All such work, alterations, decorations, installations, additions or improvements that are part of Tenant's Work shall be done at Tenant's sole expense (subject to any allowance expressly set forth herein).

(ix)      Landlord shall not be liable for any failure of any building facilities or services caused by alterations, decorations, installations, additions or improvements made by Tenant, and Tenant shall be responsible for and correct any such work causing such failure (under Landlord's supervision).

(x)      Tenant shall also make any and all changes to the Leased Premises as may be necessary to assure that the Leased Premises comply with all Applicable Laws if such changes are specifically required as a result of Tenant's Permitted Use or as a result of Tenant's Work.

(xi)      Tenant shall, at its sole expense, in doing any Tenant's Work or making any other improvements or installations in or to the Leased Premises, or otherwise in using, occupying or conducting business at the Leased Premises, comply with all Applicable Laws, including the Americans with Disabilities Act, and Tenant shall defend, indemnify and hold Landlord harmless from all losses, damages, claims, liabilities, costs and expenses (including reasonable legal fees) arising out of any failure of Tenant to do so.

(xii)     Upon Tenant's failure to correct such work or to make such changes which are Tenant's responsibility under the Lease within fifteen (15) days following written notice, Landlord may make such correction and change, and charge Tenant for the cost thereof, together with an administrative charge equal to ten percent (10%) of the cost of such work.  Such sums due Landlord shall be paid by Tenant within fifteen (15) days of being billed and paid therefore.

(xiii)    Notwithstanding anything to the contrary contained herein, there shall be no delay in the commencement of the Lease Term and no delay in the payment of rent where Tenant, following the Delivery Date, fails to occupy the Leased Premises or if Tenant fails to complete any of Tenant's Work, nor shall same operate or extend the commencement or expiration of the Lease Term.

(xiv)    Tenant shall comply with all rules and regulations established by Landlord, from time to time, for construction of tenant improvements in the Leased Premises.

(xv)     All Tenant's Work shall be completed in a lien free manner by contractors and/or subcontractors who are insured and licensed to do business in the State of Florida. Landlord shall have the right to reasonably disapprove of Tenant's general contractor or any subcontractor if Landlord reasonably believes that such contractor is:  (i) not licensed as required by any governmental agency; (ii) not technically qualified or sufficiently staffed to do the Tenant Work; and/or (iii) not financially capable of undertaking or completing the Tenant Work.  Tenant shall cause its general contractor to furnish

F-6

Execution Copy

Landlord with an original certificate of insurance for hazard and liability coverage in amounts reasonably acceptable to Landlord. Tenant shall use good faith efforts to advise its contractor(s), subcontractor(s), and material supplier(s) that no interest of Landlord in the Leased Premises, the Building and/or the Project shall be subject to liens to secure payment of any amount due for work performed or materials installed in the Leased Premises on Tenant's behalf and Tenant's contract with its general contractor.

**2.    Change Orders.** If Tenant requests any change orders to the scope of Tenant's Work after Landlord's approval of the Tenant Plans, then such change must receive the prior written approval of Landlord, such approval not to be unreasonably withheld, conditioned, or delayed; provided, however, that if such requested change would adversely affect (in the reasonable discretion of Landlord) the Building's structure or the Building's systems (including any lobby restrooms or mechanical rooms), the exterior appearance of the Building, or the appearance of the Building's common areas or elevator lobby areas, then Landlord may withhold its consent in its sole and absolute discretion.  If Tenant requests any changes to Tenant's Work described in the approved Tenant's Plans, then such increased or decreased costs and any additional design costs incurred in connection therewith as the result of any such change shall be added to or subtracted from (as applicable) the Total Construction Costs, as set forth below.

**3.    Substantial Completion of Tenant's Work.** With respect to Tenant's Work, "**Substantial Completion**" or "**substantially complete**" shall mean the date that Tenant completes its Tenant's Work in accordance with the Tenant Plans and all Applicable Laws and Tenant has received of a temporary or permanent certificate of occupancy (or its local equivalent) allowing for Tenant to use and occupy the Leased Premises for Tenant's Permitted Use, notwithstanding that punch list items or insubstantial details concerning construction, decoration, or mechanical adjustment remain to be performed.

**4.    Excess Costs.** Tenant shall pay the entire amount by which the Total Construction Costs (hereinafter defined) exceed the Construction Allowance (hereinafter defined) (such excess amount being referred to herein as the "**Excess Amount**").  Upon approval of the Tenant Plans and selection of a contractor, Tenant shall promptly execute a work order agreement prepared by Landlord which identifies such drawings and itemizes the Total Construction Costs and sets forth the Construction Allowance.  Upon substantial completion of the Tenant's Work and before Tenant occupies the Leased Premises to conduct business therein, Tenant shall pay to Landlord any actual remaining unpaid portion of the Excess Amount. In the event of default of payment of any portion of the Excess Amount, Landlord (in addition to all other remedies) shall have the same rights as for an events of default under Article 13 of the Lease.  As used herein, "**Total Construction Costs**" means the entire cost of performing the Tenant's Work (as hereinafter defined), including design of and space planning for such work and preparation of the Tenant Plans and the final "as-built" plan of such work, costs of construction labor and materials, electrical usage during construction, additional janitorial services, related taxes and insurance costs, licenses, permits, certifications, surveys and other approvals required by Applicable Laws, except for any costs that are expressly to be Landlord's sole responsibility as provided in the Lease or this Exhibit.

**5.    Construction Allowance.**

(a)    Landlord shall provide to Tenant a construction allowance not to exceed Sixty and No/100 Dollars ($60.00) per rentable square foot in the Leased Premises (i.e., $887,280.00 based on 14,788 rentable square feet) (the "**Construction Allowance**") to be applied toward the Total Construction Costs, including hard costs and soft costs.

Execution Copy

(b)      Fifty percent (50%) of the Construction Allowance shall be paid within thirty (30) days after fifty percent (50%) of the Tenant's Work has been substantially completed in a lien free manner in accordance with Tenant's Plans and Applicable Laws as evidenced by an affidavit from Tenant's general contractor. The other fifty percent (50%) of the Construction Allowance shall be paid to Tenant (or the applicable contractors) after all of the following events have occurred: (a) Tenant has delivered to Landlord final releases of lien (in form required by Landlord) from Tenant's general contractor and all lienors giving notice as defined in the Florida Construction Lien Law and a final contractor's affidavit from the general contractor in accordance with the Florida Construction Lien Law, and all other receipts and supporting information concerning payment for the work that Landlord may reasonably request; and (b) Tenant has moved into the Leased Premises and opened for business in the Leased Premises for Tenant's Permitted Use.

(c)      At Landlord's option, the Construction Allowance or any portion of it may be paid by Landlord directly to the general contractor performing the Tenant's Work or to any lienor giving notice as defined in the Florida Construction Lien Law. If Tenant is in default under this Lease beyond any applicable grace period, or if Landlord has received written notice of any unpaid claims relating to any portion of the Tenant's Work or materials in connection therewith (other than claims which will be paid in full from such disbursement), or if a claim of lien has been recorded against the Building, the Project, the Leased Premises, or Tenant's interest in the Leased Premises, by reason of work done, or claimed to have been done, or materials supplied or specifically fabricated, claimed to have been supplied or specifically fabricated, to or for Tenant or the Leased Premises which has not been discharged of record or transferred to a bond in the manner provided by Florida Construction Lien Law, Landlord may, in addition to all its other available rights and remedies, withhold payment of any unpaid portion of the Construction Allowance, even if Tenant has already paid for all or a portion of the cost of the Tenant's Work. For the avoidance of doubt, should Landlord withhold payment of any unpaid portion of the Construction Allowance in accordance with this paragraph, then if Tenant, in a timely manner, either (i) cures the applicable default, (ii) provides evidence of payment and lien waivers from any materialman, contractor or subcontractor who provided notice of an unpaid claim, or (iii) satisfies and/or bonds off a recorded construction lien in a timely manner, as applicable, then Landlord shall resume disbursements of the Construction Allowance as otherwise set forth herein following such cure.

(d)      The Construction Allowance must be used (that is, the Tenant's Work must be substantially complete and the Construction Allowance disbursed) within eighteen (18) months following the Delivery Date or else Landlord shall have no further obligation to provide the same.

(e)      All items of Tenant's Work, whether the cost is covered by the Construction Allowance or not, shall become the property of Landlord upon expiration or earlier termination of the Lease and shall remain on the Leased Premises at all times during the Lease Term.

(f)      Tenant shall not be entitled to payment or Rent reduction for any part of the Construction Allowance not used by Tenant.

6.      **Optional Additional Construction Allowance.** Provided that Tenant is not in default hereunder beyond any applicable notice or cure period, at the time of request, Landlord shall make available to Tenant, at Tenant's request, an additional construction allowance in an amount not to exceed Six Hundred Thousand and No/100 Dollars ($600,000.00) in the aggregate (the "**Additional Construction Allowance**") to be applied toward the Total Construction Costs, including hard costs and soft costs. For the avoidance of doubt, Tenant may request the Additional Construction Allowance in an amount less

F-8

than Six Hundred Thousand and No/100 Dollars ($600,000.00).  Should Tenant desire the Additional Construction Allowance, then Tenant shall notify Landlord in writing of such request no later than ninety (90) days prior to the earlier of (i) the date such Additional Construction Allowance is needed by Tenant or (ii) the Delivery Date.  Should Tenant request and receive the Additional Construction Allowance from Landlord, Landlord shall adjust the Base Rent due hereunder in order to amortize the cost of such Additional Construction Allowance in a manner reasonably determined by Landlord, and Tenant shall, promptly following Tenant's request for such Additional Construction Allowance, be required to execute an amendment to this Lease memorializing such adjusted Base Rent.  Landlord and Tenant agree on the following adjustments to Base Rent in the First Lease Year based on the following hypothetical amounts disbursed as the Additional Construction Allowance (which shall be subject to annual escalations of Base Rent in each subsequent Lease Year as provided in this Lease):

| Amount of Additional Construction Allowance | Amount by which Year 1 Base Rent Increases |
| --- | --- |
| $100,000.00 | $0.83 per RSF |
| $200,000.00 | $1.67 per RSF |
| $300,000.00 | $2.50 per RSF |
| $400,000.00 | $3.33 per RSF |
| $500,000.00 | $4.17 per RSF |
| $600,000.00 | $5.00 per RSF |

7.   **Construction Representatives.**  Landlord's and Tenant's representatives for coordination of construction and approval of change orders will be as follows, provided that either party may change its representative upon written notice to the other:

Landlord's Representative:

Name: Max Raskin
Phone: 561-797-3297; Email:
mraskin@propertymg.com

Tenant's Representative:

Name: Len Wanger
Phone: 312-375-3996; Email:
Len.Wanger@velocityesports.com

[No Further Text on Page]

F-9

Execution Copy

## EXHIBIT "F"

### LEGAL DESCRIPTION & SITE PLAN DEPICTING THE LEASED PREMISES

### LEGAL DESCRIPTION OF PROJECT

Parcel 1: Fee

Lot 1 of CENTRAL STATION, according to the Plat thereof as recorded in Plat Book 79, Page 60, of the Public Records of Orange County, Florida.

Parcel 2: Air Rights

The air rights as defined per Plat of Central Station, according to the plat thereof, as recorded in Plat Book 79, Page 60, public records of Orange County, Florida, which is described as lying 15.00 feet above the finished surface of the paved roadway of the following described property.

A strip of land lying in Section 26, Township 22 South, Range 29 East and being all of that 60.00 feet wide cross-access and utility easement of Lot 1, Central Station, according to the plat thereof, as recorded in Plat Book 79, Page 60, public records of Orange County, Florida, described as follows:

Commence at the Southwest corner of said Lot 1, for a point of reference; thence run, South 89°57'20" East, along the South line of said Lot 1, a distance of 123.65 feet to the Point of Beginning; said point lies on the westerly line of said 60.00 feet wide cross-access and utility easement; thence run North 00°02'22" East, along said Westerly easement line, 319.93 feet; thence run South 89°5248" West, along said Westerly easement line, 123.65 feet to a point lying on the Westerly line of said Lot 1; thence run North 00°02'22" East, along said Westerly easement line and said Westerly line of Lot 1, a distance of 60.00 feet to the Northwest corner of said Lot 1; thence run North 89°52'48" East, along the Northerly line of said Lot 1, a distance of 416.79 feet to the Northeast corner of said Lot 1; said point also lies on the West right-of-way line of orange avenue; thence run South 00°04'20" West, along said West right-of-way line and the East line of said Lot 1, a distance of 60.00 feet to a point lying on the Easterly line of said 60.00 feet wide cross-access and utility easement; thence run South 89°52'48" West, along said Easterly easement line, 233.11 feet;  thence run South 00°02'22" West, along said Easterly easement line, 320.10 feet to a point lying on aforesaid South line of Lot 1; thence run North 89°57'20" West, along said South line of Lot 1, a distance of 60.00 feet to the Point of Beginning.

Parcel 3: Appurtenant Easement

Perpetual Non-Exclusive Easement rights, as an appurtenance to and for the benefit of Parcels 1 and 2, created under and further described in that certain Transit Oriented Development Agreement For Lynx Central Station by and between Central Florida Regional Transportation Authority d/b/a Lynx and 400 North Orange, LLC, a Delaware limited liability company, as recorded in Official Records Book 10575, Page 7677, of the Public Records of Orange County, Florida.

Execution Copy

## SITE PLAN OF PREMISES



*Premises is the area outlined in red above.

F-2

Execution Copy

## EXHIBIT "G"

### EXCLUSIVE USES AND PROHIBITED USES

Without limiting any provisions in the Lease, Tenant covenants not to do any of the following with respect to the Leased Premises: (i) conduct any auction, fire, distress, going out of business, liquidation, bankruptcy or like sales in the Leased Premises or the Building; (ii) display, sell, lease, or offer for sale or lease, in any manner on the Leased Premises or the Building pornographic material of any kind, including books, magazines and movies; (iii) operate any speakeasy bar, lounge or nightclub which does not serve food; or (iv) engage in any activity or use the Leased Premises for any purpose that is illegal or is not in keeping with the standards or character of a first-class restaurant or would otherwise unreasonably interfere with standard Building operations.  In addition to the foregoing, Tenant shall not grant any concession, license or permission to any third party to sell or take orders for merchandise in the Leased Premises. Except as otherwise specifically permitted in this Lease, Tenant shall not place or keep any tables, merchandise or other items in the Common Areas, and shall not be permitted to use any area outside of the Leased Premises for any portion of Tenant's business operations.  Tenant, or Tenant's employees and agents, shall not solicit business in the Common Areas and shall not distribute any handbills or other advertising matter therein.  In no event, shall Tenant or any of its customers, patrons, employees and invitees have any right to use or access any of the residential area, or any areas of the Building designated by Landlord as exclusively for the use of the residential area (specifically including, without limitation, any areas in parking areas in the Building designated by Landlord as exclusively for the use of the residential area).

Execution Copy

## EXHIBIT "H"

## TENANT'S INSURANCE REQUIREMENTS

Tenant shall, at Tenant's sole cost and expense, procure and maintain throughout the Lease Term, all of the minimum insurance coverages in accordance with the following requirements:

1.      Property Insurance. Property Insurance in an amount of not less than Five Hundred Thousand and No/100 Dollars ($500,000.00), which covers (a) all of Tenant's personal property in, on, at, or about the Leased Premises, and (b) all leasehold improvements to the Leased Premises including but not limited to Tenant's Work. Tenant's Property Insurance shall be written on the broadest available "all-risk" policy form (or its then-equivalent); must include an agreed-amount endorsement for no less than one hundred percent (100%) of full replacement cost; must include provisions and/or endorsements assuring both mold coverage and terrorism coverage; and must name Landlord (and, if and as requested by Landlord, Landlord's ground lessor(s) and/or mortgagee(s), as applicable), as an "insured as its interest may appear", and which policy has a deductible no greater than Ten Thousand and No/100 Dollars ($10,000.00).

2.      Business Income Insurance. Business income/business interruption insurance and extra expense coverage ("**Business Income Insurance**") with coverage amounts that will reimburse Tenant for all direct and indirect loss of income arising out of and all charges and costs incurred in connection with all losses covered by Tenant's Property Insurance. This coverage must include loss arising from prevention of, or denial of use of or access to, all or part of the Leased Premises or the Building. Business Income Insurance Coverage must provide coverage for no less than twelve (12) months' income to cover Rent payable by Tenant, and which policy has a deductible no greater than Ten Thousand and No/100 Dollars ($10,000.00); and

3.      Commercial General Liability Insurance. Commercial general liability insurance, or its then-equivalent, written on an "occurrence" policy form, covering all claims, demands or actions for bodily injury, property damage, personal and advertising injury, premise, operations, products-complete operations, independent contractors, contractual liability and medical payments arising out of or relating, directly or indirectly, to Tenant's business operations, conduct, assumed liabilities, or use or occupancy of the Leased Premises, or by the condition of the Leased Premises, including environmental coverage and dram shop (*i.e.*, alcohol sales) coverage if Tenant's business in any way involves serving or selling of alcohol or if deemed appropriate by Landlord (collectively, "**Tenant's Liability Insurance**") Tenant's Liability Insurance must also include the broadest available form of contractual liability coverage. No exclusion or restrictions of coverage will be permitted beyond those contained in the standard coverage form. The minimum acceptable limits for Tenant's Liability Insurance are One Million and No/100 Dollars ($1,000,000.00) (with no offset for occurrences on property other than the Leased Premises) per occurrence and Two Million and No/100 Dollars ($2,000,000.00) in the aggregate. These minimum limits can be a combination of commercial general liability and excess insurance (as required below). Tenant must cause Landlord, Landlord's mortgagees, Landlord's ground lessor (if applicable), Landlord's property manager and any other entities required by Landlord to be named as "additional insured" by endorsement satisfactory in form and substance to Landlord.

4.      Business Automobile Liability Insurance. The minimum acceptable limits for the Business Automobile Liability Insurance is are One Million and No/100 Dollars ($1,000,000.00). The Business Automobile Liability Insurance must be written on an occurrence basis and must include liability arising

H-1

out of operation of owned, hired, and non-owned vehicles. Tenant must cause Landlord, Landlord's mortgagees, Landlord's ground lessor (if applicable), Landlord's property manager and any other entities required by Landlord to be named as "additional insured" by endorsement satisfactory in form and substance to Landlord.

5.    Workers' Compensation Insurance. Workers' Compensation Insurance in the amount required by the laws in the State of Florida, together with employer's liability insurance in an amount not less than $500,000/$500,000/$500,000 covering Tenant's agents and employees in the Leased Premises and containing waivers of subrogation in favor of Landlord. TENANT HEREBY INDEMNIFIES, AGREES TO HOLD HARMLESS AND, AT LANDLORD'S OPTION, DEFEND LANDLORD AND LANDLORD'S AGENTS, REPRESENTATIVES AND EMPLOYEES FROM AND AGAINST ALL CLAIMS ARISING OUT OF ANY LOSS SUFFERED BY (OR IN CONNECTION WITH) ANY OF TENANT'S AGENTS, REPRESENTATIVES OR EMPLOYEES AT THE LEASED PREMISES WHICH WOULD HAVE BEEN OR IS COVERED BY AN APPROPRIATE WORKERS' COMPENSATION INSURANCE POLICY AND/OR EMPLOYER'S LIABILITY INSURANCE POLICY.

6.    Builder's Risk. At all times during which construction work is being performed by or on behalf of Tenant at the Leased Premises, Tenant shall maintain or cause its general contractor to maintain "Builder's Risk" insurance or an equivalent form per industry standards, covering the full replacement value of all such work being performed, naming Landlord as loss payee and "additional insured as its interest may appear," and being written in amounts of coverage that meet any coinsurance requirements of the policy or policies.

7.    Dram Shop Insurance. For such period of time as Tenant shall serve liquor or other alcoholic beverages at the Leased Premises, liquor/dram shop liability (i.e. for the sale and consumption of alcohol) insurance insuring Landlord and Tenant against loss, cost, or expense by reason of bodily injury or property damage for which Landlord and/or Tenant may be held liable by or because of the violation of any statute, ordinance or regulation pertaining to the sale, gift, distribution, or use of any alcoholic beverage, by reason of the selling, serving, or giving of any alcoholic beverage to a minor or to a person under the influence of alcohol or which causes or contributes to the intoxication of any person, or as a person or organization engaged in the business of manufacturing, distributing, selling or serving alcoholic beverages, or as an owner or lessor of the Leased Premises used for such purposes. The liquor liability insurance shall be written with minimum limits of coverage not less than One Million Dollars ($1,000,000.00) per occurrence and not less than Three Million and 00/100 Dollars ($3,000,000.00) in the aggregate.

8.    Excess/Umbrella Coverage. Tenant shall procure and maintain Umbrella/Excess liability insurance for damages because of bodily injury, property damage, personal and advertising injury with, at minimum, the same terms and conditions as the Employer's Liability, Commercial General Liability, Automobile Liability, and Dram Shop insurances required by the Lease. Umbrella/Excess Liability insurance shall include the Lessor, their respective officers and employees as additional insured on a primary basis with no contribution by the Landlord's liability insurance. Such Umbrella/Excess insurance purchased by Tenant shall provide the following minimum limits of liability and shall be maintained through the Lease Term: $5,000,000 Each Occurrence, and $5,000,000 General Aggregate Limit. Landlord will accept per occurrence and aggregate limits that are met with any combination of primary (or underlying) and excess (or umbrella) insurance for General Liability, Auto Liability Employer's Liability and Dram Shop insurance provided the combined minimum limits are met.

I-2

9.    Miscellaneous. The insurance requirements set forth herein are independent of Tenant's waiver, indemnification, and other obligations under this Lease and cannot be construed or interpreted in any way to restrict, limit, or modify Tenant's waiver, indemnifications, and other obligations or to limit in any way Tenant's liability under this Lease.  In addition, each insurance company must have a rating of no less than A:VIII in the current Best's Insurance Guide or A- in the current Standard and Poor Insurance Solvency Review and must be duly licensed and/or approved to engage in the business of insurance in the State of Florida.  Tenant's insurance must be primary insurance and must provide that any insurance carried by the Landlord or any other party is strictly excess, secondary, and noncontributing with any insurance carried by Tenant.  The insurance Tenant is required to carry under this Lease shall provide that it cannot be canceled, not renewed, or be subject to a change in coverage or limits of coverage except after thirty (30) days' prior written notice to Landlord or to such other party or address as may be designated by Landlord or its designee.  Moreover, Tenant shall obtain a written obligation on the part of each insurance company to notify Landlord at least thirty (30) days' prior to cancellation or modification of such insurance.  Tenant is permitted to provide its insurance through a blanket policy as long as Tenant, at Tenant's sole cost and expense, procures a "per location" endorsement applicable to the Leased Premises, or an equivalent reasonably acceptable to Landlord.  If Tenant should fail to comply with the foregoing requirements relating to insurance within applicable notice and cure periods, Landlord may obtain such insurance and Tenant shall pay to Landlord on ten (10) days written demand as Additional Rent hereunder the premium cost thereof plus interest at the Interest Rate from the date of payment by Landlord until repaid by Tenant, and the foregoing shall be cumulative with, and does not supersede or reduce in any way, Landlord's rights for Tenant's default under the Lease.

If, during the Lease Term, (x) it becomes customary, in the reasonable judgment of Landlord's insurance advisor, for retail tenants of properties similar to the retail portion of the Building and/or Project or retail tenants engaged in uses similar to Tenant's Permitted Use of the Leased Premises to provide either additional amounts of insurance or different types of insurance coverage(s) from that set forth above and (y) Landlord, at such time of determination, is then requesting such additional types or amounts of insurance from new or prospective retail tenants at the Building and/or Project, then Landlord may, upon no less than thirty (30) days prior written notice, require that Tenant obtain such additional insurance as may be reasonably requested by Landlord.

10.    Additional Requirements. Tenant must deliver to Landlord certificate of insurance to reflect that Tenant is carrying the type and amount of insurance coverage required by this Lease before Tenant enters onto the Leased Premises and at any time thereafter upon ten (10) days written request from Landlord.  Additionally, Tenant shall deliver to Landlord, no less than thirty (30) days before the expiration date of any policy, adequate proof that Tenant has obtained renewal or replacement coverage for at least one (1) year immediately following such expiration.  While the following checklist does not override the requirements of the preceding sentences, it is intended to give Tenant a preliminary checklist of the insurance documentation Landlord requires:

(a)    ACORD Form 28 ("Evidence of Commercial Property Insurance" for Property and Business Income Insurance and Builder's Risk), ACORD Form 25 ("Evidence of Commercial General Liability Insurance"), and/or equivalent forms satisfactory to Landlord for Tenant's general and excess liability, contractor's  general and excess liability Insurance (as applicable), automobile liability insurance, dram shop (liquor) liability insurance, Worker's Compensation Insurance, and Employers' Liability Insurance.

(b)    Copies of all additional insured endorsements (which must be on ISO Form 2026 or an ISO form which replaces such form).

I-3

Execution Copy

(c)     Intentionally Deleted

(d)     Intentionally Deleted.

(e)     Copies of all waivers of subrogation.

11.     Tenant shall require all of Tenant's contractors and subcontractors engaged in the performance of Tenant's Work to effect and maintain and deliver to Tenant and Landlord certificates evidencing the existence of, and covering Landlord, Tenant and Tenant's contractors, prior to commencement of Tenant's Work and until completion thereof, of the workers' compensation insurance, employer's liability insurance, commercial general and excess liability insurance and commercial automobile liability insurance policies in the amounts and as described above.  Tenant's, Tenant's contractors' and subcontractors', insurance is primary with respect to Landlord; any other insurance maintained by Landlord, Landlord's parent company, subsidiaries and affiliates is excess and non-contributing.  Failure of Tenant, Tenant's contractors or subcontractors to take out and/or maintain the required insurance shall not relieve Tenant from any liability under this Lease, nor shall the insurance requirements be construed to conflict with or otherwise limit the obligations of Tenant under the Lease.

Execution Copy

EXHIBIT "I-1"

**CORPORATE GUARANTY**

**[See Attached]**

I-1

Execution Copy
58775981;11

## GUARANTY OF LEASE

In order to induce **434 N. ORANGE INVESTMENT, LLC**, a Delaware limited liability company ("**Landlord**") to execute the foregoing Retail Lease Agreement (the "**Lease**") with Velocity Esports Orlando Downtown, LLC, a Florida limited liability company ("**Tenant**"), for a certain Leased Premises located at 410 N. Orange Ave., Orlando, FL (which building, together with all ancillary improvements appurtenant thereto, is herein called the "**Building**"), the undersigned (whether one or more than one, "**Guarantor**"), an affiliate of Tenant, has guaranteed and by this instrument (the "**Guaranty**") does, subject to Section 10 hereof, hereby unconditionally guarantee the full and prompt payment of all rental amounts and other sums required to be paid by Tenant under the Lease (individually, a "**Guaranteed Payment**", and collectively, the "**Guaranteed Payments**"), and the full and faithful performance of all terms, conditions, covenants, liabilities, obligations, duties and agreements contained in the Lease on the Tenant's part to be performed (individually, a "**Guaranteed Obligation**", and collectively, the "**Guaranteed Obligations**"), as if the undersigned has executed the Lease as Tenant thereunder, and the undersigned Guarantor further promises to pay all of Landlord's costs and expenses (including reasonable attorneys' fees) incurred in endeavoring to collect the Guaranteed Payments or to enforce the Guaranteed Obligations or incurred in enforcing this Guaranty, as well as all damages which Landlord may suffer in consequence of any default or breach under the Lease or this Guaranty.

1.      Landlord may at any time and from time to time, without notice to or consent by the undersigned Guarantor, take any or all of the following actions without affecting or impairing the liability and obligations of the undersigned Guarantor on this Guaranty:

(a)      grant an extension or extensions of time for payment of any Guaranteed Payment or time for performance of any Guaranteed Obligation;

(b)      grant an indulgence or indulgences in the payment of any Guaranteed Payment or in the performance of any Guaranteed Obligation;

(c)      modify or amend the Lease or any term thereof or any obligation of Tenant arising thereunder;

(d)      consent to any assignment or assignments, sublease or subleases and successive assignments or subleases by Tenant or by Tenant's successors or assigns;

(e)      consent to an extension or renewal (or extensions or renewals) of the Lease Term;

(f)      accept other guarantees or guarantors;

(g)      release any person primarily or secondarily liable hereunder or under the Lease or under any other guaranty of the Lease; and/or

(h)      enter into any other covenants with respect to the Lease as Landlord may deem appropriate.

2.      The liability of the undersigned Guarantor under this Guaranty (a) shall not be affected, impaired, modified, changed, released or limited in any manner whatsoever by any failure or delay by Landlord in collecting or enforcing any Guaranteed Payment or enforcing any Guaranteed Obligation or this Guaranty or any security therefor or in exercising any right or power in respect thereto, or by any compromise, waiver, settlement, change, subordination, impairment, release, modification or disposition of any Guaranteed Payment or Guaranteed Obligation or of any security therefor, or by any indulgence, compromise, settlement or variation of terms which may be extended to Tenant by Landlord or agreed upon by Landlord and Tenant, and (b) shall not be impaired, modified, changed, released, or limited in any manner whatsoever by any impairment, modification, change, release, or limitation of the liability of Tenant or its estate in bankruptcy, or of any remedy for the enforcement thereof, resulting from the

Execution Copy

operation of any present or future provisions of the United States Bankruptcy Code or any similar law or statute of the United States or any State thereof.  In order to hold the undersigned Guarantor liable hereunder, there shall be no obligation on the part of Landlord, at any time, to resort to Tenant or to any other guaranty or to any security or other rights and remedies for payment or performance, and Landlord shall have the right to enforce this Guaranty irrespective of whether or not other proceedings or actions are pending or being taken seeking resort to or realization upon or from any of the foregoing.

3.        Landlord and Tenant, without notice to or consent by the undersigned, may at any time or times enter into such extensions, renewals, amendments, assignments, subleases, or other covenants with respect to the Lease as they may deem appropriate, and the undersigned shall not be released thereby, but shall continue to be fully liable for the payment and performance of all liabilities, obligations and duties of Tenant under the Lease as so extended, renewed, amended, assigned or otherwise modified.

4.        The undersigned hereby waives notice of acceptance of this Guaranty and all other demands and notices of any kind in connection with this Guaranty or any Guaranteed Payment or Guaranteed Obligation (including, without limitation, notices of dishonor or default by Tenant under the Lease, notice of acceleration or intent to accelerate, and notice of any extensions granted or other action taken in reliance hereon), and waives all diligence in collection or in protection of any security, presentment, protest, demand, or suit on the part of Landlord in the enforcement of any liability, obligation or duty guaranteed hereby.

5.        The undersigned Guarantor hereby acknowledges full and complete notice and knowledge of all the terms, conditions, covenants, obligations and agreements of the Lease.

6.        The payment by the undersigned Guarantor of any amount pursuant to this Guaranty shall not in any way entitle the undersigned Guarantor to any right, title or interest (whether by subrogation or otherwise) of Tenant under the Lease or to any security being held for any Guaranteed Payment or Guaranteed Obligation.

7.        The undersigned agrees that, within ten (10) days after a request from Landlord (but not more than once per calendar year, unless in connection with an uncured Tenant default, a proposed sale or refinance of the Building in whole or in part), the undersigned shall deliver to Landlord such financial statements as are reasonably required by Landlord to verify the net worth of the undersigned.  The undersigned further agrees that, within five (5) days after a request from Landlord, the undersigned shall deliver to Landlord a statement certifying to the undersigned's address and the undersigned's driver license number and/or social security number, federal employer identification number or tax identification number, as applicable.

8.        The undersigned further agrees that Landlord shall not be first required to enforce against Tenant or any other person any liability, obligation or duty guaranteed hereby before seeking enforcement thereof against the undersigned.  Suit may be brought and maintained against the undersigned by Landlord to enforce any liability, obligation or duty guaranteed hereby without joinder of Tenant or any other person.

9.        This Guaranty shall be continuing, absolute and unconditional and shall remain in full force and effect until all Guaranteed Payments are made, all Guaranteed Obligations are performed and all obligations of the undersigned Guarantor under this Guaranty are fulfilled.

I-3

Execution Copy

10.     Maximum Liability Amount; Reduction.

(a)     Notwithstanding anything herein to the contrary, the Guaranteed Obligations of the Guarantor hereunder shall not exceed an amount equal to sixty (60) months' of Base Rent payments owed by Tenant under the Lease (measured as of the month in which the applicable default by Tenant occurs and without giving effect to any partial abatement in the first Lease Year) (the "**Maximum Liability Amount**"), excluding from such Maximum Liability Amount any costs incurred by Landlord in connection with the enforcement of this Guaranty (which shall not be subject to such cap and for which Guarantor shall remain liable).

(b)     Notwithstanding anything herein to the contrary, provided that the Reduction Conditions (defined below) have been satisfied in all respects as of each applicable Reduction Date (as hereinafter defined), the Maximum Liability Amount of Guarantor hereunder shall be reduced as follows: (i) as of the first day of the thirteenth (13th) month of the Lease Term (the "**First Reduction Date**"), provided that the Reduction Conditions are satisfied, the Maximum Liability Amount hereunder shall be reduced to forty-eight (48) months' of Base Rent payments owed by Tenant under the Lease (measured as of the month in which the applicable default by Tenant occurs); (ii) as of the first day of the twenty-fifth (25th) month of the Lease Term (the "**Second Reduction Date**"), provided that the Reduction Conditions are satisfied, the Maximum Liability Amount hereunder shall be reduced to thirty-six (36) months' of Base Rent payments owed by Tenant under the Lease (measured as of the month in which the applicable default by Tenant occurs); (iii) as of the first day of the thirty-seventh (37th) month of the Lease Term (the "**Third Reduction Date**"), provided that the Reduction Conditions are satisfied, the Maximum Liability Amount hereunder shall be reduced to twenty-four (24) months' of Base Rent payments owed by Tenant under the Lease (measured as of the month in which the applicable default by Tenant occurs); and (iv) as of the first day of the forty-ninth (49th) month of the Lease Term (the "**Fourth Reduction Date**", and individually and collectively with the First Reduction Date, the Second Reduction Date and the Third Reduction Date, the "**Reduction Date(s)**"), provided that the Reduction Conditions are satisfied, the Maximum Liability Amount hereunder shall be reduced to twelve (12) months' of Base Rent payments owed by Tenant under the Lease (measured as of the month in which the applicable default by Tenant occurs). For the avoidance of doubt, (x) the Maximum Liability Amount, as reduced, following each such Reduction Date, shall continue to exclude from such reduced cap any costs (legal and otherwise) incurred by Landlord in connection with the enforcement of this Guaranty and (y) in no event shall the Maximum Liability Amount be reduced below twelve (12) months' of Base Rent payments owed by Tenant under the Lease (e.g., there shall be no further reductions after the Fourth Reduction Date for the balance of the Lease Term).

(c)     As used in this Guaranty, the "**Reduction Conditions**" shall mean each of the following conditions have been satisfied as of the applicable Reduction Date: (i) Tenant has not assigned or subleased the Leased Premises (other than a Permitted Transfer) and is occupying the entire Leased Premises in accordance with the terms and conditions of the Lease; (ii) Tenant is not then in default under the Lease beyond any notice and/or grace period; and (iii) Tenant has not failed to pay rent, as and when due, under the Lease more than two (2) times in any twelve (12) month period prior to the applicable Reduction Date.

(d)     Notwithstanding anything in the foregoing to the contrary, if Tenant elects to receive an "Additional Construction Allowance" pursuant to the Work Letter attached as Exhibit E-1 to the Lease, then the Maximum Liability Amount described above shall automatically be increased to account for the amount of such Additional Construction Allowance received by Tenant. For purposes of illustration only, if Tenant were to receive an Additional Construction Allowance in the amount of $500,000.00, then the

I-4

Maximum Liability Amount in the first Lease Year of the Lease Term would be increased accordingly by $500,000.00, which amount of increase shall be subject to reduction as shown below:

| Time Period: | Amount by which Maximum Liability Amount Increases Because of Additional Construction Allowance Received by Tenant |
|---|---|
| Lease Year 1 | $500,000.00 |
| Lease Year 2 (after First Reduction Date) | $400,000.00 |
| Lease Year 3 (after Second Reduction Date) | $300,000.00 |
| Lease Year 4 (after Third Reduction Date) | $200,000.00 |
| Lease Year 5 (after Fourth Reduction Date) | $100,000.00 |
| Lease Year 6* | $0.00 |

*As of the commencement of the 6th Lease Year and for the duration of the Lease Term (as may be extended), the Maximum Liability Amount will be twelve (12) months' of Base Rent payments owed by Tenant under the Lease.

11.    This Guaranty shall be binding upon the undersigned and shall also bind the heirs, personal representatives, executors, administrators, successors and assigns of the undersigned Guarantor and shall inure to the benefit of Landlord and Landlord's heirs, executors, administrators, successors and assigns.

12.    If this Guaranty is executed by more than one person, all singular nouns and verbs herein relating to the undersigned Guarantor shall include the plural number, the obligations of the several Guarantors shall be joint and several, and Landlord may enforce this Guaranty against any one or more Guarantors without joinder of any other Guarantor (hereunder or otherwise).

13.    Landlord and the undersigned Guarantor intend and believe that each provision of this Guaranty comports with all applicable laws. However, if any provision of this Guaranty is found by a court to be invalid for any reason, the remainder of this Guaranty shall continue in full force and effect and the invalid provision shall be construed as if it were not contained herein.

14.    It is understood that other agreements similar to this Guaranty may, at Landlord's sole option and discretion, be executed by other persons with respect to the Lease. This Guaranty shall be cumulative of any such agreements and the liabilities and obligations of the undersigned Guarantor under this Guaranty shall in no event be affected or diminished by reason of any such other agreements. Moreover, in the event Landlord obtains another signature of more than one guarantor on this Guaranty or by obtaining additional guarantee agreements, or both, Guarantor agrees that Landlord, in Landlord's sole and absolute discretion, may (a) bring suit against all Guarantors of the Lease, jointly and severally,

I-5

Execution Copy

or against any one or more of them, (b) compound or settle with any one or more of the Guarantors for such consideration as Landlord may deem proper, and (c) release one or more of the Guarantors from liability. The undersigned Guarantor further agrees that no such action shall impair the rights of Landlord to enforce the Lease or any guaranty obligations against any remaining Guarantor or Guarantors, including the undersigned Guarantor.

15.     This Guaranty shall be governed by and construed according to the laws of the State of Florida. The situs for the resolution (including any judicial proceedings) of any disputes arising under or relating to this Guaranty shall be county where the Leased Premises are located. The undersigned agrees that if either party shall employ an attorney to present, enforce or defend either Parties' rights or remedies hereunder, the prevailing party shall have any reasonable attorneys' fees and costs incurred by paid for by the other party.

16.     THE UNDERSIGNED AND LANDLORD (BY ACCEPTANCE OF THIS GUARANTY) EACH WAIVE ANY RIGHT THEY MAY HAVE TO REQUIRE THAT A JURY PARTICIPATE IN DECIDING ANY OR ALL ISSUES ARISING UNDER OR IN CONNECTION WITH THE LEASE OR THIS GUARANTY OR ANY OTHER DOCUMENT EXECUTED IN CONNECTION WITH THE LEASE OR THIS GUARANTY. THIS WAIVER SPECIFICALLY INCLUDES A WAIVER OF TRIAL BY JURY, APPLIES TO ALL PRESENT AND FUTURE RIGHTS, AND IS MADE TO THE FULLEST EXTENT PERMITTED BY LAW.

[Signature Page(s) Attached]

Execution Copy

DocuSign Envelope ID: C9FDBF25-1029-4BDB-8985-1DDC2E10956B

IN WITNESS WHEREOF, the undersigned Guarantor has executed this Guaranty as of this  28th  day of April, 2023, to be effective the same day as the Effective Date of the Lease.

| WITNESSES: | GUARANTOR: |
|---|---|
| Print Name:_____ <br><br> Print Name:_____ | VELOCITY ESPORTS INC., <br> a Nevada corporation <br><br> DocuSigned by: <br> By: *Len Wanger* <br> 8FDB97B7431B4B4... <br> Name: Leonard Wanger <br> Title:  President <br><br> Address: 3319 N Cicero Avenue #412002 <br> Chicago, IL 60641 |

I-7

Execution Copy

EXHIBIT "I-2"

**PERSONAL GUARANTY**

**[See Attached]**

I-8

Execution Copy

## GUARANTY OF LEASE

In order to induce **434 N. ORANGE INVESTMENT, LLC**, a Delaware limited liability company ("**Landlord**") to execute the foregoing Retail Lease Agreement (the "**Lease**") with Velocity Esports Orlando Downtown, LLC, a Florida limited liability company ("**Tenant**"), for a certain Leased Premises located at 410 N. Orange Ave., Orlando, FL (which building, together with all ancillary improvements appurtenant thereto, is herein called the "**Building**"), the undersigned (whether one or more than one, "**Guarantor**") has guaranteed and by this instrument (the "**Guaranty**") does, subject to Section 10 hereof, hereby unconditionally guarantee the full and prompt payment of all rental amounts and other sums required to be paid by Tenant under the Lease (individually, a "**Guaranteed Payment**", and collectively, the "**Guaranteed Payments**"), and the full and faithful performance of all terms, conditions, covenants, liabilities, obligations, duties and agreements contained in the Lease on the Tenant's part to be performed (individually, a "**Guaranteed Obligation**", and collectively, the "**Guaranteed Obligations**"), as if the undersigned has executed the Lease as Tenant thereunder, and the undersigned Guarantor further promises to pay all of Landlord's costs and expenses (including reasonable attorneys' fees) incurred in endeavoring to collect the Guaranteed Payments or to enforce the Guaranteed Obligations or incurred in enforcing this Guaranty, as well as all damages which Landlord may suffer in consequence of any default or breach under the Lease or this Guaranty.

1.      Landlord may at any time and from time to time, without notice to or consent by the undersigned Guarantor, take any or all of the following actions without affecting or impairing the liability and obligations of the undersigned Guarantor on this Guaranty:

(i)      grant an extension or extensions of time for payment of any Guaranteed Payment or time for performance of any Guaranteed Obligation;

(j)      grant an indulgence or indulgences in the payment of any Guaranteed Payment or in the performance of any Guaranteed Obligation;

(k)      modify or amend the Lease or any term thereof or any obligation of Tenant arising thereunder;

(l)      consent to any assignment or assignments, sublease or subleases and successive assignments or subleases by Tenant or by Tenant's successors or assigns;

(m)      consent to an extension or renewal (or extensions or renewals) of the Lease Term;

(n)      accept other guarantees or guarantors;

(o)      release any person primarily or secondarily liable hereunder or under the Lease or under any other guaranty of the Lease; and/or

(p)      enter into any other covenants with respect to the Lease as Landlord may deem appropriate.

2.      The liability of the undersigned Guarantor under this Guaranty (a) shall not be affected, impaired, modified, changed, released or limited in any manner whatsoever by any failure or delay by Landlord in collecting or enforcing any Guaranteed Payment or enforcing any Guaranteed Obligation or this Guaranty or any security therefor or in exercising any right or power in respect thereto, or by any compromise, waiver, settlement, change, subordination, impairment, release, modification or disposition of any Guaranteed Payment or Guaranteed Obligation or of any security therefor, or by any indulgence, compromise, settlement or variation of terms which may be extended to Tenant by Landlord or agreed upon by Landlord and Tenant, and (b) shall not be impaired, modified, changed, released, or limited in any manner whatsoever by any impairment, modification, change, release, or limitation of the liability of Tenant or its estate in bankruptcy, or of any remedy for the enforcement thereof, resulting from the

I-9

Execution Copy

operation of any present or future provisions of the United States Bankruptcy Code or any similar law or statute of the United States or any State thereof. In order to hold the undersigned Guarantor liable hereunder, there shall be no obligation on the part of Landlord, at any time, to resort to Tenant or to any other guaranty or to any security or other rights and remedies for payment or performance, and Landlord shall have the right to enforce this Guaranty irrespective of whether or not other proceedings or actions are pending or being taken seeking resort to or realization upon or from any of the foregoing.

3.        Landlord and Tenant, without notice to or consent by the undersigned, may at any time or times enter into such extensions, renewals, amendments, assignments, subleases, or other covenants with respect to the Lease as they may deem appropriate, and the undersigned shall not be released thereby, but shall continue to be fully liable for the payment and performance of all liabilities, obligations and duties of Tenant under the Lease as so extended, renewed, amended, assigned or otherwise modified.

4.        The undersigned hereby waives notice of acceptance of this Guaranty and all other demands and notices of any kind in connection with this Guaranty or any Guaranteed Payment or Guaranteed Obligation (including, without limitation, notices of dishonor or default by Tenant under the Lease, notice of acceleration or intent to accelerate, and notice of any extensions granted or other action taken in reliance hereon), and waives all diligence in collection or in protection of any security, presentment, protest, demand, or suit on the part of Landlord in the enforcement of any liability, obligation or duty guaranteed hereby.

5.        The undersigned Guarantor hereby acknowledges full and complete notice and knowledge of all the terms, conditions, covenants, obligations and agreements of the Lease.

6.        The payment by the undersigned Guarantor of any amount pursuant to this Guaranty shall not in any way entitle the undersigned Guarantor to any right, title or interest (whether by subrogation or otherwise) of Tenant under the Lease or to any security being held for any Guaranteed Payment or Guaranteed Obligation.

7.        The undersigned agrees that, within ten (10) days after a request from Landlord (but not more than once per calendar year, unless in connection with an uncured Tenant default, a proposed sale or refinance of the Building in whole or in part), the undersigned shall deliver to Landlord such financial statements as are reasonably required by Landlord to verify the net worth of the undersigned. The undersigned further agrees that, within five (5) days after a request from Landlord, the undersigned shall deliver to Landlord a statement certifying to the undersigned's address and the undersigned's driver license number and/or social security number, federal employer identification number or tax identification number, as applicable.

8.        The undersigned further agrees that Landlord shall not be first required to enforce against Tenant or any other person any liability, obligation or duty guaranteed hereby before seeking enforcement thereof against the undersigned. Suit may be brought and maintained against the undersigned by Landlord to enforce any liability, obligation or duty guaranteed hereby without joinder of Tenant or any other person. Notwithstanding the foregoing or anything to the contrary set forth herein, Landlord agrees that the liability of the Corporate Guarantor under the Corporate Guaranty (as such capitalized terms are defined in the Lease) shall be primary and the liability of the undersigned personal Guarantors under this Guaranty shall be secondary to the liability of the Corporate Guarantor under said Corporate Guaranty. In furtherance of the foregoing, Landlord agrees to first make a good faith effort to collect any outstanding obligations secured by the Corporate Guaranty from the Corporate Guarantor

I-10

Execution Copy

before causing the undersigned personal Guarantors to cover such obligations pursuant to this Guaranty; provided, however, that if the Corporate Guarantor, as of such time of potential enforcement of the Corporate Guaranty or at any time thereafter (i) is bankrupt or insolvent, (ii) has suffered the appointment of or possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator (or other similar official) of any substantial part of such Corporate Guarantor's assets, (iii) has made an assignment for the benefit of its creditor(s), (iv) has indicated to Landlord an inability to pay its debts as they come due, (v) is challenging or threatening to challenge the validity of the Corporate Guaranty or raising defenses to the enforcement thereof or (vi) if Landlord reasonably believes, in good faith, that the Corporate Guarantor does not have the financial means to satisfy any judgment sought to be obtained for the guaranteed obligations, then Landlord shall have the right, without pursuit or further pursuit (as applicable) of the Corporate Guarantor, to instead pursue the undersigned personal Guarantors under this Guaranty for such outstanding obligations.

9.      This Guaranty shall be continuing, absolute and unconditional and shall remain in full force and effect until all Guaranteed Payments are made, all Guaranteed Obligations are performed and all obligations of the undersigned Guarantor under this Guaranty are fulfilled.

10.      **Maximum Liability Amount.**  Notwithstanding anything herein to the contrary, the Guaranteed Obligations of the Guarantor(s) hereunder shall not exceed Four Hundred Thousand and No/100 Dollars ($400,000.00) in the aggregate (the "**Maximum Liability Amount**"), excluding from such Maximum Liability Amount any costs incurred by Landlord in connection with the enforcement of this Guaranty (which shall not be subject to such cap and for which Guarantor shall remain liable).

11.      This Guaranty shall be binding upon the undersigned and shall also bind the heirs, personal representatives, executors, administrators, successors and assigns of the undersigned Guarantor and shall inure to the benefit of Landlord and Landlord's heirs, executors, administrators, successors and assigns.

12.      If this Guaranty is executed by more than one person, all singular nouns and verbs herein relating to the undersigned Guarantor shall include the plural number, the obligations of the several Guarantors shall be joint and several, and Landlord may enforce this Guaranty against any one or more Guarantors without joinder of any other Guarantor (hereunder or otherwise).

13.      Landlord and the undersigned Guarantor intend and believe that each provision of this Guaranty comports with all applicable laws.  However, if any provision of this Guaranty is found by a court to be invalid for any reason, the remainder of this Guaranty shall continue in full force and effect and the invalid provision shall be construed as if it were not contained herein.

14.      It is understood that other agreements similar to this Guaranty may, at Landlord's sole option and discretion, be executed by other persons with respect to the Lease.  This Guaranty shall be cumulative of any such agreements and the liabilities and obligations of the undersigned Guarantor under this Guaranty shall in no event be affected or diminished by reason of any such other agreements. Moreover, in the event Landlord obtains another signature of more than one guarantor on this Guaranty or by obtaining additional guarantee agreements, or both, Guarantor agrees that Landlord, in Landlord's sole and absolute discretion, may (a) bring suit against all Guarantors of the Lease, jointly and severally, or against any one or more of them, (b) compound or settle with any one or more of the Guarantors for such consideration as Landlord may deem proper, and (c) release one or more of the Guarantors from liability.  The undersigned Guarantor further agrees that no such action shall impair the rights of Landlord

Execution Copy

to enforce the Lease or any guaranty obligations against any remaining Guarantor or Guarantors, including the undersigned Guarantor.

15.     This Guaranty shall be governed by and construed according to the laws of the State of Florida. The situs for the resolution (including any judicial proceedings) of any disputes arising under or relating to this Guaranty shall be county where the Leased Premises are located. The undersigned agrees that if either party shall employ an attorney to present, enforce or defend either Parties' rights or remedies hereunder, the prevailing party shall have any reasonable attorneys' fees and costs incurred by paid for by the other party.

16.     THE UNDERSIGNED AND LANDLORD (BY ACCEPTANCE OF THIS GUARANTY) EACH WAIVE ANY RIGHT THEY MAY HAVE TO REQUIRE THAT A JURY PARTICIPATE IN DECIDING ANY OR ALL ISSUES ARISING UNDER OR IN CONNECTION WITH THE LEASE OR THIS GUARANTY OR ANY OTHER DOCUMENT EXECUTED IN CONNECTION WITH THE LEASE OR THIS GUARANTY. THIS WAIVER SPECIFICALLY INCLUDES A WAIVER OF TRIAL BY JURY, APPLIES TO ALL PRESENT AND FUTURE RIGHTS, AND IS MADE TO THE FULLEST EXTENT PERMITTED BY LAW.

[Signature Page(s) Attached]

Execution Copy

DocuSign Envelope ID: C9FDBF25-1029-4BDB-8985-1DDC2E10956B

IN WITNESS WHEREOF, the undersigned Guarantor has executed this Guaranty as of this <u>28th</u> day of April, 2023, to be effective the same day as the Effective Date of the Lease.

| WITNESSES: | | GUARANTOR: |
|---|---|---|
| | | DocuSigned by:<br>*len Wanger*<br>—8FDB97B7431B4B4 |
| Print Name:_____ | | Printed Name: **LEONARD WANGER**<br>Address:_ 3838 N Kenneth Avenue ____<br>_Chicago, IL 60641 ____ |
| Print Name:_____ | | |
| | | Spouse of above Guarantor (if applicable): |
| | | Printed Name:_____<br>Address:_____<br>_____ |

| WITNESSES: | | GUARANTOR: |
|---|---|---|
| | | DocuSigned by:<br>*Philip N kaplan*<br>—FB38B4722A1424... |
| Print Name:_____ | | Printed Name: **PHILIP KAPLAN**<br>Address:_ 2443 Fillmore Street, #289 ___<br>_San Francisco, CA 94115 ___ |
| Print Name:_____ | | |
| | | Spouse of above Guarantor (if applicable): |
| | | Printed Name:_____<br>Address:_____<br>_____ |

I-13

## FIRST AMENDMENT TO LEASE AGREEMENT

THIS FIRST AMENDMENT TO LEASE AGREEMENT ("**Amendment**") is entered into this 8th day of February, 2024 ("**Amendment Effective Date**"), by and between 434 N. ORANGE INVESTMENT, LLC, a Delaware limited liability company ("**Landlord**") and VELOCITY ESPORTS ORLANDO DOWNTOWN, LLC, a Florida limited liability company ("**Tenant**"). Capitalized terms used herein and not otherwise defined shall have the same meaning as set forth in the Lease (as hereinafter defined) unless otherwise provided.

WHEREAS, Landlord and Tenant entered into that certain Retail Lease Agreement, dated April 28, 2023 (the "**Lease**"), with respect to the certain premises located within the Building known as "Society Orlando" and located at 410 N. Orange Ave., Orlando, Florida (the "**Premises**"), as more particularly set forth in the Lease;

WHEREAS, Landlord and Tenant desire to modify certain terms of the Lease and to confirm other obligations with respect to the Lease as described herein; and

NOW THEREFORE, in consideration of the premises and mutual covenants hereinafter contained and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant hereby agree as follows:

1.  Recitals. The foregoing recitals are true and correct and are incorporated herein in their entirety.

2.  Leased Premises. The first sentence of Section 3 of the Lease is hereby deleted in its entirety and replaced with the following: "That certain retail premises with approximately 14,788 square feet of rentable area located at 15 W Livingston Street, Orlando, Florida 32801 ("**Leased Premises**") as more particularly shown on the site plan attached as Exhibit "F" hereto, which Leased Premises shall be located in the building commonly known as "Society Orlando" (which building, together with all ancillary improvements appurtenant thereto, is herein collectively referred to as the "**Building**")."

3.  Base Rent. The parties hereby acknowledge and agree that Tenant timely requested to receive the maximum amount of the Additional Construction Allowance (i.e., $600,000.00) pursuant to Section 6 of the Tenant Work Letter, attached to the Lease as Exhibit E-1. In connection therewith, Section 6 of the Basic Lease Information Summary is hereby deleted in its entirety and replaced with the following:

"Commencing on the Rent Commencement Date, Tenant shall commence making payments of Base Rent at a rate of Thirty-Four and No/100 Dollars ($34.00) per rentable square foot for the first full twelve (12) month period (which may include any partial month in which the Rent Commencement Date occurs), with increases as set forth below (subject to the 50% Base Rent abatement shown below during the first 6 months of the first Lease Year):

| LEASE TERM | ANNUAL BASE RENT PER SQUARE FOOT | ANNUALIZED BASE RENT | MONTHLY BASE RENT** |
|---|---|---|---|
| Lease Year 1* (Months 1-6) | $17.00 | $251,396.00 | $20,949.67 |
| Lease Year 1* (Months 7-12) | $34.00 | $502,792.00 | $41,899.33 |
| Lease Year 2 | $35.02 | $517,875.76 | $43,156.31 |

-1-

| LEASE TERM | ANNUAL BASE RENT PER SQUARE FOOT | ANNUALIZED BASE RENT | MONTHLY BASE RENT** |
|---|---|---|---|
| Lease Year 3 | $36.07 | $533,412.03 | $44,451.00 |
| Lease Year 4 | $37.15 | $549,414.39 | $45,784.53 |
| Lease Year 5 | $38.27 | $565,896.83 | $47,158.07 |
| Lease Year 6 | $39.42 | $582,873.73 | $48,572.81 |
| Lease Year 7 | $40.60 | $600,359.94 | $50,030.00 |
| Lease Year 8 | $41.82 | $618,370.74 | $51,530.90 |
| Lease Year 9 | $43.07 | $636,921.86 | $53,076.82 |
| Lease Year 10 | $44.36 | $656,029.52 | $54,669.13 |
| Lease Year 11*** | $45.69 | $675,710.40 | $56,309.20 |

*During Months 1 to 6 of the First Lease Year, as shown above, Tenant shall only be required to pay partially (i.e., 50%) abated Base Rent in the amount of $20,949.67 (plus all sales tax thereon); provided, however, that if the Rent Commencement Period occurs on a day other than the first day of a calendar month, then the partially abated Base Rent shall apply for that month as well as the initial six (6) full months of Lease Year 1. During this six (6) month period during which Tenant is only required to pay partially (i.e., 50%) abated Base Rent, Tenant shall be required to pay full (i.e., 100%) unabated Additional Rent hereunder.

**Base Rent amounts exclude sales tax, which shall be paid by Tenant thereon in accordance herewith.

***Lease Year 11 shall only include months 121-126 of the Lease Term (i.e., 6 months)

4. Applicable Law. This Amendment shall be governed by and construed in accordance with the laws of the State of Florida.

5. Ratification of Lease. The Lease, as amended hereby, is in full force and effect, and is ratified and confirmed, and there are no other amendments or modifications therein. In the event of any conflicts between the terms and conditions of the Lease and the terms and conditions of this Amendment, the terms and conditions of this Amendment shall prevail. All terms and conditions of the Lease not modified by this Amendment shall remain in full force and effect.

6. Partial Invalidity or Unenforceability. The invalidity of one or more of the provisions of this Amendment shall not affect the remaining portions of this Amendment; and, if any one or more of the provisions of this Amendment should be declared invalid by final order, decree or judgment of a court of competent jurisdiction, this Amendment shall be construed as if such invalid provisions had not been included in this Amendment.

7. Execution and Counterparts. This Amendment may be executed in counterpart originals, each of which when taken together shall be deemed an original and shall constitute one and the same instrument. Signatures of the parties hereto on copies of this Amendment transmitted by facsimile machine or electronic mail shall be deemed originals for all purposes hereunder, and shall be binding upon the parties hereto.

IN WITNESS WHEREOF, the parties hereto have hereunto executed this Amendment, under seal, the day and year above written.

LANDLORD:

**434 N. ORANGE INVESTMENT, LLC,**
a Delaware limited liability company

By: _____

Name: Ryan Shear

Title: Authorized Signatory

TENANT:

**VELOCITY ESPORTS ORLANDO DOWNTOWN, LLC**, a Florida limited liability company

By: _____

Name: Leonard Wanger

Title: President

-3-

# EXHIBIT 2

## GUARANTY OF LEASE

In order to induce **434 N. ORANGE INVESTMENT, LLC**, a Delaware limited liability company ("**Landlord**") to execute the foregoing Retail Lease Agreement (the "**Lease**") with Velocity Esports Orlando Downtown, LLC, a Florida limited liability company ("**Tenant**"), for a certain Leased Premises located at 410 N. Orange Ave., Orlando, FL (which building, together with all ancillary improvements appurtenant thereto, is herein called the "**Building**"), the undersigned (whether one or more than one, "**Guarantor**") has guaranteed and by this instrument (the "**Guaranty**") does, subject to Section 10 hereof, hereby unconditionally guarantee the full and prompt payment of all rental amounts and other sums required to be paid by Tenant under the Lease (individually, a "**Guaranteed Payment**", and collectively, the "**Guaranteed Payments**"), and the full and faithful performance of all terms, conditions, covenants, liabilities, obligations, duties and agreements contained in the Lease on the Tenant's part to be performed (individually, a "**Guaranteed Obligation**", and collectively, the "**Guaranteed Obligations**"), as if the undersigned has executed the Lease as Tenant thereunder, and the undersigned Guarantor further promises to pay all of Landlord's costs and expenses (including reasonable attorneys' fees) incurred in endeavoring to collect the Guaranteed Payments or to enforce the Guaranteed Obligations or incurred in enforcing this Guaranty, as well as all damages which Landlord may suffer in consequence of any default or breach under the Lease or this Guaranty.

1.  Landlord may at any time and from time to time, without notice to or consent by the undersigned Guarantor, take any or all of the following actions without affecting or impairing the liability and obligations of the undersigned Guarantor on this Guaranty:

(i) grant an extension or extensions of time for payment of any Guaranteed Payment or time for performance of any Guaranteed Obligation;

(j) grant an indulgence or indulgences in the payment of any Guaranteed Payment or in the performance of any Guaranteed Obligation;

(k) modify or amend the Lease or any term thereof or any obligation of Tenant arising thereunder;

(l) consent to any assignment or assignments, sublease or subleases and successive assignments or subleases by Tenant or by Tenant's successors or assigns;

(m) consent to an extension or renewal (or extensions or renewals) of the Lease Term;

(n) accept other guarantees or guarantors;

(o) release any person primarily or secondarily liable hereunder or under the Lease or under any other guaranty of the Lease; and/or

(p) enter into any other covenants with respect to the Lease as Landlord may deem appropriate.

2.  The liability of the undersigned Guarantor under this Guaranty (a) shall not be affected, impaired, modified, changed, released or limited in any manner whatsoever by any failure or delay by Landlord in collecting or enforcing any Guaranteed Payment or enforcing any Guaranteed Obligation or this Guaranty or any security therefor or in exercising any right or power in respect thereto, or by any compromise, waiver, settlement, change, subordination, impairment, release, modification or disposition of any Guaranteed Payment or Guaranteed Obligation or of any security therefor, or by any indulgence, compromise, settlement or variation of terms which may be extended to Tenant by Landlord or agreed upon by Landlord and Tenant, and (b) shall not be impaired, modified, changed, released, or limited in any manner whatsoever by any impairment, modification, change, release, or limitation of the liability of Tenant or its estate in bankruptcy, or of any remedy for the enforcement thereof, resulting from the

I-9

Execution Copy

operation of any present or future provisions of the United States Bankruptcy Code or any similar law or statute of the United States or any State thereof.  In order to hold the undersigned Guarantor liable hereunder, there shall be no obligation on the part of Landlord, at any time, to resort to Tenant or to any other guaranty or to any security or other rights and remedies for payment or performance, and Landlord shall have the right to enforce this Guaranty irrespective of whether or not other proceedings or actions are pending or being taken seeking resort to or realization upon or from any of the foregoing.

3.      Landlord and Tenant, without notice to or consent by the undersigned, may at any time or times enter into such extensions, renewals, amendments, assignments, subleases, or other covenants with respect to the Lease as they may deem appropriate, and the undersigned shall not be released thereby, but shall continue to be fully liable for the payment and performance of all liabilities, obligations and duties of Tenant under the Lease as so extended, renewed, amended, assigned or otherwise modified.

4.      The undersigned hereby waives notice of acceptance of this Guaranty and all other demands and notices of any kind in connection with this Guaranty or any Guaranteed Payment or Guaranteed Obligation (including, without limitation, notices of dishonor or default by Tenant under the Lease, notice of acceleration or intent to accelerate, and notice of any extensions granted or other action taken in reliance hereon), and waives all diligence in collection or in protection of any security, presentment, protest, demand, or suit on the part of Landlord in the enforcement of any liability, obligation or duty guaranteed hereby.

5.      The undersigned Guarantor hereby acknowledges full and complete notice and knowledge of all the terms, conditions, covenants, obligations and agreements of the Lease.

6.      The payment by the undersigned Guarantor of any amount pursuant to this Guaranty shall not in any way entitle the undersigned Guarantor to any right, title or interest (whether by subrogation or otherwise) of Tenant under the Lease or to any security being held for any Guaranteed Payment or Guaranteed Obligation.

7.      The undersigned agrees that, within ten (10) days after a request from Landlord (but not more than once per calendar year, unless in connection with an uncured Tenant default, a proposed sale or refinance of the Building in whole or in part), the undersigned shall deliver to Landlord such financial statements as are reasonably required by Landlord to verify the net worth of the undersigned.  The undersigned further agrees that, within five (5) days after a request from Landlord, the undersigned shall deliver to Landlord a statement certifying to the undersigned's address and the undersigned's driver license number and/or social security number, federal employer identification number or tax identification number, as applicable.

8.      The undersigned further agrees that Landlord shall not be first required to enforce against Tenant or any other person any liability, obligation or duty guaranteed hereby before seeking enforcement thereof against the undersigned.  Suit may be brought and maintained against the undersigned by Landlord to enforce any liability, obligation or duty guaranteed hereby without joinder of Tenant or any other person.  Notwithstanding the foregoing or anything to the contrary set forth herein, Landlord agrees that the liability of the Corporate Guarantor under the Corporate Guaranty (as such capitalized terms are defined in the Lease) shall be primary and the liability of the undersigned personal Guarantors under this Guaranty shall be secondary to the liability of the Corporate Guarantor under said Corporate Guaranty.  In furtherance of the foregoing, Landlord agrees to first make a good faith effort to collect any outstanding obligations secured by the Corporate Guaranty from the Corporate Guarantor

I-10

Execution Copy

before causing the undersigned personal Guarantors to cover such obligations pursuant to this Guaranty; provided, however, that if the Corporate Guarantor, as of such time of potential enforcement of the Corporate Guaranty or at any time thereafter (i) is bankrupt or insolvent, (ii) has suffered the appointment of or possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator (or other similar official) of any substantial part of such Corporate Guarantor's assets, (iii) has made an assignment for the benefit of its creditor(s), (iv) has indicated to Landlord an inability to pay its debts as they come due, (v) is challenging or threatening to challenge the validity of the Corporate Guaranty or raising defenses to the enforcement thereof or (vi) if Landlord reasonably believes, in good faith, that the Corporate Guarantor does not have the financial means to satisfy any judgment sought to be obtained for the guaranteed obligations, then Landlord shall have the right, without pursuit or further pursuit (as applicable) of the Corporate Guarantor, to instead pursue the undersigned personal Guarantors under this Guaranty for such outstanding obligations.

9.      This Guaranty shall be continuing, absolute and unconditional and shall remain in full force and effect until all Guaranteed Payments are made, all Guaranteed Obligations are performed and all obligations of the undersigned Guarantor under this Guaranty are fulfilled.

10.     Maximum Liability Amount.  Notwithstanding anything herein to the contrary, the Guaranteed Obligations of the Guarantor(s) hereunder shall not exceed Four Hundred Thousand and No/100 Dollars ($400,000.00) in the aggregate (the "**Maximum Liability Amount**"), excluding from such Maximum Liability Amount any costs incurred by Landlord in connection with the enforcement of this Guaranty (which shall not be subject to such cap and for which Guarantor shall remain liable).

11.     This Guaranty shall be binding upon the undersigned and shall also bind the heirs, personal representatives, executors, administrators, successors and assigns of the undersigned Guarantor and shall inure to the benefit of Landlord and Landlord's heirs, executors, administrators, successors and assigns.

12.     If this Guaranty is executed by more than one person, all singular nouns and verbs herein relating to the undersigned Guarantor shall include the plural number, the obligations of the several Guarantors shall be joint and several, and Landlord may enforce this Guaranty against any one or more Guarantors without joinder of any other Guarantor (hereunder or otherwise).

13.     Landlord and the undersigned Guarantor intend and believe that each provision of this Guaranty comports with all applicable laws.  However, if any provision of this Guaranty is found by a court to be invalid for any reason, the remainder of this Guaranty shall continue in full force and effect and the invalid provision shall be construed as if it were not contained herein.

14.     It is understood that other agreements similar to this Guaranty may, at Landlord's sole option and discretion, be executed by other persons with respect to the Lease.  This Guaranty shall be cumulative of any such agreements and the liabilities and obligations of the undersigned Guarantor under this Guaranty shall in no event be affected or diminished by reason of any such other agreements. Moreover, in the event Landlord obtains another signature of more than one guarantor on this Guaranty or by obtaining additional guarantee agreements, or both, Guarantor agrees that Landlord, in Landlord's sole and absolute discretion, may (a) bring suit against all Guarantors of the Lease, jointly and severally, or against any one or more of them, (b) compound or settle with any one or more of the Guarantors for such consideration as Landlord may deem proper, and (c) release one or more of the Guarantors from liability.  The undersigned Guarantor further agrees that no such action shall impair the rights of Landlord

I-11

to enforce the Lease or any guaranty obligations against any remaining Guarantor or Guarantors, including the undersigned Guarantor.

15.    This Guaranty shall be governed by and construed according to the laws of the State of Florida. The situs for the resolution (including any judicial proceedings) of any disputes arising under or relating to this Guaranty shall be county where the Leased Premises are located. The undersigned agrees that if either party shall employ an attorney to present, enforce or defend either Parties' rights or remedies hereunder, the prevailing party shall have any reasonable attorneys' fees and costs incurred by paid for by the other party.

16.    THE UNDERSIGNED AND LANDLORD (BY ACCEPTANCE OF THIS GUARANTY) EACH WAIVE ANY RIGHT THEY MAY HAVE TO REQUIRE THAT A JURY PARTICIPATE IN DECIDING ANY OR ALL ISSUES ARISING UNDER OR IN CONNECTION WITH THE LEASE OR THIS GUARANTY OR ANY OTHER DOCUMENT EXECUTED IN CONNECTION WITH THE LEASE OR THIS GUARANTY. THIS WAIVER SPECIFICALLY INCLUDES A WAIVER OF TRIAL BY JURY, APPLIES TO ALL PRESENT AND FUTURE RIGHTS, AND IS MADE TO THE FULLEST EXTENT PERMITTED BY LAW.

[Signature Page(s) Attached]

I-12

Execution Copy

DocuSign Envelope ID: C9FDBF25-1029-4BDB-8985-1DDC2E10956B

IN WITNESS WHEREOF, the undersigned Guarantor has executed this Guaranty as of this <u>28th</u> day of April, 2023, to be effective the same day as the Effective Date of the Lease.

| WITNESSES: | | GUARANTOR: |
|---|---|---|
| | | DocuSigned by: |
| | | *lun Wanger* |
| | | 8FDB97B7431B4B4 |
| Print Name:_____ | | Printed Name: **LEONARD WANGER** |
| | | Address:_ 3838 N Kenneth Avenue |
| Print Name:_____ | | Chicago, IL 60641 |
| | | Spouse of above Guarantor (if applicable): |
| | | Printed Name:_____ |
| | | Address:_____ |

| WITNESSES: | | GUARANTOR: |
|---|---|---|
| | | DocuSigned by: |
| | | *Philip N kaplan* |
| | | FB38B84722A1424... |
| Print Name:_____ | | Printed Name: **PHILIP KAPLAN** |
| | | Address:_ 2443 Fillmore Street, #289 |
| Print Name:_____ | | San Francisco, CA 94115 |
| | | Spouse of above Guarantor (if applicable): |
| | | Printed Name:_____ |
| | | Address:_____ |

I-13

Execution Copy

# EXHIBIT 3

## LEASE TERMINATION AND SURRENDER AGREEMENT

**THIS LEASE TERMINATION AND SURRENDER AGREEMENT** (this "Agreement"), dated as of December 2nd, 2024 (the "Effective Date"), by and between **434 N. ORANGE INVESTMENT, LLC**, a Delaware limited liability company ("Landlord"); **VELOCITY ESPORTS ORLANDO DOWNTOWN, LLC**, a Florida limited liability company ("Tenant"); and **VELOCITY ESPORTS INC.**, a Nevada corporation, **LEONARD WANGER**, individually; and **PHILIP KAPLAN**, individually (collectively referred to as the "Guarantors") recites and provides:

### RECITALS:

A.      Pursuant to that certain Retail Lease Agreement dated April 28, 2023, as amended by that certain First Amendment to Lease Agreement, dated February 8, 2024 (collectively, the "Lease"), and the Guaranty of Leases dated April 28, 2023 (collectively the "Guarantees"), Landlord leased to Tenant a certain premises containing approximately 14,788 rentable square feet located in the building commonly known as "Society Orlando" located at 410 N., Orange Ave., Orlando, FL 32801 (the "Leased Premises"), as more particularly described in the Lease.

B.      Although the Term of the Lease is not yet scheduled to expire, Landlord is willing to enter into this Agreement, at Tenant's request, to terminate the Lease early, upon the terms and conditions set forth below.

### AGREEMENT:

For and in consideration of the covenants set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant hereby agree as follows:

1.      <u>Recitals and Defined Terms</u>. The foregoing Recitals are hereby incorporated herein and made a part hereof to the same extent as if set forth in full in this Agreement. All terms not herein defined shall have the meaning ascribed to them in the Lease.

2.      <u>Termination Date</u>. Landlord and Tenant agree that the Lease and all rights and obligations of the parties thereunder shall be conditionally terminated effective as of the Effective Date (the "Termination Date"), subject to (and contingent upon) Tenant's timely satisfaction of the Termination Conditions as set forth in Section 3 immediately below on or before the applicable Termination Condition Deadline (as hereinafter defined).

3.      <u>Termination Conditions</u>. Landlord and Tenant agree that this Agreement, the termination of the Lease and the effectiveness of the termination on the Termination Date shall be contingent upon and subject to the following conditions being satisfied in the time periods specified herein, time being of the essence (collectively, the "Termination Conditions"):

(i)      Landlord and Tenant execute this Agreement in a timely manner pursuant to Section 14 of this Agreement;

(ii)     Tenant shall deliver up and surrender to Landlord possession of the Leased Premises in the condition and manner required herein on the Termination Date; and

(iii)    Tenant shall have timely complied with all terms and conditions of this Agreement, including, without limitation, the timely and full payment of all amounts set forth in Section

1

Docusign Envelope ID: E8C4B522-5G2C-449E-8C75-404E16FEB85A

4 below.

For the avoidance of doubt, all Termination Conditions shall be satisfied on the Termination Date but for the payment of all required Monthly Termination Payment(s), the last of which shall be paid on or before September 1, 2025 (such deadline(s) are individually and collectively referred to herein as the "Termination Condition Deadline").

4.    Initial Termination Payment; Forfeiture of Security Deposit and Prepaid Rent.

(a)    Upon the Effective Date of this Agreement, Tenant shall forfeit and surrender to Landlord and irrevocably release any of Tenant's claim and interest in and to both (i) Tenant's Security Deposit in the amount of $54,000.00, as well as (ii) the first month's Rent previously pre-paid by Tenant in the amount of $53,557.21.

(b)    On or before December 15, 2024, Tenant shall, as partial consideration for Landlord's execution of this Agreement pay to Landlord a termination payment in the amount of $75,778.25 (the "Initial Termination Payment");

(c)    Commencing January 1, 2025, and continuing on the first (1st) day of each calendar month thereafter through and including September 1, 2025, Tenant shall, as partial consideration for Landlord's execution of this Agreement, pay to Landlord a series of nine (9) consecutive monthly payments in the amount of $21,725.58 per month (the "Monthly Termination Payment(s)"). Each Monthly Termination Payment shall have a grace period of five (5) days from the due date. Payments received after this grace period shall be deemed a breach of this Agreement.

(d)    Tenant hereby agrees to pay, upon the Effective Date, Landlord's reasonable out of pocket legal fees incurred in connection with the preparation and negotiation of this Agreement.

(e)    Tenant shall satisfy and cause to be released, prior to the Termination Date, any construction liens affecting the Leased Premises that are attributable to the actions or omissions of Tenant and shall pay, in full, all contractors, suppliers or materialmen who have provided goods or materials or rendered services to Tenant that could result in any construction liens being recorded against the Leased Premises or the Building (which obligation shall survive termination of the Lease).

(f)    Notwithstanding anything herein to the contrary, all indemnities of Tenant expressly provided for in the Lease will survive termination of the Lease in accordance with the terms thereof.

5.    Guarantors. The undersigned Guarantors of the Lease join in and execute this Agreement for the purpose of guaranteeing the obligations of Tenant under this Agreement.

6.    Surrender of Leased Premises. Landlord and Tenant agree that Tenant shall surrender the Leased Premises to Landlord on the Termination Date in good condition and repair and shall deliver all keys to the Leased Premises to Landlord. Tenant shall have the right to remove all of Tenant's inventory and other personal property from the Leased Premises on or before the Termination Date, provided any damage to the Leased Premises caused thereby shall be promptly repaired by Tenant at its sole cost and expense in accordance with the requirements of the Lease. The parties hereto further agree that Tenant shall not be permitted to remove any alterations, fixtures or improvements to the Leased Premises prior to the Termination Date unless Landlord specifically requests that Tenant remove the same prior to the Termination Date. Within five (5) days after Tenant's surrender of the Leased Premises to Landlord on the Termination Date, Landlord shall conduct an inspection of the Leased Premises. If Landlord fails to provide Tenant with a written list of deficiencies based on said inspection within said five (5) day period, the Leased

Premises shall be deemed accepted by Landlord in the condition as surrendered by Tenant, and Tenant shall be released from any further obligations concerning the condition of the Leased Premises at the time of surrender.

7.     Release.

(a)     Tenant hereby forever remises, releases and quitclaims unto Landlord all right, title and interest of Tenant in and to the Leased Premises under the Lease effective upon the Termination Date.  In consideration of Landlord's execution of this Agreement, Tenant hereby forever fully releases, remises, acquits and discharges Landlord and its affiliates and their respective officers, directors, agents, shareholders, members, partners and employees of and from any and all claims, demands, agreements, contracts, covenants, actions, suits, causes of action, obligations, controversies, debts, costs, expenses, accounts, charges, judgments, executions, losses and liabilities of whatever kind or nature, in law, equity or otherwise, whether known or unknown (collectively, "Lease Related Claims"), which Tenant may have had, now has or can, shall or may have for or by reason of any matter, cause or thing whatsoever arising out of or in any way connected with the Lease.

(b)     Subject to (and contingent upon) Tenant's timely satisfaction of the Termination Conditions set forth in Section 3 above by the applicable Termination Condition Deadline, Landlord shall be deemed to have fully released, remised, acquitted and discharged Tenant and the undersigned Guarantors from any and all Lease Related Claims, which Landlord may have had, now has or can, shall or may have for or by reason of any matter, cause or thing whatsoever arising out of or in any way connected with the Lease and the Guarantees thereof signed by the undersigned Guarantors. For the avoidance of doubt, if Tenant fails to timely (including the grace period set forth in Section 4(c)) satisfy the Termination Conditions set forth in Section 3 above by the applicable Termination Condition Deadline, then this release of Tenant and the undersigned Guarantors from any Lease Related Claims shall be null and void and of no further force and effect.

8.     Representations and Acknowledgments.  Landlord and Tenant each represent and warrant to the other that this Agreement has been duly authorized, executed and delivered by all necessary action on its behalf, constitutes the valid and binding agreement of such party and is enforceable in accordance with its terms.

9.     Confidentiality.  Each party understands and agrees that the terms of this Agreement are highly confidential and that neither it nor any of its officers, directors, employees, representatives, agents and all others working for such party is to disclose the terms and conditions of this Agreement (the "Confidential Information"), except as required by law, release or disclose any Confidential Information to any other person, except to such party's employees, attorneys, accountants, representatives, agents, engineers, consultants, advisors and lenders and financial partners who need to know the Confidential Information in connection with the consummation of the transactions contemplated by this Agreement, who are informed by the disclosing party of the confidential nature of the Confidential Information, and who agree to be bound by the terms and conditions of this section.  The Confidential Information shall not include any information which can be shown to be or have become generally available to the public other than as a result of a disclosure by the disclosing party or its officers, directors, employees, attorneys, accountants, representatives, agents, consultants or advisors.  Each party hereby acknowledges and agrees that, in the event that the other party has reasonable cause to believe that this Paragraph has been breached by the other party or any of its officers, directors, employees, representatives, agents or any others working for such party, the non-breaching party may, in its sole discretion, pursue any remedy at law or in equity that it may have for such breach.

10.     Brokerage Commission.  Each party represents and warrants that it has not engaged the

services of or dealt with any broker, salesperson or other entity who may claim a commission or other payment in conjunction with this Agreement. Each party agrees to indemnify, defend and hold the other harmless from and against all loss, claims, costs and expenses (including attorneys' fees) caused by a breach of the foregoing representation.

11.    Miscellaneous. This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior discussions, understandings or agreements between the parties. In the event of any inconsistency between the terms of the Lease and this Agreement, the terms of this Agreement shall in all cases govern. This Agreement may be modified only by a written instrument duly executed by the parties hereto. Landlord and Tenant covenant and agree to execute and deliver, or cause to be executed and delivered, and to do or make, or cause to be done or made, upon the reasonable request of the other party, any and all instruments, papers, deeds, acts or things, supplemental, confirmatory or otherwise, as may be reasonably required for the purpose of effecting the termination and release described herein. This Agreement shall bind and inure to the benefit of the parties hereto and their respective heirs, personal representatives, successors and assigns. If any term, provision, covenant or condition of this Agreement or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Agreement or the application of such term, provision, covenant or condition to persons or circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby and each term, provision, covenant or condition of this Agreement shall be valid and be enforceable to the fullest extent permitted by law.

12.    Governing Law. This Agreement shall be governed by and construed and interpreted in accordance with the laws of the State of Florida, without regard to conflicts of laws principles.

13.    Counterparts; Delivery. This Agreement may be executed in any number of separate counterparts by the parties hereto, each of which, when so executed and delivered, shall be deemed to be an original, and all of which counterparts, taken together, shall constitute one and the same instrument. Any signature page from any such counterpart may be attached to any other counterpart to complete a fully executed counterpart of this Agreement. Signatures to this Agreement (or to any assignment or amendment to this Agreement) transmitted in a commonly accepted electronic format that reproduces an image of the actual executed signature page shall be deemed a binding original and shall have the same legal effect, validity, and enforceability as a manually executed counterpart of the document to the extent and as provided for in the Federal Electronic Signatures in Global and National Commerce Act and the applicable state law based on the Uniform Electronic Transactions Act. In no event shall any party be obligated hereunder unless and until this Agreement has been fully executed and delivered by all parties hereto.

14.    Automatic Rescission; Waiver of Jury Trial.

(a)    If either (x) the Termination Conditions are not satisfied by the applicable Termination Condition Deadline, as confirmed by Landlord, (y) this Agreement has not been fully-executed and delivered by all parties hereto by December 4, 2024, or (z) Tenant otherwise fails to abide by its obligations under this Agreement (including without limitation Tenant's obligation to timely and fully pay the all amounts owed pursuant to Section 4 hereof, subject to the grace period set forth in Section 4(c)), time being of the essence in each instance, then Landlord may elect, in its sole discretion, upon written notice to Tenant, to rescind and cancel this Agreement, in which case (i) this Agreement shall be null and void (except for the terms of this paragraph which shall survive such rescission and cancellation) and (ii) Landlord shall be entitled to immediately, and, without further notice, demand repayment of all Rent (e.g., Base Rent and Additional Rent) owed under the Lease, and pursue all remedies set forth in the Lease for an event of default by Tenant thereunder (including, without limitation, the remedy of acceleration).

(b)    For the avoidance of doubt and notwithstanding anything herein to the contrary, if this

Docusign Envelope ID: E8C4B522-5C2C-449E-8C75-404E16FEB85A

Agreement is rescinded and cancelled by Landlord in accordance with Section 14(a) above, then Landlord shall be permitted to retain (and shall have no obligation to return to Tenant) any deposit(s) and/or amounts previously paid to or forfeited to Landlord pursuant to Section 4 hereof, which payments or amounts shall be applied by Landlord against all damages, liabilities, costs, fees or amounts due and payable by Tenant to Landlord in connection with any Tenant default under the Lease and/or this Agreement.

(c)    IT IS AGREED BY AND AMONG LANDLORD, TENANT AND THE UNDERSIGNED GUARANTORS THAT THE RESPECTIVE PARTIES HERETO SHALL AND HEREBY DO WAIVE A RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY ANY OF THE PARTIES HERETO AGAINST THE OTHER ON ANY MATTERS ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT.

(d)    If Landlord, Tenant or Guarantors shall deem it necessary to engage attorneys or institute any suit against the other in connection with the enforcement of their respective rights under this Agreement, the declaration of their rights hereunder, or the protection of Landlord's, Tenant's or Guarantors' interests under this Agreement, the non-prevailing party shall reimburse the prevailing party for its reasonable expenses incurred as a result thereof including, without limitation, reasonable court costs and reasonable attorneys' fees.

[Signature Page(s) Attached]

**IN WITNESS WHEREOF,** the parties have executed or caused this Agreement to be executed on their behalf by their duly authorized representatives as of the Effective Date.

**LANDLORD:**

**434 N. ORANGE INVESTMENT, LLC,**
a Delaware limited liability company

By:_____
Print Name: Ryan Shear
Title: Authorized Signatory

**TENANT:**

**VELOCITY ESPORTS ORLANDO DOWNTOWN, LLC,** a Florida limited liability company

By:_____
Print Name:_____ Wanger
Title: President

**GUARANTOR(S):**

VELOCITY ESPORTS INC., a Nevada corporation

By:_____
Print Name: Philip N Kaplan
Title: board member

LEONARD WANGER

PHILIP KAPLAN

# EXHIBIT 4



**NEVADA BANKRUPTCY**
A T T O R N E Y S

Matthew I. Knepper, Esq. | Brenden Gougeon, Esq. | Shawn W. Miller, Esq.
5940 S Rainbow Blvd Ste 400, PMB 99721
Las Vegas, Nevada 89118
Phone: 702.880.5554 | e-mail: mknepper@nvbankruptcyattorneys.com

February 6, 2025

**_Sent via E-Mail and First Class U.S. Mail to_**:

Property Markets Group
Attention: Spencer Young
398 NE 5th St, 13th Fl
Miami, FL 33132
Email: syoung@propertymg.com

**Re: Notice of Representation of Velocity Esports Inc. and Affiliated LLCs in Chapter 11 Bankruptcy**

Dear Mr. Young,

Nevada Bankruptcy Attorneys ("NBA") represents Velocity Esports Inc. as Chapter 11 bankruptcy counsel in connection with its anticipated filing under Chapter 11 of the U.S. Bankruptcy Code. NBA also represents its affiliated limited liability companies: Velocity Esports Newport Kentucky, LLC, Velocity Esports Newport Kentucky II, LLC, Velocity Esports Las Vegas Town Square, LLC, Velocity Esports Chicago Schaumburg, LLC, and Velocity Esports Orlando Downtown, LLC (collectively, "Velocity"). as Chapter 11 bankruptcy counsel in connection with their anticipated filing under Chapter 11 of the U.S. Bankruptcy Code.

As a critical vendor and key creditor, we want to inform you of Velocity's restructuring efforts. Over the next two weeks, you should expect direct outreach from our office regarding potential prepackaged agreements for treatment under Velocity's proposed Chapter 11 Plan of Reorganization.

NBA is serving as legal counsel throughout this process, and we encourage you or your legal counsel to contact **Matthew Knepper, Esq.** directly at **mknepper@nvbankruptcyattorneys.com** with any immediate questions or concerns regarding Velocity's restructuring efforts.

//

Velocity is committed to an efficient and transparent restructuring process. It seeks to maximize value for all stakeholders by maintaining open lines of communication, providing regular updates on key developments, and working collaboratively to achieve fair and equitable resolutions. We appreciate your cooperation and look forward to working with you to achieve a mutually beneficial outcome.

Sincerely,

Matthew I. Knepper, Esq.
**Nevada Bankruptcy Attorneys**
Nevada Bankruptcy Attorneys
Email: mknepper@nvbankruptcyattorneys.com
Website: www.nvbankruptcyattorneys.com

# EXHIBIT 5



**Reply to:**
**JOSH M. RUBENS**
jrubens@klugerkaplan.com
(305) 379-9000

February 14, 2025

**VIA EMAIL**

Matthew I. Knepper, Esq.
Nevada Bankruptcy Attorneys
5940 S Rainbow Blvd.
Ste 400, PMB 99721
Las Vegas, Nevada 89118
mknepper@nvbankruptcyattorneys.com

Ryan Stibor, Esq.
Davis Stibor
3900 S. Hualapai Way, Suite 200
Las Vegas, NV 89147
ryan@davisstibor.com

Re:  Lease Termination and Surrender Agreement dated December 2, 2024 (the "Termination Agreement") between 434 N. Orange Investment, LLC ("Landlord"), on the one hand, and Velocity Esports Orlando Downtown, LLC ("Former Tenant"), Velocity Esports Inc. ("Corporate Guarantor"), Leonard Wanger ("Wanger"), and Philip Kaplan ("Kaplan") (collectively, Corporate Guarantor, Wanger, and Kaplan are referred to as "Guarantors"), on the other hand

Dear Matthew and Ryan:

This firm represents Landlord. This correspondence responds to Matthew's February 6, 2025 letter on behalf of Former Tenant and Corporate Guarantor stating that Former Tenant and Corporate Guarantor will be pursuing relief under the bankruptcy code.

Former Tenant has failed to satisfy the Termination Conditions on or before the Termination Condition Deadline.[1] Termination Agreement at ¶¶ 3-4. Specifically, Former Tenant and Guarantors have failed to timely pay, in full, the Initial Termination Payment in the amount of $75,778.25 that was due on or before December 15, 2024, along with Landlord's "reasonable out of pocket legal fees incurred in connection with the preparation and negotiation of this Agreement." *Id.* at ¶¶ 4(b) and (d), 5.

Given Former Tenant's breaches of the Termination Agreement, the Retail Lease Agreement dated April 28, 2023, as amended by that certain First Amendment to Lease Agreement, dated February 8, 2024 (the "Lease"), has not been terminated and Landlord's conditional release in favor Former Tenant and Guarantors set forth in the Termination Agreement is not effective. *Id.* at ¶ 7(b) ("For the avoidance of doubt, if Tenant fails to timely (including the grace period set forth in Section 4(c)) satisfy the Termination Conditions set forth in Section 3 above by the applicable Termination Condition Deadline, then this release of Tenant and the undersigned Guarantors from any Lease Related Claims shall be null and void and of no further

---

[1] All capitalized terms not defined herein shall have the meanings ascribed to them in the Termination Agreement.

Matthew I. Knepper, Esq.
Ryan Stibor, Esq.
February 14, 2025
Page 2

force and effect"). This correspondence serves as notice that Landlord has elected to rescind and cancel the Termination Agreement. *Id.* at ¶ 14(a)-(b).

Please note that the Lease contains certain rights in favor of Landlord in the event of Former Tenant's bankruptcy. *See* Lease ¶ at 13.3. Landlord intends to enforce its rights.

Separate and apart from Landlord's rights against Former Tenant under the Lease and the bankruptcy code, Landlord intends to pursue its rights against Wanger and Kaplan, as guarantors, to collect all amounts owed to Landlord under the Lease.

Landlord reserves and preserves all of its rights against Former Tenant and Guarantors under the Lease, Termination Agreement, and Florida law, and waives no such rights.

Regards,

**KLUGER, KAPLAN, SILVERMAN, KATZEN & LEVINE, P.L.**

By: /s/ Josh M. Rubens
      Josh M. Rubens, Esq.

cc:    Landlord

# EXHIBIT 6


**KLUGER KAPLAN**

**Reply to:**
JOSH M. RUBENS
jrubens@klugerkaplan.com
(305) 379-9000

March 7, 2025

**VIA EMAIL**

Leonard Wanger
3838 N. Kenneth Avenue
Chicago, IL 60641
len.wanger@velocityesports.com

Philip Kaplan
2443 Fillmore Street, #289
San Francisco, CA 94115
phil.kaplan@velocityesports.com

**Re:**  Retail Lease Agreement dated April 28, 2023 between 434 N. Orange Investment, LLC ("Landlord"), on the one hand, and Velocity Esports Orlando Downtown, LLC ("Tenant"), as amended by that certain First Amendment to Lease Agreement, dated February 8, 2024 (collectively, the "Lease"), and the Guaranty of Lease dated April 28, 2023 ("Guaranty") between Landlord, on the one hand, and Leonard Wanger ("Wanger"), and Philip Kaplan ("Kaplan") (collectively the "Guarantors"), on the other hand

Dear Mr. Wanger and Mr. Kaplan:

This firm represents Landlord. As set forth in correspondence dated February 14, 2025, a copy of which is enclosed, Tenant failed to satisfy its obligations under the Lease Termination and Surrender Agreement dated December 2, 2024 (the "Termination Agreement"), and therefore Landlord retains all claims against Tenant and Guarantors under the Lease and Guaranty, respectively.

The Guaranty states that Guarantors "hereby unconditionally guarantee the full and prompt payment of all rental amounts and other sums required to be paid by Tenant under the Lease (individually, a 'Guaranteed Payment', and collectively, the 'Guaranteed Payments') …." limited to $400,000.00, plus attorneys' fees and costs in enforcing the Guaranty. Guaranty at p. 1, ¶ 10.

Velocity Esports, Inc.'s ("Corporate Guarantor") and Tenant's bankruptcy do not limit Guarantors' liability under the Guaranty. *Id.* at ¶ 2(b) ("The liability of the undersigned Guarantor under this Guaranty …. shall not be impaired, modified, changed, released, or limited in any manner whatsoever by any impairment, modification, change, release, or limitation of the liability of Tenant or its estate in bankruptcy, or of any remedy for the enforcement thereof, resulting from the operation of any present or future provisions of the United States Bankruptcy Code or any similar law or statute of the United States or any State thereof ….").

Further, given that Corporate Guarantor is insolvent, bankrupt, and "has indicated to Landlord an inability to pay its debts as they come due", Landlord "reasonably believes, in good faith, that the Corporate Guarantor does not have the financial means to satisfy any judgment sought to be obtained for the guaranteed obligations". Each of those reasons standing alone entitles Landlord to pursue claims against Guarantors without pursuing Corporate Guarantor further.

Leonard Wanger
Philip Kaplan
March 7, 2025
Page 2

Landlord's damages from Tenant's breach of the Lease are extensive, inclusive of all rent owed during the remaining term of the Lease, plus attorneys' fees and costs. Landlord hereby demands full and prompt payment of a total of $400,000.00 from Guarantors, in full satisfaction of their obligation under the Guaranty, within ten (10) days or by March 17, 2025.

In accordance with paragraph 7 of the Guaranty, Landlord also hereby demands that each Guarantor timely deliver to Landlord (i) current financial statements sufficient to verify the net worth of each Guarantor, and (ii) statements certifying to each Guarantor's address and driver license number, and social security number.

Landlord reserves and preserves all of its rights against Guarantors under the Lease, Guaranty, Termination Agreement, and Florida law, and waives no such rights.

Regards,

**KLUGER, KAPLAN, SILVERMAN, KATZEN & LEVINE, P.L.**

By: /s/ Josh M. Rubens _____
        Josh M. Rubens, Esq.


cc:    Landlord